JS 44 CAND (Rev. 12/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| MARTHA DAVIS, as assignee of "THE MOTELS," on behalf of herself and all others similarly situated, | EMI GROUP LIMITED |

**(b)** County of Residence of First Listed Plaintiff    Columbia, OR
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Raymond P. Boucher, Esq., KIESEL BOUCHER LARSON LLP
8648 Wilshire Boulevard, Beverly Hills, CA 90211
Tel.: (310) 854-4444

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1   U.S. Government Plaintiff | ☐ 3   Federal Question *(U.S. Government Not a Party)* |
| ☐ 2   U.S. Government Defendant | X   4   Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | X 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | X 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 340 Marine | Liability | | | ☐ 480 Consumer Credit |
| | ☐ 345 Marine Product | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | |
| X 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | ☐ 385 Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | Injury | Product Liability | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | ☐ 362 Personal Injury - Med. Malpractice | | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| X 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district *(specify)* | ☐ 6 Multidistrict Litigation |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Section 1332 (d)
Brief description of cause:
Breach of Contract

## VII. REQUESTED IN COMPLAINT:
X   CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** According to Proof    CHECK YES only if demanded in complaint:
**JURY DEMAND:**   X Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE   Hon. Yvonne Gonzalez Rogers    DOCKET NUMBER   CV 12-01002-YGR

## IX. DIVISIONAL ASSIGNMENT (Civil L.R. 3-2)
*(Place an "X" in One Box Only)*    X   SAN FRANCISCO/OAKLAND    ☐ SAN JOSE    ☐ EUREKA

DATE   March 30, 2012      SIGNATURE OF ATTORNEY OF RECORD 

FILED

2012 MAR 30 P 1: 36

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  Bruce L. Simon (Bar No. 96241)
   Robert G. Retana (Bar No. 148677)
2  **PEARSON, SIMON, WARSHAW & PENNY, LLP**
   44 Montgomery Street, Suite 2450
3  San Francisco, California 94104
   Telephone: (415) 433-9000
4  Facsimile: (415) 433-9008
   Email: bsimon@pswplaw.com
5  Email: rretana@pswplaw.com

6  Neville L. Johnson (Bar No. 66329)
   **JOHNSON & JOHNSON LLP**
7  439 N. Canon Drive, Suite 200
   Beverly Hills, California 90210
8  Telephone: (310) 975-1080
   Facsimile: (310) 975-1095
9  Email: njohnson@jjllplaw.com

10 Michael D. Hausfeld                    Raymond P. Boucher (Bar No. 115364)
   James J. Pizzirusso                     Jeffrey A. Koncius (Bar No. 189803)
11 **HAUSFELD LLP**                        **KIESEL BOUCHER LARSON LLP**
   1700 K Street, NW Suite 650            8648 Wilshire Boulevard
12 Washington, D.C. 20006                 Beverly Hills, California 90211
   Telephone: (202) 540-7200             Telephone: (310) 854-4444
13 Facsimile: (202) 540-7201             Facsimile: (310) 854-0812
   Email: mhausfeld@hausfeldllp.com      Email: boucher@kbla.com
14 Email: jpizzirusso@hausfeldllp.com     Email: koncius@kbla.com

15  Attorneys for Plaintiff and the Class

16  [Additional Counsel Appear on Signature Pages]

17              **UNITED STATES DISTRICT COURT**

18            **NORTHERN DISTRICT OF CALIFORNIA**

19  C V   1 2   1 6 0 2

20  MARTHA DAVIS, as assignee of "THE          CASE NO.
    MOTELS," on behalf of herself and all others
21  similarly situated,                         **COMPLAINT**

22              Plaintiff,                       **CLASS ACTION**

23      vs.                                      **JURY TRIAL DEMANDED**

24  EMI GROUP LIMITED,

25              Defendant.

26

27

28

E-filing

MEJ

COMPLAINT

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1  Plaintiff Martha Davis as assignee of "The Motels" on behalf of herself and all others

2  similarly situated, alleges upon personal knowledge as to herself and her own acts, and upon

3  information and belief as to all other matters, based upon, *inter alia*, the investigation made by and

4  through her attorneys, as follows:

5  ## I. NATURE OF THE ACTION

6  1.  Plaintiff brings this nationwide class action for breach of contract and statutory

7  violations of California law against Defendant EMI Group Limited, a business entity

8  headquartered in the United Kingdom, but that undertakes significant business activity in this

9  State and District, through its divisions, related and affiliated entities, owned and distributed

10 record labels, and predecessors in interest including, but not limited to, the entity previously

11 headquartered in Hollywood and known as "Capitol Records" (collectively "EMI"), for EMI's

12 failure to properly account to Plaintiff and Class members for royalties stemming from the

13 licensing of Plaintiff's and Class members' musical performances or recordings produced by them

14 that were utilized by "Music Download Providers," "Music Streaming Providers" and "Ringtone

15 Providers" (collectively "Digital Content Providers") for digital download, streaming and

16 distribution.

17 2.  Plaintiff seeks monetary damages, injunctive, and/or declaratory relief against EMI

18 for its willful violation of contracts between itself and recording artists and/or music producers

19 through which EMI obtained recording artists' and producers' master recordings in exchange for

20 the payment of certain royalties to these artists and producers (hereinafter "Standard Recording

21 Agreements"). EMI has unilaterally breached these contracts by deciding to pay its recording

22 artists and producers a fraction of the actual amount owed to them for the licensing of master

23 recordings to Digital Content Providers and has failed to properly pay royalties to its artists for

24 electronic transmission of their works.

25 3.  On information and belief, EMI has entered into licensing agreements with Digital

26 Content Providers whereby these Digital Content Providers are permitted to sell or stream EMI's

27 catalogue of master recordings (including those made and/or produced by Plaintiff and Class

28

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1  members under EMI's Standard Recording Agreements) to end users via digital transmission.

2      4.      On information and belief, under its licensing agreements with Music Download

3  Providers, EMI receives approximately seventy percent (70%) for every licensed, digital

4  download sold by the Music Download Provider to an end user.

5      5.      On information and belief, under its licensing agreements with Ringtone Providers,

6  EMI receives approximately fifty percent (50%) of the retail sale price for every licensed, digital

7  download sold by the Ringtone Provider to an end user.

8      6.      On information and belief, under its licensing agreements with "Music Streaming

9  Providers," EMI has received significant advance and other payments related to the digital

10  streaming of music.

11      7.      Under the Standard Recording Agreements at issue in this case, when EMI licenses

12  master recordings produced under these agreements to third parties, EMI is required to pay its

13  recording artists and producers a certain royalty equal to a percentage of all net receipts received

14  by EMI from these third party-licensees (hereinafter the "Masters Licensed Provisions"). The

15  Masters Licensed Provisions apply to master recordings licensed by EMI to Digital Content

16  Providers for their transmission through digital distribution.

17      8.      Rather than paying its recording artists and producers the percentage of net receipts

18  it received—and continues to receive—from Digital Content Providers for "licenses," EMI fails to

19  pay appropriate royalties and, for example, wrongfully treats each digital transmission as a "sale"

20  of a physical phonorecord (i.e., an LP, EP, CD, or cassette tape) through "Normal Retail

21  Channels," which are governed by much lower royalty provisions than "licenses" in EMI's

22  Standard Recording Agreements. In doing so, EMI has:

23      a.      Failed to properly account to and pay Plaintiff and other Class members

24  moneys owed to them from the licensing of master recordings to Digital Content Providers;

25      b.      Underreported the actual number of digital downloads and digital streams

26  that occur by treating these transmissions as they would sales of physical product that might be

27  returned;

28

3
COMPLAINT

1          c.     Deducted, without authorization or legal authority, container/packaging

2  deductions when no such deductions are applicable to digital transmissions; and/or

3          d.     Reduced its royalty payments by improperly taking "audiophile

4  deductions."[1]

5      9.     In addition, on information and belief, EMI illegally withholds a certain percentage

6  of royalties owed to Plaintiff and Class members as "reserves." These reserves are meant to offset

7  losses related to the return of unsold records; however, digital transmissions are incapable of being

8  returned, as there is no physical product to return.

9      10.    During the applicable Class Period, EMI has, in a wide-spread and calculated

10  manner, violated the royalty provisions of its Standard Recording Agreements with Plaintiff and

11  Class members by (a) failing to make proper royalty payments to Plaintiff and Class members

12  and/or (b) failing to properly credit Plaintiff's and Class members' royalty accounts. As a result of

13  EMI's ongoing breach of the Masters Licensed Provisions, Plaintiff and Class members have

14  suffered hundreds of millions of dollars in damages.

15      11.    In *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010), the

16  Ninth Circuit held, in an analogous action against another major record label, that royalties for

17  digital downloads and mastertones (ringtones) should be paid pursuant to the amounts agreed to

18  for a "license" and not at the lower rate of a "sale." 621 F.3d at 964-67. The Ninth Circuit's ruling

19  became final when the U.S. Supreme Court recently declined review. *See id.*, *cert. denied*, 131 S.

20  Ct. 1677 (March 21, 2011). The conclusion that EMI has acted improperly in this case follows

21  from the Ninth Circuit's ruling in *F.B.T. Prods.* that Universal Music Group, Inc. ("UMG") and

22  one of its owned and distributed record labels, Aftermath Records, failed as a matter of law to

23  properly account for and pay royalty payments on digital content to artists and producers.

24

25

26  [1] Audiophile records are those marketed in specially priced catalog series by reason of their superior sound quality or other distinctive technical characteristics.

27

28

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1    12.    In holding that UMG's agreements with "iTunes [the market leader in the digital
2  downloads of recorded music], cellular phone carriers [primarily Sprint, Verizon, and AT&T] and
3  other third parties to use [UMG's] sound recordings to produce and sell permanent downloads and
4  [ring]tones . . . *qualify as licenses*," *id.* at 964 (emphasis added), the Ninth Circuit found that the
5  agreements at issue unambiguously provided for a much higher royalty payment than UMG had
6  previously paid.

7    13.    EMI's Standard Recording Agreements are, in every material way, the same as
8  UMG's Standard Recording Agreements in *F.B.T. Prods.*  Accordingly, Plaintiff here alleges that
9  the digital download income received by EMI from Digital Content Providers are based on
10  "licenses" and not "sales," as those terms are defined in EMI's Standard Recording Agreements
11  with these Providers. Just as UMG in *F.B.T. Prods.*, EMI has not properly accounted for the
12  appropriate amount of royalties owed to Plaintiff and Class members.  By this lawsuit, Plaintiff
13  seeks to compel EMI to account for and pay all of its recording artists and music producers their
14  rightful share of the licensing income paid to EMI for digital transmissions.

15    14.    Contrary to public perception, not all recording artists are paid vast sums in
16  royalties; in fact, some recording artists have been reported to be destitute after the high points of
17  their careers have passed. *See* Chuck Phillips, "Artists Put Pressure on for Benefits", L.A. TIMES,
18  June 3, 2002. In response to such stories, the California Senate Judiciary Committee co-chaired
19  hearings during which Senator Martha Excutia, Chair of the Committee, noted that "if public tax
20  dollars are being spent to support artists who were cheated out of their royalty earnings, we need
21  to shift the burden back to where it belongs: to the record labels that failed to pay the artists their
22  rightful earnings."  Record Label Accounting Practices: J. Hearings of the Cal. State Senate
23  Comm. on the Judiciary and State Senate Select Comm. on the Entm't Indus., 2001-2002 Leg. 3,
24  (Cal. 2002), at 1 (as quoted in 20 Berkeley Tech L. J. 933, 944 n.66).

25    15.    This action seeks the payment to artists of their "rightful earnings."

26    16.    Plaintiff seeks damages on behalf of herself and all others similarly situated, as
27  well as an accounting and judgment declaring the proper method of calculating payments of

28

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1 │ royalties or crediting royalty accounts with respect to the licensing of master recordings to Digital

2 │ Content Providers. Further, Plaintiff requests that this Court order EMI to adhere to the proper

3 │ methodology for calculating such royalties in the future.

4 │

## II. THE PARTIES

5 │ 17.     Plaintiff Martha Davis is a musician, recording artist, and performing artist who

6 │ resides in St. Helens, Oregon. Plaintiff was the lead singer of a band known as "The Motels" and

7 │ pursuant to an assignment of rights, she is the assignee of all rights and obligation of The Motels.

8 │ The Motels is a New Wave music band from the Los Angeles area best known for the songs "Only

9 │ the Lonely" and "Suddenly Last Summer", each of which peaked at #9 on the Billboard Hot 100

10 │ in 1982 and 1983, respectively. They have had five singles on the Billboard Hot 100.[2] Two of

11 │ their albums have gone gold in the United States.

12 │ 18.     Defendant EMI is a business entity headquartered in the United Kingdom, but that

13 │ undertakes significant business activity in this State and District, through its divisions, related and

14 │ affiliated entities, owned and distributed record labels, and predecessors in interest including, but

15 │ not limited to, the entity previously headquartered in Hollywood known as "Capitol Records, Inc."

16 │ At all relevant times, EMI was and continues to be in the business of exploiting the sound

17 │ recordings of musical performances and the audio-visual recordings of such performances. EMI's

18 │ exploitation includes, but is not limited to, producing, manufacturing, distributing, licensing, and

19 │ selling these recordings. According to EMI it "is one of the world's leading music companies,

20 │ home to some of the most successful and best known recording artists."

21 │ http://www.emimusic.com/about/ Further, EMI "record labels include Angel, Astralwerks, Blue

22 │ Note, Capitol, Capitol Latin, Capitol Records Nashville, EMI Classics, EMI CMG, EMI Records,

23 │ EMI Records Nashville, Manhattan, Parlophone, Virgin Classics and Virgin Records." *Id.* The

24 │ EMI roster of artists include "Lily Allen, Bat For Lashes, The Beatles, Beastie Boys, Luke Bryan,

25 │

26 │

[2] http://www.allmusic.com/artist/the-motels-p4960/charts-awards/billboard-singles

27 │

28 │

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1 Coldplay, Depeche Mode, Gorillaz, David Guetta, Iron Maiden, Norah Jones, Lady Antebellum,

2 Massive Attack, Kylie Minogue, Katy Perry, Pink Floyd, Corinne Bailey Rae, Sir Simon Rattle,

3 Snoop Dogg, Tinie Tempah, Thirty Seconds To Mars, KT Tunstall and Keith Urban as well as

4 international artists such as Amaral (Spain), Air and Camille (France), Empire of the Sun

5 (Australia), Tiziano Ferro and Vasco Rossi (Italy), Flex (Mexico), LaFee (Germany) and Hikaru

6 Utada (Japan)". *Id.* In November 2011, EMI's recorded music unit was sold to UMG for $1.9

7 billion (http://online.wsj.com/article/SB10001424052970204224604577031694160429400.html),

8 however, that deal is not yet final and is undergoing regulatory approval at the time of this filing.

9 Upon information and belief, the sale occurred due to EMI being so poorly managed by a fund that

10 had acquired it that it was foreclosed upon by its lender and sold to UMG. Prior to the sale, EMI

11 had been operating as a skeleton operation the past few years in a desperate attempt to stay solvent

12 and viable.

13 ### III. JURISDICTION AND VENUE

14     19.    This Court has jurisdiction over this matter pursuant to the Class Action Fairness

15 Act, 28 U.S.C. §§ 1332(d), because the aggregate claims of the Class exceed the sum or value of

16 $5,000,000, and there is diversity of citizenship between proposed Class members and EMI. This

17 Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

18     20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (c).

19 ### IV. SUBSTANTIVE ALLEGATIONS

20 **A.    Music Download Services**

21     21.    "Music Download Services" allow consumers to purchase and download digital

22 versions of master recordings directly to their computers or other electronic storage devices

23 ("Music Downloads"). There is no physical packaging and returns are not permitted. However,

24 Music Downloads often have various restrictions in place to prevent the consumer from copying

25 and/or sharing the Music Download with others. Oftentimes, these restrictions are enforced

26 through a Digital Rights Management system ("DRM") that encrypts the content. Music

27 Download Services are offered by Music Download Providers.

28

1     22.    On information and belief, in order to allow users to purchase digital copies of the

2  master recordings owned by record labels, Music Download Providers have signed *licensing*

3  agreements with EMI and other record labels. Depending on the licensing agreement with the

4  record label, Music Download Providers generally either: (a) charge a flat, per-download fee to

5  end users; or (b) operate as a subscription service, allowing consumers to access digital copies of

6  the master recordings for a set monthly fee for as long as they continue paying the monthly

7  subscription charge. Some providers offer both options.

8     23.    The first commercially successful Music Download Provider, Ritmoteca.com, was

9  founded in or around 1999. Ritmoteca signed licensing agreements with UMG, Warner Brothers,

10  Sony Music Entertainment, and Bertelsmann Music Group, between 1999 and 2000. These

11  licensing agreements allowed Ritmoteca to offer its customers 300,000 tracks for download at

12  prices between 99¢ and $1.99 per track, or $9.99 per album. Ritmoteca folded during the dot-com

13  bust in April 2000.

14     24.    Shortly thereafter, in or around 2001, other Music Download Services were

15  developed by both the major record labels and by independent companies. These services faced

16  stiff competition from illegal downloading sites such as Napster.com and were largely

17  unsuccessful.

18     25.    When Apple launched its iTunes Store in April 2003, and offered "legal" Music

19  Downloads for, on average, 99¢ per track or $9.99 per album, the popularity of digital downloads

20  began to grow exponentially. On February 24, 2010, total Music Downloads from the iTunes

21  Store reached 10 billion tracks. Today, the iTunes Store accounts for roughly two-thirds of all

22  Music Downloads. The iTunes store generated $1.4 billion in revenue for Apple in the second

23  quarter of 2011, up from $1.1 billion in the second quarter of 2010.

24     26.    Besides the iTunes Store, many Music Download Providers have signed licensing

25  deals with EMI and other record labels to offer Music Downloads to consumers. These providers

26  include, but are not limited to, Amazon.com, Buy.com, Liquid Digital Media (walmart.com),

27  Napster, Rhapsody, Microsoft's Zune Marketplace, and eMusic. In fact, the International

28

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1  Federation of the Phonographic Industry ("IFPI"), a worldwide representative of the record

2  industry, estimates that record labels had licensed roughly 13 million tracks of music to over 400

3  Music Download Providers by 2010.

4      27.     The licensing of master recordings to Music Download Providers has become

5  highly lucrative for record labels such as EMI. It is estimated that the licensing of master

6  recordings generated $4.6 billion in worldwide revenue for record labels in 2010, or roughly 29%

7  of their total revenue. In the United States, Music Downloads account for roughly half of record

8  labels' revenues; revenue from Music Downloads is expected to surpass revenue from album sales

9  by 2012.

10     28.     EMI itself has long recognized the important role that digital sales play and how it

11 has continued to seek to make its presence felt in the digital marketplace:

> Given our heritage of innovation, when digital music began to take off in the
> 1990s, EMI was well placed to respond to the new trends. EMI Music's first
> websites went live in 1993 and 1994 and in 1998 EMI streamed the first complete
> album over the internet, 'Mezzanine' by Massive Attack. The following year EMI
> was the first company to release a digital album download, David Bowie's
> '...Hours'. EMI also launched the first internet video single in 2001. In 2007 EMI
> was the first major music company to make its music available without digital
> rights management (DRM) software.
>
> In 2009 Coldplay became the first recording artists to sell more than one million
> digital albums in the US and two million worldwide and this year we launched
> OpenEMI to engage directly with the tech developer community around the world
> with initiatives such as creating a platform with The Echo Nest for developers to
> access EMI Music tracks and content to create innovative and exciting new apps
> and digital music concepts for EMI's artists.
>
> Today EMI Music has agreements with hundreds of digital partners to distribute
> our music across the globe, covering a huge variety of digital music business
> models and ideas.

http://www.emimusic.com/about/

24     29.     EMI is, as of this filing, one of the "Big 4" group of record labels (UMG, EMI,

25 Warner Music Group Corp., and Sony BMG Music Entertainment) which is soon to be known as

26 the "Big 3" once EMI is finally acquired by UMG. Together, these labels license 80% of the

27 Music Downloads sold by Music Download Providers to end users in the United States.

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1      30.    Music Download Providers have obtained licenses from EMI that authorize them to

2 sell or otherwise distribute, via digital download, either all or some of EMI's catalog of master

3 recordings, including Plaintiff's recordings as described herein. In this regard, in its annual review

4 for 2009/10, it was noted that "DIGITAL MILESTONES[:] EMI Music is working at the forefront

5 of digital music innovation, and we have developed an award-winning digital marketing capability

6 to drive our expansion in this area. The consumer insight that this capability delivers enables us to

7 identify potential release schedule opportunities and drive ongoing marketing efficiency and

8 effectiveness. During the past year, the company [EMI MUSIC] signed new digital agreements

9 with iTunes, Microsoft, Sky, Rhapsody, Napster, Deezer, MOG, RDIO, Grooveshark, Stingray

10 Digital (Canada), Australian telco AAPT, and Hungama Digital Media (South East Asia), among

11 others." Maltby Capital Limited Annual Review 2009/10 ("Annual Review") at 13/106.

12      31.    As set out by EMI itself, digital sales for its artists have been significant, for

13 example "Katy Perry continued to have a successful 12 months with her global hit album 'One of

14 The Boys' which was released in June 2008 selling a further 3.8 million digital track downloads

15 and nearly half a million full albums during the 2010 financial year. Coldplay, whose 2008 album

16 'Viva La Vida' was the biggest selling album worldwide that year, passed another milestone in

17 July 2009 when they became the first artist to sell more than one million full digital albums in the

18 US and two million globally." Annual Review at 11/106.

19      32.    On information and belief, under its licensing agreements with Music Download

20 Providers, EMI does not manufacture or warehouse any physical product or packaging, nor does it

21 ship or sell any product to stores or other distribution points, and consequently faces no risk of

22 breakage or the return of unsold product. Rather, as the Ninth Circuit held with respect to UMG

23 and Aftermath Records in *F.B.T. Prods.*, EMI is licensing its catalog of recordings to Music

24 Download Providers for sale or distribution by them via digital download by consumers. EMI,

25 recognizing the "continuing rapid decline of the physical market" (Annual Review at 47/106) has

26 sought to "offset" such decline by a corresponding "growth in digital sales" (Annual Review at

27 24/106).

28

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1    33.    The prevalence of digital download sales by Music Download Providers means that

2 EMI's continued improper accounting of royalties owed to Plaintiff and Class members has

3 deprived Plaintiff and the Class of millions of dollars in royalties.

4    **B.    Music Streaming Services**

5    34.    "Music Streaming Services" allow consumers to listen to (or "stream") digital

6 versions of master recordings directly through their computers or other electronic storage devices

7 without actually purchasing an electronic copy of the recording. Music Streaming Services often

8 have various restrictions in place to prevent the consumer from copying and/or sharing the Music

9 Stream with others. Music Streaming Services are offered by Music Streaming Providers.

10    35.    On information and belief, in order to allow users to stream digital copies of the

11 master recordings owned by record labels, Music Streaming Providers have signed *licensing*

12 agreements with EMI and other record labels. Depending on the licensing agreement with the

13 record label, Music Streaming Providers generally either: (a) charge a flat, per-stream fee to end

14 users; or (b) operate as a subscription service, allowing consumers to access digital copies of the

15 master recordings for a set monthly fee for as long as they continue paying the monthly

16 subscription charge. Some providers offer both options.

17    36.    Some Music Streaming Providers have paid significant upfront fees to labels, such

18 as EMI, to acquire rights to large catalogs of music. Due to non-disclosure agreements signed

19 between Music Streaming Providers and Labels, artists (such as Plaintiff and the Class herein) are

20 not provided with any details about these payments and there is little transparency about how –

21 and if – that money makes its way to artists. On information and belief, EMI does not provide

22 appropriate royalty payments to its artists (such as Plaintiff and the Class herein) from the

23 licensing income it receives from Music Streaming Providers.

24    **C.    Master Ringtones**

25    37.    Ringtones that are a portion/clip of an artist's actual sound recording (rather than an

26 electronic reproduction, e.g., MIDI) and are played on a mobile phone when someone is calling,

27 texting, or otherwise trying to contact the mobile phone operator are known as "mastertones."

28

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1    38.    Mastertones are sold to consumers by Ringtone Providers and range in price

2 between $1.00 and $3.00 per ringtone. Ringtone Providers include, but are not limited to, wireless

3 carriers (e.g., AT&T Wireless, Verizon Wireless, Sprint, and T-Mobile), content owners (e.g.,

4 MTV and VH1), and third-party aggregators (e.g., Zed, Hudson Soft, Jamster and iTunes). In

5 general, consumers purchase and download mastertones directly from their mobile phones.

6    39.    On information and belief, in order to sell Mastertones to consumers, Ringtone

7 Providers have entered into license agreements with EMI and other record labels that authorize

8 Ringtone Providers to use the label's master recordings to produce ringtones for sale to

9 consumers. In return, the Ringtone Providers pay the record labels approximately fifty percent

10 (50%) of the retail sales price of the mastertone.

11    40.    Record labels have made hundreds of millions, if not billions, of dollars from their

12 licensing agreements with Ringtone Providers. Global mastertone sales reached roughly $4 billion

13 in 2004. In the United States, mastertone sales reached $714 million in 2007 and $541 million in

14 2008.

15    41.    Ringtone Providers continue to sell mastertones and to enter into license

16 agreements with record labels. In fact, Apple did not enter into a license agreement with record

17 labels that enabled them to sell mastertones until in or around September 2009. Currently,

18 mastertones are available on the iTunes Store for between 0.99¢ and $1.29 per download.

19    42.    Mastertones continue to play an important role in record labels' revenue streams as

20 well. The RIAA has added its Gold and Platinum recognition program to mastertone sales. In

21 2006, the RIAA awarded Gold Status (500,000 downloads) to 84 mastertones, Platinum Status

22 (1,000,000 downloads) to 40 mastertones, and Multi-Platinum Status (increments of 1,000,000

23 downloads over 1,000,000 downloads) to 4 mastertones. In 2009, the RIAA certified Lil Wayne's

24 "Lollipop" mastertone as 5x Platinum (5 million downloads). In 2010, the RIAA awarded

25 Platinum Status to five additional mastertones: AC/DC's "Thunderstruck"; Akon's "Right Now

26 (Na Na Na)"; Jason Aldean's "Big Green Tractor"; Drake's "Best I Ever Had"; and Young

27 Money's "Bedrock."

28

1     43.     On information and belief, under its licensing agreements with Ringtone Providers,

2 EMI does not manufacture or warehouse any physical product or packaging, nor does it ship or

3 sell any product to stores or other distribution points, and consequently faces no risk of breakage

4 or the return of unsold product. Rather, EMI is licensing its catalog of master recordings to

5 Ringtone Providers for sale or distribution by them via digital download to consumers.

6     44.     The lucrative sales of mastertones by Ringtone Providers means that EMI's

7 continued improper accounting of royalties owed to Plaintiff and Class members has deprived

8 Plaintiff and the Class of millions of dollars in royalties.

9     45.     The agreements between Digital Content Providers and EMI that allow these

10 providers to distribute EMI's master recordings for sale through digital downloads are "licenses"

11 and subject to the royalty provisions for such clauses.

**D.     EMI's Standard Recording Agreements**

13     46.     EMI and its predecessors in interest have entered into Standard Recording

14 Agreements with musical artists and producers whose musical performances EMI intended to

15 commercially exploit. Under these Standard Recording Agreements, the artists and producers

16 promised to make certain master recordings for EMI and to transfer title to these master recordings

17 so that EMI could engage in commercial exploitation of these recordings. In return, EMI

18 promised to pay the recording artists and producers certain royalties.

19     47.     Specifically, under EMI's Standard Recording Agreements, the artists and

20 producers are entitled to the payment of royalties as either (a) actual payments, or (b) credits

21 against advances paid by EMI to the artist and/or producer until such advances are recouped, after

22 which time, EMI is required to pay royalties to the artist and/or producer.

23     48.     EMI's Standard Recording Agreements set forth and govern the calculation,

24 distribution, and payment of royalties by EMI to each Class member. On information and belief,

25 these royalties are computed electronically through various software programs that EMI controls

26 and maintains. Thus, the ability to calculate the amount owed to Plaintiff and Class members is a

27 matter of simple calculations through adjustment of these software programs.

28

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

49.     In accordance with industry practice, EMI's Standard Recording Agreements set forth the same, or substantially the same, two equations for all Class members. The royalties owed to these artists and performers equal the sum of two equations:

a.     Royalties for phonorecords *sold* by EMI and its affiliates in the United States and abroad ("sold equation"); and

b.     Royalties for master recordings *licensed* by EMI to third parties ("licensed equation").

50.     These equations were invariably drafted by EMI and its predecessors in interest and were non-negotiable terms of its Standard Recording Agreements. While EMI's recording agreements may have varied slightly in non-material ways, every recording agreement that is part of the Class has these standard equations.

51.     EMI's Standard Recording Agreements provide a significantly higher percentage of royalties under the licensed equation than under the sold. In general, the sold equation provides for royalties of between five and thirty percent (5% - 30%) (depending on the popularity of the artist; i.e., the more popular, the higher the royalty rate) while the licensed equation generally provides for royalties of twenty-five to fifty percent (25% - 50%) of net receipts. Under both equations, EMI takes certain deductions before computing the royalties owed. Again, these deductions are all calculated electronically and are a matter of simple inputs into EMI's standardized software programs.

52.     The sold equation in EMI's Standard Recording Agreements provides for substantially more deductions than those found in the licensed equation. For example, such deductions typically include:

a.     A "Net Sales Deduction";

b.     A "Container Charge" deduction, depending on the type of phonorecord sold; and/or

c.     An "Audiophile Deduction."

53.     As a result, a recording artist or producer is paid a significantly lower percentage of

1 the total money received by EMI for its commercial exploitation of the artist's or producer's

2 master recordings under the sold equation than under the licensed equation.

3 **E.      The Recording Agreements at Issue**

4       **1.      The Motels 1979 Contract**

5       54.     On or about May 12, 1979, "The Motels" entered into an agreement with Capitol

6 Records, Inc. ("Capitol") that is typical of the form recording agreement signed by members of the

7 Class (the "1979 Agreement"). As of the filing of this Complaint, EMI owns the Capitol label

8 and, therefore, now owns the rights to the master recordings referred to in the 1979 Agreement.

9       55.     The 1979 Agreement provides that The Motels would record masters for Capitol

10 and Capitol would exploit those masters through the sale and licensing of them.

11       56.     As set forth below, the royalties to be paid to The Motels differ and are dependent

12 on whether a "sale" or "license" of their works occurs.

13       57.     Paragraph 2 of the 1979 Agreement generally governs the payment of royalties to

14 The Motels for the "sale" of their master recordings to be paid as follows:

15           •      14% for sales of singles
             •      16% for sales of "other records"
16
       58.     With regard to royalties on "lp-disc" sales, pursuant to Paragraph 20(a), they are
17
 paid on a sliding scale as follows during the initial and first option periods:
18
           •      16% for net sales of 1 – 500,000 units
19           •      18% for net sales of 500,001 – 1,000,000 units
             •      20% for net sales of 1,000,001 – 1,500,000 units
20           •      22% for net sales over 1,500,000 units

21 Pursuant to Paragraph 20(c), during the second and third option periods, the above percentages are

22 each increased 2%, e.g., 18% for net sales of 1 – 500,000 units, etc.

23       59.     With regard to royalties on singles, pursuant to Paragraph 20(e), they are paid on a

24 sliding scale as follows:

25           •      14% for net sales of 1 – 500,000 units
             •      16% for net sales over 500,000 units
26
       60.     With regard to royalties for "sales" in the United States such royalties, pursuant to
27
 Paragraph 3(a)(i) are to be "computed and paid upon net sales of records" against which "Capitol
28
                                                 15
                                             COMPLAINT

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1 shall be entitled to withhold from payments otherwise due from time to time reasonable reserves

2 against anticipated returns, rebates and credits".

3     61.    In contrast to the payment of royalties on sales contained in the 1979 Agreement,

4 Paragraph 3(a)(vii) stated that the royalty on licenses of the artistic works would be 50% of the net

5 sales:

6     (vii) As to records sold embodying masters hereunder or masters* [*hereunder]
otherwise used by licensees of Capitol or licensees of Capitol's licensees, and if fees
7     payable to Capitol are for record club sales or are based on a flat fee, or cent rate per
unit sold (herein referred to as "Flat Fee"), then in lieu of any other royalty specified
8     in this agreement, my royalty shall be 50% of Capitol's net royalties from such
licensee with respect to such sale of records or other use of the applicable masters, as
9     the case may be, computed on the same quantity, basis and in the same manner as
Capitol is paid. For the purpose hereof, the term "net royalties" shall mean the gross
10     Flat Fee received by Capitol from the applicable licensee with respect to either:

11     (a)    net sales of records, . . . .

12     62.    Accordingly, a licensed master should result in the payment of 50% of EMI's net

13 sales, which is significantly higher than the royalty payable on sales as set out above.

14     63.    Paragraph 17 of the 1979 Agreement contains a California choice of law provision

15 and expressly provides that the contract be interpreted under California law. As set forth above,

16 both Plaintiff and EMI have substantial contacts with the State of California.

17     **2.**    **The Motels 1985 Contract**

18     64.    On or about April 1, 1985, "The Motels" entered into a subsequent agreement with

19 Capitol that is typical of the form recording agreement signed by members of the Class (the "1985

20 Agreement").

21     65.    The 1985 Agreement provides that The Motels would record masters for Capitol

22 and Capitol would exploit those masters through the sale and licensing of them.

23     66.    As set forth below, the royalties to be paid to The Motels differ and are dependent

24 on whether a "sale" or "license" of their works occurs.

25     67.    Paragraph 7 of the 1985 Agreement governs the payment of royalties to The Motels

26 for the "sale" and "licensing" of their master recordings.

27     68.    With regard to royalties for "sales" in the United States such royalties, pursuant to

28

16
COMPLAINT

1  Paragraph (7)(a)(i) are to be "computed and paid upon net sales of records" against which "Capitol

2  shall be entitled to withhold from payments otherwise due from time to time reasonable reserves

3  against anticipated returns and credits". Further, the royalty to be paid is as follows:

4              •       20% for sales of 7 inch singles
               •       14% for sales of 12 inch singles and Mini-LP's
5              •       $1.15 for "All Other Records"

6  Paragraph 7(b)(i) then "proportionally" increases, or decreases, the royalty on album sales using

7  $8.98 as a benchmark (where x, in the following formula "equals the royalty applicable to the

8  album with the Different Retail List Price"):

9          $1.15                              x
           -------  =    -----------------------------------------
10         $8.98                Different Retail List Price

11  Therefore, the benchmark royalty on an album sale, is 12.81% ($1.15 ÷ $8.98).

12          69.     In contrast to the payment of royalties on sales contained in the 1985 Agreement,

13  Paragraph 7(a)(vi) stated that the royalty on licenses of the artistic works would be 50% of the net

14  sales:

15          (vi) As to records sold by a licensee of Capitol through a special markets plan or
        record club distribution plan; or as to soundtrack albums (other than soundtrack
16      albums distributed by Capitol or licensed by Capitol to be distributed by Primary
        Licensees) embodying masters; or with respect to masters otherwise used by
17      licensees of Capitol (other than Primary Licensees) in lieu of any other royalty
        specified in this Agreement, Company's royalty shall be fifty percent (50%) of the
18      net royalties received by Capitol from such licensee with respect to such sales of
        records or such other use of the applicable masters, as the case may be, computed on
19      the same quantity, basis and in the same manner as Capitol is paid. For purposes
        hereof the term "net royalties" shall mean the gross amount received by Capitol from
20      the applicable licensee with respect to either:

21          (A) net sales of records, . . . .

22
           70.     Accordingly, a licensed master should result in the payment of 50% of EMI's net
23
    sales, which is significantly higher than the royalty payable on sales as set out above. Therefore,
24
    in both the 1979 and 1985 Agreements the royalty to be paid on licenses is 50% of net receipts.
25
           71.     Paragraph 9 of the 1985 Agreement contains a California choice of law provision
26
    and expressly provides that the contract be interpreted under California law. As set forth above,
27
    both Plaintiff and EMI have substantial contacts with the State of California.
28
                                              17
                                          COMPLAINT

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

72.     The Motels have satisfied their obligations under the 1979 and 1985 Agreements. However, EMI has not paid The Motels, nor the members of the Class similarly situated, the correct sums for digital transmissions of their music. Instead of paying the agreed-upon rate of fifty percent (50%) of net receipts for a *licensed* master recording, EMI pays The Motels and members of the Class similarly situated a much lower royalty based on a *sale* of a physical recording (e.g., a CD) which includes, on information and belief, deductions for container charges and other items that are not at issue in digital transmissions since no physical product is being manufactured and shipped for use by end-users.

F.      **EMI Has Licensed its Master Recordings to Digital Download Services and Should Pay License Royalty Rates to Artists**

73.     EMI's Standard Recording Agreements provide that where EMI licenses master recordings to third parties for the third party's record or other use, EMI will pay the recording artist or producer whose master was licensed fifty percent (50%) of its net receipts from the third party.

74.     On information and belief, EMI has entered into contracts with Digital Content Providers that allow these providers to digitally distribute all or some of EMI's catalog of master recordings to end-users. In exchange, these providers pay EMI a flat rate or fixed percentage per digital download (typically 70¢). As is custom in the industry, and upon information and belief, EMI typically receives sales reports from Digital Download Services which set out the sales of the recordings as set out herein.

75.     These Digital Content Providers include, but are not limited to, the following entities:

         a.     Apple (iTunes Store);

         b.     Amazon.com;

         c.     Buy.com;

         d.     Liquid Digital Media (walmart.com);

         e.     Napster;

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

f.    MOG;

g.    Rdio;

h.    Rhapsody;

i.    Microsoft (Zune Marketplace);

j.    eMusic;

k.    Verizon Wireless;

l.    AT&T Wireless;

m.    Nokia;

n.    Sprint;

o.    T-Mobile;

p.    Virgin Mobile;

q.    Vodafone;

r.    Spotify;

s.    MTV;

t.    VH1;

u.    Zed;

v.    Orange;

w.    YouTube;

x.    MySpace Music;

y.    Hudson Soft; and

z.    Jamster.

76.    As discussed herein, EMI's agreements with these Digital Content Providers constitute licenses and not sales. As such, under EMI's Standard Recording Agreements, EMI is required to pay Plaintiff and Class members the corresponding percentage of its net receipts from these Digital Content Providers for licenses.

77.    However, in breach of its contractual obligations under its Standard Recording Agreements, EMI has treated its transactions with Digital Content Providers as "sales" rather than

19

COMPLAINT

1 "licenses." In so doing, EMI has applied the incorrect formula for calculating royalties owed to
2 Plaintiff and Class members, taken unjustifiable deductions (including, but not limited to, the Net
3 Sales Deduction, the Container Charge deduction, and the Audiophile Deduction), and applied a
4 royalty percentage that is, in general, less than half of what it should be applying in its
5 computation.

6      78.     Plaintiff is informed and believes that, before violating its obligations to its royalty
7 participants, EMI vetted the policies and practices at issue in this case at its highest corporate
8 levels; that it commissioned, either on its own initiative or with the support of the U.S. music
9 industry's principal trade organization, so-called "white papers" on the issue; that it analyzed
10 internally the financial consequences of its misconduct and cast it in terms of the additional profit
11 to be made by it avoiding its contractual obligations; and that it repeatedly made public statements
12 characterizing its agreements with Digital Music Providers in the interest of its recording artists.

13      79.     The licensing provision in EMI's Standard Recording Agreements provide a higher
14 royalty rate than retail sales because in cases where the record label "licenses" the master
15 recordings, the label is essentially acting as a conduit between the artist and a third party, and the
16 label incurs none of the normal costs of goods sold, such as physical materials, distribution,
17 advertising, and promotion. Because the label incurs none of the traditional costs associated with
18 physical distribution of records when it gives Digital Content Providers the right to sell or stream
19 digital copies of master recordings, these agreements fall within the types of situations
20 contemplated by the parties when they agreed to the Master License Provision.

21      80.     Similarly, the royalty base price in EMI's Standard Recording Agreement is
22 generally computed, in part, by deducting a "Container Charge." However, Container Charges are
23 meant to compensate the record label for the physical packaging of a record, and as such, are
24 inappropriate for digital transmissions that neither have, nor require, physical packaging.
25 Consequently, the royalty base price is unascertainable for digital downloads and cannot apply.

26      81.     The ordinary meaning of a license is the "permission to act," WEBSTER'S THIRD
27 NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1304 (2002), while a sale is (a) an

28

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1 actual transfer of title in a copy of the work or (b) the passing of all exclusive, intellectual property

2 rights in a work. *See* 17 U.S.C. § 109 (describing (a)); *Quality King Distribs. v. L'anza Research*

3 *Int'l*, 523 U.S. 135, 145 (1998) (describing (b)).

4     82.    Based on the ordinary meanings of "license" and "sale," the Ninth Circuit found in

5 *F.B.T. Prods.* that the record labels "did not 'sell' anything to the download distributors. The

6 download distributors did not obtain title to the digital files. The ownership of those files

7 remained with [the label, which] reserved the right to regain possession of the files at anytime, and

8 [the label] obtained recurring benefits in the form of payments based on the volume of

9 downloads." The facts in this case are analogous and, as such, the ordinary meaning of these

10 words supports a finding that these agreements were "licenses" under the Master License

11 Provision and not "sales."

12     83.    Under the first sale doctrine, after the first sale of a legally copyrighted work, the

13 copyright holder no longer has a right to restrict or prevent subsequent sale of their work. Thus,

14 purchasers are free to resell CDs and other physical music products that were lawfully purchased

15 without obtaining the copyright holder's approval. The U.S. Copyright Office, however, has

16 declined to extend this doctrine to digital media further arguing against these types of transactions

17 as "sales" as opposed to "licenses."

18     84.    Former Apple CEO, Steve Jobs, published a piece entitled "Thoughts on Music" on

19 February 6, 2007 in which he stated, "[s]ince Apple does not own or control any music itself, it

20 must *license* the rights to distribute music from others, primarily the 'big four' music companies:

21 Universal, Sony BMG, Warner, and EMI." (Emphasis added). Thus, the CEO of the largest

22 Digital Download Provider in the world has characterized its agreement with EMI as a "license"

23 and not a "sale."

24     85.    In its terms of service of the iTunes Store, Apple states that "Apple and its

25 *licensors* reserve the right to change, suspend, remove, or disable access to any iTunes products,

26 content, or other materials." (Emphasis added.) Thus, Apple has explicitly acknowledged that it

27 licenses content from third parties, which includes EMI.

28

1   86.   Upon information and belief, the Master License Provisions found in the recording
2   agreements at issue here, as relevant to the claims herein, are the same or substantially similar to
3   those found in other production and recording agreements across all or substantially all of EMI's
4   owned and distributed record labels entered into by EMI and/or its predecessors in interest. Those
5   agreements call for accountings and payments to recording artists and producers for licensing of
6   masters as a percentage (usually fifty percent (50%)) of the net receipts of the label, rather than a
7   lesser percentage as a royalty paid to the artist or producer based on the suggested retail list price
8   of each unit sold.

9   **G.   EMI's Failure to Provide a Proper Calculation of its Royalty Obligations Has Caused**
10      **Substantial Damages to Plaintiff and the Class**

11   87.   EMI's accounting practices, as alleged herein, have allowed EMI to illegally
12   withhold a substantial amount of money it receives from Digital Content Providers at the expense
13   of Plaintiff and the Class.

14   88.   As a result, EMI is paying Plaintiff and Class Members much lower royalties than
15   it should be paying them for moneys received from Digital Content Providers.

16   89.   As a result of EMI's systematic violation of its contractual obligations to Plaintiff
17   and other Class members to make proper royalty payments and to properly credit royalty accounts
18   pursuant to its Standard Recording Agreement, EMI has caused substantial damages to Plaintiff
19   and Class members, the exact amount to be determined at trial.

20   90.   At all relevant times, EMI has had a duty and obligation under its recording
21   agreements with Plaintiff and other Class Members to properly and accurately account for moneys
22   received by EMI from Digital Content Providers, to which EMI has licensed the master recordings
23   of Plaintiff and other Class Members. However, rather than fulfilling its contractual obligations,
24   EMI has systematically, knowingly, and intentionally miscalculated the royalties due to Plaintiff
25   and other Class members. As a result, EMI has under credited and/or underpaid each and every
26   Class member, while also deriving substantial financial benefits from its licensing of these master
27   recordings.

28

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1

## V. CLASS ACTION ALLEGATIONS

2    91.    Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a)

3    and 23(b) on behalf of herself and the following Class:

4

5              All persons and entities, their agents, successors in interest, assigns,
               heirs, executors, and administrators who are or were parties to EMI

6              recording agreements containing "Master License Provisions" or
               their equivalent, through which such persons and entities, either

7              directly or indirectly, received royalties on, or financial credits or
               adjustments for, income received by EMI for the commercial

8              exploitation of master recordings through EMI's licensing of said
               master recordings to Digital Content Providers, at a rate less than the

9              rate provided for in their contract with EMI.

10   92.    The following persons and entities shall be excluded from the Class: (1) EMI and

11   its subsidiaries, affiliates, officers, and employees; (2) all persons who make a timely election to

12   be excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom this

13   case is assigned and any immediate family members thereof.

14   93.    Plaintiff reserves the right to redefine the Class prior to certification.

15   94.    This action is properly maintainable as a class action.

16   95.    The Class for whose benefit this action is brought is so numerous that joinder of all

17   Class members is impracticable. While Plaintiff does not presently know the exact number of

18   Class members, Plaintiff is informed and believes that there are tens of thousands of Class

19   members, and that those Class members can only be determined and identified through EMI's files

20   and, if necessary, other appropriate discovery.

21   96.    There are questions of law and fact which are common to Class members and

22   which predominate over any questions affecting only individual members of the Class. A class

23   action will generate common answers to the below questions, which are apt to drive the resolution

24   of the litigation:

25              a.    Whether EMI violated its recording agreements by, *inter alia*,

26   mischaracterizing the money it received from Digital Content Providers as "sales" income rather

27   than "license" income in violation of the recording agreements;

28

23
COMPLAINT

1          b.      Whether EMI benefited financially from its wrongful acts;

2          c.      Whether EMI acted in a manner calculated to conceal the illegality of its

3   actions from recording artists and music producers;

4          d.      Whether EMI will continue collecting licensing income from Digital

5   Content Providers and misrepresent the royalties due for such licensing income to its recording

6   artists and music producers despite knowing that such misrepresentation constitutes a breach of its

7   artists' recording contract;

8          e.      Whether EMI, by way of the conduct alleged herein, must comply with

9   California Code of Civil Procedure §§ 337, 337a and provide a proper accounting of the amounts

10   owed to Plaintiff and other Class members;

11          f.      Whether EMI, by way of the conduct alleged herein, engaged in deceptive

12   or unfair acts or practices in violation of California unfair trade practices laws, including but not

13   limited to California Business & Professions Code §§ 17200, *et seq.,* for which Plaintiff and other

14   Class members are entitled to recover;

15          g.      Whether, assuming EMI intends to continue breaching its contractual

16   obligations to Plaintiff and other Class members, and/or to violate California state statutory law,

17   declaratory and injunctive relief is appropriate to curtail its conduct as alleged herein;

18          h.      Whether Plaintiff and other Class members have been damaged by EMI's

19   actions or conduct; and

20          i.      The proper measure of damages.

21       97.      Plaintiff is committed to prosecuting this action and has retained competent counsel

22   experienced in litigation of this nature. Plaintiff's claims are typical of the claims of other Class

23   members and Plaintiff has the same interests as other Class members. Plaintiff has no interests

24   that are antagonistic to, or in conflict with, the interests of the other members of the Class.

25   Plaintiff is an adequate representative of the Class and will fairly and adequately protect the

26   interests of the Class.

27       98.      The prosecution of separate actions by individual Class members could create a

28

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1 | risk of inconsistent or varying adjudications with respect to individual members of the Class,

2 | which could establish incompatible standards of conduct for EMI or adjudications with respect to

3 | individual members of the Class which would, as a practical matter, be dispositive of the interests

4 | of the members of the Class not parties to the adjudications.

5 |       99.    Furthermore, as the damages suffered by some of the individual Class members

6 | may be relatively small, the expense and burden of individual litigation make it impracticable for

7 | the individual members of the Class to redress the wrongs done to them individually. If a Class or

8 | general public action is not permitted, Class members will continue to suffer losses and EMI's

9 | misconduct will continue without proper remedy.

10 |       100.    EMI has acted and refused to act on grounds generally applicable to the entire

11 | Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with

12 | respect to the Class as a whole.

13 |       101.    Plaintiff anticipates no unusual difficulties in the management of this litigation as a

14 | class action. Class members may be identified from EMI's records and such Class members may

15 | be notified of the pendency of this action by mail or by electronic means (like email), using

16 | techniques and a form of notice customarily used in class actions.

17 |       102.    For the above reasons, a class action is superior to other available methods for the

18 | fair and efficient adjudication of this action.

19 | **VI. CAUSES OF ACTION**

20 | **FIRST CAUSE OF ACTION**

21 | **(Breach of Contract)**

22 | **(On Behalf of Plaintiff and All Class Members)**

23 |       103.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs

24 | above as though fully set forth herein.

25 |       104.    Plaintiff and Class members entered into a Standard Recording Agreement with

26 | EMI or one of its affiliates.

27 |       105.    These Standard Recording Agreements contained the same or substantially similar

28

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1   terms relating to the treatment of licensing income for royalty accounting.  By definition, such
2   licensing income includes income derived from the licensing of recordings to Digital Content
3   Providers.

4       106.    Plaintiff and other Class members have performed their obligations under their
5   respective recording agreements by providing master recordings to EMI to exploit.  At no point
6   did EMI advise Plaintiff and Class members that such master recordings were non-conforming or
7   otherwise objectionable.  As a result, all conditions required for EMI's performance under the
8   written contracts—namely, the payment of the appropriate royalties to Plaintiff and Class
9   members—have occurred

10      107.    By reason of the foregoing, and other acts not presently known to Plaintiff and
11  Class members, EMI has materially breached its contractual obligations under its pertinent
12  Standard Recording Agreements between itself and Class members by failing to properly account
13  and provide adequately royalty compensation to Plaintiff and Class members with regard to
14  licensing of master recordings to Digital Content Providers.  Further, EMI has disregarded the
15  rights of Plaintiff and other Class members by breaching its contractual obligations.

16      108.    EMI has failed and refused to cure these breaches and continues to incorrectly
17  calculate these royalties in violation of Plaintiff's and Class members' recording agreements.
18  Further, EMI has continued to disregard the rights of Plaintiff and other Class members.

19      109.    By reason of the foregoing, Plaintiff and other Class members have been damaged
20  in an amount to be determined at trial.

21                              **SECOND CAUSE OF ACTION**

22                              **(Declaratory Judgment)**

23                      **(On Behalf of Plaintiff and All Class Members)**

24      110.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs
25  above as though fully set forth herein.

26      111.    Pursuant to its Standard Recording Agreements, EMI is obligated to pay and/or
27  credit Plaintiff and other Class members a certain percentage of the income EMI derives from its

28

1  licensing of master recordings, produced for EMI by Plaintiff and other Class members, to Digital

2  Content Providers, but that EMI has failed to provide sufficient payment/credit to Plaintiff and

3  other Class members by illegally mischaracterizing these licenses as sales.

4    112. Plaintiff and other Class members have no adequate remedy at law.

5    113. By reason of the foregoing, there is a present controversy between Plaintiff and

6  other Class members, on the one hand, and EMI, on the other hand, with respect to which this

7  Court should enter a declaratory judgment determining that the pertinent recording agreements

8  obligate EMI to pay and/or credit Plaintiff and other Class members the percentage specified for

9  licensing, rather than for sales, when EMI licenses the master recordings of Plaintiff and other

10 Class members to Digital Content Providers.

**THIRD CAUSE OF ACTION**

**(Common Counts – Open Book Account:**

**California Code of Civil Procedure § 337a)**

**(On Behalf of Plaintiff and All Class Members)**

15   114. Plaintiff repeats and realleges each and every allegation contained in the paragraphs

16 above as though fully set forth herein.

17   115. Pursuant to EMI's agreements with Plaintiff and other Class members, EMI keeps,

18 and at all relevant times has kept, open book accounts reflecting the debits and credits made to

19 each Class member's account with EMI from inception. Plaintiff is informed and believes that

20 said open book accounts include entries reflecting income EMI has received, and continues to

21 receive, from its license agreements with Digital Content Providers.

22   116. These book accounts constitute the principal records of the transactions between

23 EMI and all Class members, including Plaintiff.

24   117. Plaintiff is informed and believes that said book accounts are, and at all relevant

25 times were, created in the regular course of EMI's business and kept in a reasonably permanent

26 form and manner.

27   118. EMI has become indebted to Plaintiff and other Class members on said open book

28

27
COMPLAINT

1 accounts in an amount equal to EMI's underpayment on the income EMI has received, and
2 continues to receive, from its licenses for digital downloads.

3     119.   As such, the outstanding balance owed by EMI to Plaintiff and other Class
4 members on said open book accounts, including a calculation of the amount of underpayment with
5 respect to digital downloads, can be determined by examining all of the debits and credits recorded
6 for each account.

7 **FOURTH CAUSE OF ACTION**

8 **(Violations of California's Unfair Competition Law:**

9 **California Business & Professions Code §§ 17200, *et seq.*)**

10 **(On Behalf of Plaintiff and All Class Members)**

11     120.   Plaintiff repeats and realleges each and every allegation contained in the paragraphs
12 above as though fully set forth herein.

13     121.   California Business and Professions Code §§ 17200, *et seq.* prohibits any unlawful,
14 unfair, or fraudulent business acts or practices.

15     122.   As detailed in this Complaint, EMI has violated the foregoing law, by engaging in
16 unlawful, unfair, and fraudulent business practices. EMI knowingly breached its Standard
17 Recording Agreements with Plaintiff and other Class members. EMI either knew, should have
18 known, or recklessly disregarded that the income it collected from Digital Content Providers was
19 in connection with a license agreement, and as such, that the royalties payable to Plaintiff and
20 other Class members should have been accounted and paid for on this basis. Furthermore, failing
21 to disclose the unlawful nature of its conduct, and employing such devices as are alleged above, as
22 well as affirmatively representing its authority to collect and account for this income on such
23 basis, had a tendency to mislead Plaintiff and other Class members.

24     123.   EMI engaged in "unfair" business acts or practices by converting monies properly
25 due Plaintiff and the Class under the express terms of the Standard Recording Agreements. EMI's
26 misconduct offends public policy and is immoral, unscrupulous, unethical, and offensive, and
27 causes substantial injury to consumers.

28

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1      124.    The harm to Plaintiff and other Class members resulting from EMI's deceptive and

2  unlawful practices outweighs the utility, if any, of those practices. There is no possible economic

3  justification for such conduct, and consequently, the gravity of the misconduct outweighs any

4  possible economic justification offered by EMI.

5      125.    EMI's illegal conduct, as described herein, is ongoing, continues to this date, and

6  constitutes unfair and fraudulent business acts and practices within the meaning of Business &

7  Professions Code §§ 17200, *et seq.*, as interpreted by the California State Courts. Further, EMI's

8  unlawful and unfair business acts and practices present a continuing threat to Plaintiff, Class

9  members, and the general public in that EMI has refused to publicly acknowledge and correct its

10  wrongdoing, and provide compensation for the damages it has caused.

11      126.    Pursuant to California Business & Professions Code § 17203, Plaintiff and other

12  Class members are therefore entitled to:

13      a.    An Order requiring EMI to cease the acts of unfair competition alleged

14  herein;

15      b.    An Order enjoining EMI from continuing to account for royalties payable to

16  Plaintiff and Class members in the manner it does for income derived from such licenses;

17      c.    Full restitution of all monies paid to and retained by EMI otherwise payable

18  to Plaintiff and Class members including, but not limited to, disgorgement pursuant to California

19  Code of Civil Procedure § 384;

20      d.    Interest at the highest rate allowable by law; and

21      e.    The payment of Plaintiff's attorneys' fees and costs under, among other

22  provisions of law, Cal. Code Civ. Proc. § 1021.5, or otherwise to the extent permitted by law.

23  **PRAYER FOR RELIEF**

24      **WHEREFORE,** Plaintiff, on behalf of herself and the other putative Class members,

25  prays for judgment against EMI as follows:

26      1.    An order certifying the proposed Class, designating Plaintiff as the named

27  representative of the Class, and designating the undersigned as Class Counsel;

28

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

1    2.    A declaration that EMI is financially responsible for notifying all Class members

2    that the pertinent recording agreements obligate EMI to pay and/or credit Plaintiff and other Class

3    members the percentage specified in their contracts for licensing, rather than for sales, and that

4    EMI has been improperly accounting for such transactions;

5    3.    An injunction requiring EMI to abide by the express terms of its Standard

6    Recording Agreements with regard to licensing of master recordings to Digital Content Providers;

7    4.    An award to Plaintiff and the Class of compensatory, exemplary, and/or statutory

8    damages in an amount to be proven at trial;

9    5.    An award of attorneys' fees and costs, as allowed by law;

10    6.    An award of pre-judgment and post-judgment interest, as provided by law;

11    7.    For leave to amend the Complaint to conform to the evidence produced at trial; and

12    8.    Such other and further relief as the Court may deem just and proper.

13                              **JURY TRIAL DEMANDED**

14        Plaintiff, on behalf of herself and the Class, hereby demands a trial by jury.

15    DATED: March 30, 2012                **KIESEL BOUCHER LARSON LLP**

16

17                                    By: _____
18                                         RAYMOND P. BOUCHER
                                          JEFFREY A. KONCIUS
19

20                                         Neville L. Johnson (Bar No. 66329)
                                          Douglas L. Johnson (Bar No. 209216)
21                                         James T. Ryan (Bar No. 210515)
                                          **JOHNSON & JOHNSON LLP**
22                                         439 N. Canon Drive, Suite 200
                                          Beverly Hills, CA 90210
23                                         Telephone: (310) 975-1080
                                          Facsimile: (310) 975-1095
24                                         njohnson@jjllplaw.com
                                          djohnson@jjllplaw.com
25                                         jryan@jjllplaw.com

26

27

28
                              30

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California

Clifford H. Pearson (Bar No. 108523)
Daniel L. Warshaw (Bar No. 185365)
**PEARSON, SIMON, WARSHAW &**
**PENNY, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA  91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104
cpearson@pswplaw.com
dwarshaw@pswplaw.com

Bruce L. Simon (Bar No. 96241)
Robert G. Retana (Bar No. 148677)
Aaron M. Sheanin (Bar No. 214472)
William J. Newsom (Bar No. 267643)
**PEARSON, SIMON, WARSHAW &**
**PENNY, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA  94104
Telephone: (415) 433-9000
Facsimile:  (415) 433-9008
bsimon@pswplaw.com
rretana@pswplaw.com
asheanin@pswplaw.com
wnewsom@pswplaw.com

Michael D. Hausfeld (*pro hac vice* pending)
James J. Pizzirusso (*pro hac vice* pending)
**HAUSFELD LLP**
1700 K Street, NW Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile:  (202) 540-7201
mhausfeld@hausfledllp.com
jpizzirusso@hausfeldllp.com

Michael P. Lehmann (Bar No. 77152)
Bruce J. Wecker (Bar No. 78530)
Arthur N. Bailey, Jr. (Bar No. 248460)
**HAUSFELD LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile:  (415) 358-4980
mlehmann@hausfeldllp.com
bwecker@hausfeldllp.com
abailey@hausfeldllp.com

Attorneys for Plaintiff and the Class

KIESEL BOUCHER LARSON LLP
Attorneys at Law
Beverly Hills, California