Bruce L. Simon (Bar No. 96241)
Robert G. Retana (Bar No. 148677)
**PEARSON, SIMON, WARSHAW & PENNY, LLP**
44 Montgomery Street, Suite 2450
San Francisco, California 94104
Telephone: (415) 433-9000
Facsimile:  (415) 433-9008
Email: bsimon@pswplaw.com
Email: rretana@pswplaw.com

Neville L. Johnson (Bar No. 66329)
**JOHNSON & JOHNSON LLP**
439 N. Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile:  (310) 975-1095
Email: njohnson@jjllplaw.com

Michael D. Hausfeld                     Raymond P. Boucher (Bar No. 115364)
James J. Pizzirusso                     Jeffrey A. Koncius (Bar No. 189803)
**HAUSFELD LLP**                        **KIESEL BOUCHER LARSON LLP**
1700 K Street, NW Suite 650             8648 Wilshire Boulevard
Washington, D.C. 20006                  Beverly Hills, California 90211
Telephone: (202) 540-7200               Telephone: (310) 854-4444
Facsimile:  (202) 540-7201              Facsimile:  (310) 854-0812
Email: mhausfeld@hausfledllp.com        Email: boucher@kbla.com
Email: jpizzirusso@hausfedllp.com       Email: koncius@kbla.com

Attorneys for Plaintiff and the Class

[Additional Counsel Appear on Signature Pages]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTHA DAVIS, as assignee of "THE MOTELS," on behalf of herself and all others similarly situated,<br><br>              Plaintiff,<br><br>       vs.<br><br>EMI GROUP LIMITED; CAPITOL RECORDS, LLC; EMI MUSIC NORTH AMERICA, LLC; EMI RECORDED MUSIC; and EMI MARKETING,<br><br>              Defendants. | CASE NO.:  3:12-cv-01602-MEJ<br><br>**FIRST AMENDED COMPLAINT**<br><br><u>**CLASS ACTION**</u><br><br>**JURY TRIAL DEMANDED** |

1    Plaintiff Martha Davis as assignee of "The Motels" on behalf of herself and all others

2    similarly situated, alleges upon personal knowledge as to herself and her own acts, and upon

3    information and belief as to all other matters, based upon, *inter alia*, the investigation made by and

4    through her attorneys, as follows:

5    ### I.  <u>**NATURE OF THE ACTION**</u>

6    1.    Plaintiff brings this nationwide class action for breach of contract and statutory

7    violations of California law against Defendants EMI Group Limited; Capitol Records, LLC; EMI

8    North America, LLC; EMI Recorded Music; and EMI Marketing (collectively referred to herein as

9    "EMI"), for EMI's failure to properly account to Plaintiff and Class members for royalties

10   stemming from the licensing of Plaintiff's and Class members' musical performances or

11   recordings produced by them that were utilized by "Music Download Providers," "Music

12   Streaming Providers" and "Ringtone Providers" (collectively "Digital Content Providers") for

13   digital download, streaming and distribution.

14   2.    Plaintiff seeks monetary damages, injunctive, and/or declaratory relief against EMI

15   for its willful violation of contracts between itself and recording artists and/or music producers

16   through which EMI obtained recording artists' and producers' master recordings in exchange for

17   the payment of certain royalties to these artists and producers (hereinafter "Standard Recording

18   Agreements").  EMI has unilaterally breached these contracts by deciding to pay its recording

19   artists and producers a fraction of the actual amount owed to them for the licensing of master

20   recordings to Digital Content Providers and has failed to properly pay royalties to its artists for

21   electronic transmission of their works.

22   3.    On information and belief, EMI has entered into licensing agreements with Digital

23   Content Providers whereby these Digital Content Providers are permitted to sell or stream EMI's

24   catalogue of master recordings (including those made and/or produced by Plaintiff and Class

25   members under EMI's Standard Recording Agreements) to end users via digital transmission.

26   4.    On information and belief, under its licensing agreements with Music Download

27   Providers, EMI receives approximately seventy percent (70%) for every licensed, digital

28   download sold by the Music Download Provider to an end user.

5.      On information and belief, under its licensing agreements with Ringtone Providers, EMI receives approximately fifty percent (50%) of the retail sale price for every licensed, digital download sold by the Ringtone Provider to an end user.

6.      On information and belief, under its licensing agreements with "Music Streaming Providers," EMI has received significant advance and other payments related to the digital streaming of music.

7.      Under the Standard Recording Agreements at issue in this case, when EMI licenses master recordings produced under these agreements to third parties, EMI is required to pay its recording artists and producers a certain royalty equal to a percentage of all net receipts received by EMI from these third party-licensees (hereinafter the "Masters Licensed Provisions").  The Masters Licensed Provisions apply to master recordings licensed by EMI to Digital Content Providers for their transmission through digital distribution.

8.      Rather than paying its recording artists and producers the percentage of net receipts it received—and continues to receive—from Digital Content Providers for "licenses," EMI fails to pay appropriate royalties and, for example, wrongfully treats each digital transmission as a "sale" of a physical phonorecord (i.e., an LP, EP, CD, or cassette tape) through "Normal Retail Channels," which are governed by much lower royalty provisions than "licenses" in EMI's Standard Recording Agreements.  In doing so, EMI has:

a.      Failed to properly account to and pay Plaintiff and other Class members moneys owed to them from the licensing of master recordings to Digital Content Providers;

b.      Underreported the actual number of digital downloads and digital streams that occur by treating these transmissions as they would sales of physical product that might be returned;

c.      Deducted, without authorization or legal authority, container/packaging deductions when no such deductions are applicable to digital transmissions; and/or

3
FIRST AMENDED COMPLAINT

1          d.      Reduced its royalty payments by improperly taking "audiophile

2   deductions."[1]

3          9.      In addition, on information and belief, EMI illegally withholds a certain percentage

4   of royalties owed to Plaintiff and Class members as "reserves."  These reserves are meant to offset

5   losses related to the return of unsold records; however, digital transmissions are incapable of being

6   returned, as there is no physical product to return.

7          10.     During the applicable Class Period, EMI has, in a wide-spread and calculated

8   manner, violated the royalty provisions of its Standard Recording Agreements with Plaintiff and

9   Class members by (a) failing to make proper royalty payments to Plaintiff and Class members

10  and/or (b) failing to properly credit Plaintiff's and Class members' royalty accounts.  As a result of

11  EMI's ongoing breach of the Masters Licensed Provisions, Plaintiff and Class members have

12  suffered hundreds of millions of dollars in damages.

13         11.     In *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010), the

14  Ninth Circuit held, in an analogous action against another major record label, that royalties for

15  digital downloads and mastertones (ringtones) should be paid pursuant to the amounts agreed to

16  for a "license" and not at the lower rate of a "sale."  621 F.3d at 964-67.  The Ninth Circuit's

17  ruling became final when the U.S. Supreme Court recently declined review.  *See id.*, *cert. denied*,

18  131 S. Ct. 1677 (March 21, 2011). The conclusion that EMI has acted improperly in this case

19  follows from the Ninth Circuit's ruling in *F.B.T. Prods.* that Universal Music Group, Inc.

20  ("UMG") and one of its owned and distributed record labels, Aftermath Records, failed as a matter

21  of law to properly account for and pay royalty payments on digital content to artists and producers.

22         12.     In holding that UMG's agreements with "iTunes [the market leader in the digital

23  downloads of recorded music], cellular phone carriers [primarily Sprint, Verizon, and AT&T] and

24  other third parties to use [UMG's] sound recordings to produce and sell permanent downloads and

25  _____

26  [1] Audiophile records are those marketed in specially priced catalog series by reason of their
    superior sound quality or other distinctive technical characteristics.

27

28

1   [ring]tones . . . *qualify as licenses*," *id.* at 964 (emphasis added), the Ninth Circuit found that the

2   agreements at issue unambiguously provided for a much higher royalty payment than UMG had

3   previously paid.

4         13.    EMI's Standard Recording Agreements are, in every material way, the same as

5   UMG's Standard Recording Agreements in *F.B.T. Prods.* Accordingly, Plaintiff here alleges that

6   the digital download income received by EMI from Digital Content Providers are based on

7   "licenses" and not "sales," as those terms are defined in EMI's Standard Recording Agreements

8   with these Providers. Just as UMG in *F.B.T. Prods.*, EMI has not properly accounted for the

9   appropriate amount of royalties owed to Plaintiff and Class members. By this lawsuit, Plaintiff

10   seeks to compel EMI to account for and pay all of its recording artists and music producers their

11   rightful share of the licensing income paid to EMI for digital transmissions.

12         14.    Contrary to public perception, not all recording artists are paid vast sums in

13   royalties; in fact, some recording artists have been reported to be destitute after the high points of

14   their careers have passed. *See* Chuck Phillips, "Artists Put Pressure on for Benefits", L.A. TIMES,

15   June 3, 2002. In response to such stories, the California Senate Judiciary Committee co-chaired

16   hearings during which Senator Martha Excutia, Chair of the Committee, noted that "if public tax

17   dollars are being spent to support artists who were cheated out of their royalty earnings, we need

18   to shift the burden back to where it belongs: to the record labels that failed to pay the artists their

19   rightful earnings." Record Label Accounting Practices: J. Hearings of the Cal. State Senate

20   Comm. on the Judiciary and State Senate Select Comm. on the Entm't Indus., 2001-2002 Leg. 3,

21   (Cal. 2002), at 1 (as quoted in 20 Berkeley Tech L. J. 933, 944 n.66).

22         15.    This action seeks the payment to artists of their "rightful earnings."

23         16.    Plaintiff seeks damages on behalf of herself and all others similarly situated, as

24   well as an accounting and judgment declaring the proper method of calculating payments of

25   royalties or crediting royalty accounts with respect to the licensing of master recordings to Digital

26   Content Providers. Further, Plaintiff requests that this Court order EMI to adhere to the proper

27   methodology for calculating such royalties in the future.

28

## II.  THE PARTIES

17.     Plaintiff Martha Davis is a musician, recording artist, and performing artist who resides in St. Helens, Oregon.  Plaintiff was the lead singer of a band known as "The Motels" and pursuant to an assignment of rights, she is the assignee of all rights and obligation of The Motels. The Motels is a New Wave music band from the Los Angeles area best known for the songs "Only the Lonely" and "Suddenly Last Summer", each of which peaked at #9 on the Billboard Hot 100 in 1982 and 1983, respectively.  They have had five singles on the Billboard Hot 100.[2]  Two of their albums have gone gold in the United States.

18.     Defendant EMI Group Limited is a business entity headquartered in the United Kingdom, that undertakes significant business activity in this State and District, through its divisions, related and affiliated entities, owned and distributed record labels, and predecessors in interest including, but not limited to, the entity previously headquartered in Hollywood known as "Capitol Records, Inc."

19.     Defendant Capitol Records, LLC is a Delaware corporation with its principal places of business in New York, New York and Los Angeles, California.  Capitol Records is a global music company that specializes in the signing, development, and promotion of recording artists and their musical compositions.

20.     On information and belief, Capitol Records, LLC is also doing business as Defendant EMI Music North America, LLC.  EMI Music North America, LLC is a global music company that specializes in the signing, development, and promotion of recording artists and their musical compositions.

21.     On information and belief, Capitol Records, LLC is also doing business as Defendant EMI Recorded Music.  EMI Recorded Music is a global music company that specializes in the signing, development, and promotion of recording artists and their musical

---

[2] http://www.allmusic.com/artist/the-motels-p4960/charts-awards/billboard-singles

1  compositions.

2       22.     On information and belief, Capitol Records, LLC is also doing business as

3  Defendant EMI Music Marketing.  EMI Music Marketing is a global music company that

4  specializes in the signing, development, and promotion of recording artists and their musical

5  compositions.

6       23.     At all relevant times, EMI was and continues to be in the business of exploiting the

7  sound recordings of musical performances and the audio-visual recordings of such performances.

8  EMI's exploitation includes, but is not limited to, producing, manufacturing, distributing,

9  licensing, and selling these recordings.  According to EMI it "is one of the world's leading music

10  companies, home to some of the most successful and best known recording artists."

11  http://www.emimusic.com/about/ Further, EMI "record labels include Angel, Astralwerks, Blue

12  Note, Capitol, Capitol Latin, Capitol Records Nashville, EMI Classics, EMI CMG, EMI Records,

13  EMI Records Nashville, Manhattan, Parlophone, Virgin Classics and Virgin Records." *Id.*  The

14  EMI roster of artists include "Lily Allen, Bat For Lashes, The Beatles, Beastie Boys, Luke Bryan,

15  Coldplay, Depeche Mode, Gorillaz, David Guetta, Iron Maiden, Norah Jones, Lady Antebellum,

16  Massive Attack, Kylie Minogue, Katy Perry, Pink Floyd, Corinne Bailey Rae, Sir Simon Rattle,

17  Snoop Dogg, Tinie Tempah, Thirty Seconds To Mars, KT Tunstall and Keith Urban as well as

18  international artists such as Amaral (Spain), Air and Camille (France), Empire of the Sun

19  (Australia), Tiziano Ferro and Vasco Rossi (Italy), Flex (Mexico), LaFee (Germany) and Hikaru

20  Utada (Japan)". *Id.*

21       24.     In November 2011, UMG announced it had signed a deal with EMI owner

22  Citigroup to purchase the legendary label's recorded music division, while a consortium led by

23  Sony agreed to purchase EMI's publishing division.  EMI's recorded music unit was sold to UMG

24  for $1.9 billion,[3] however, that deal is not yet final and is undergoing regulatory approval at the

25  time of this filing.  Upon information and belief, the sale occurred due to EMI being so poorly

26  _____

27  [3] http://online.wsj.com/article/SB10001424052970204224604577031694160429400.html

28

1   managed by a fund that had acquired it that it was foreclosed upon by its lender and sold to UMG.

2   Prior to the sale, EMI had been operating as a skeleton operation the past few years in a desperate

3   attempt to stay solvent and viable.

4        25.     The European Union's antitrust regulator gave approval to the $2.2 billion

5   acquisition of the music publishing arm of EMI Group Ltd. by Sony Corp. of America and

6   investment fund Mubadala Development Co. PJSC, after the companies agreed to a series of

7   divestitures.

8        26.     SAG-AFTRA and the American Federation of Musicians sent letters to the Federal

9   Trade Commission expressing support for UMG's proposed purchase of EMI's recorded music

10   division.  The sale is still pending regulatory approval

11   ### III.  JURISDICTION AND VENUE

12        27.     This Court has jurisdiction over this matter pursuant to the Class Action Fairness

13   Act, 28 U.S.C. §§ 1332(d), because the aggregate claims of the Class exceed the sum or value of

14   $5,000,000, and there is diversity of citizenship between proposed Class members and EMI.  This

15   Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

16        28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (c).

17   ### IV.  SUBSTANTIVE ALLEGATIONS

18   **A.**     **Music Download Services**

19        29.     "Music Download Services" allow consumers to purchase and download digital

20   versions of master recordings directly to their computers or other electronic storage devices

21   ("Music Downloads").  There is no physical packaging and returns are not permitted.  However,

22   Music Downloads often have various restrictions in place to prevent the consumer from copying

23   and/or sharing the Music Download with others.  Oftentimes, these restrictions are enforced

24   through a Digital Rights Management system ("DRM") that encrypts the content.  Music

25   Download Services are offered by Music Download Providers.

26        30.     On information and belief, in order to allow users to purchase digital copies of the

27   master recordings owned by record labels, Music Download Providers have signed ***licensing***

28   agreements with EMI and other record labels.  Depending on the licensing agreement with the

1   record label, Music Download Providers generally either: (a) charge a flat, per-download fee to

2   end users; or (b) operate as a subscription service, allowing consumers to access digital copies of

3   the master recordings for a set monthly fee for as long as they continue paying the monthly

4   subscription charge.  Some providers offer both options.

5          31.     The first commercially successful Music Download Provider, Ritmoteca.com, was

6   founded in or around 1999.  Ritmoteca signed licensing agreements with UMG, Warner Brothers,

7   Sony Music Entertainment, and Bertelsmann Music Group, between 1999 and 2000.  These

8   licensing agreements allowed Ritmoteca to offer its customers 300,000 tracks for download at

9   prices between 99¢ and $1.99 per track, or $9.99 per album.  Ritmoteca folded during the dot-com

10  bust in April 2000.

11         32.     Shortly thereafter, in or around 2001, other Music Download Services were

12  developed by both the major record labels and by independent companies.  These services faced

13  stiff competition from illegal downloading sites such as Napster.com and were largely

14  unsuccessful.

15         33.     When Apple launched its iTunes Store in April 2003, and offered "legal" Music

16  Downloads for, on average, 99¢ per track or $9.99 per album, the popularity of digital downloads

17  began to grow exponentially.  On February 24, 2010, total Music Downloads from the iTunes

18  Store reached 10 billion tracks.  Today, the iTunes Store accounts for roughly two-thirds of all

19  Music Downloads.  The iTunes store generated $1.4 billion in revenue for Apple in the second

20  quarter of 2011, up from $1.1 billion in the second quarter of 2010.

21         34.      Besides the iTunes Store, many Music Download Providers have signed licensing

22  deals with EMI and other record labels to offer Music Downloads to consumers.  These providers

23  include, but are not limited to, Amazon.com, Buy.com, Liquid Digital Media (walmart.com),

24  Napster, Rhapsody, Microsoft's Zune Marketplace, and eMusic.  In fact, the International

25  Federation of the Phonographic Industry ("IFPI"), a worldwide representative of the record

26  industry, estimates that record labels had licensed roughly 13 million tracks of music to over 400

27  Music Download Providers by 2010.

28         35.     The licensing of master recordings to Music Download Providers has become

9
FIRST AMENDED COMPLAINT

1  highly lucrative for record labels such as EMI.  It is estimated that the licensing of master

2  recordings generated $4.6 billion in worldwide revenue for record labels in 2010, or roughly 29%

3  of their total revenue.  In the United States, Music Downloads account for roughly half of record

4  labels' revenues; revenue from Music Downloads is expected to surpass revenue from album sales

5  by 2012.

6       36.     EMI itself has long recognized the important role that digital sales play and how it

7  has continued to seek to make its presence felt in the digital marketplace:

8           Given our heritage of innovation, when digital music began to take
            off in the 1990s, EMI was well placed to respond to the new trends.
9           EMI Music's first websites went live in 1993 and 1994 and in 1998
            EMI streamed the first complete album over the internet,
10          'Mezzanine' by Massive Attack.  The following year EMI was the
            first company to release a digital album download, David Bowie's
11          '…Hours'.  EMI also launched the first internet video single in
            2001.  In 2007 EMI was the first major music company to make its
12          music available without digital rights management (DRM) software.

13          In 2009 Coldplay became the first recording artists to sell more than
            one million digital albums in the US and two million worldwide and
14          this year we launched OpenEMI to engage directly with the tech
            developer community around the world with initiatives such as
15          creating a platform with The Echo Nest for developers to access
            EMI Music tracks and content to create innovative and exciting new
16          apps and digital music concepts for EMI's artists.

17          Today EMI Music has agreements with hundreds of digital partners
            to distribute our music across the globe, covering a huge variety of
18          digital music business models and ideas.

19  http://www.emimusic.com/about/

20       37.     EMI is, as of this filing, one of the "Big 4" group of record labels (UMG, EMI,

21  Warner Music Group Corp., and Sony BMG Music Entertainment) which is soon to be known as

22  the "Big 3" once EMI is finally acquired by UMG.  Together, these labels license 80% of the

23  Music Downloads sold by Music Download Providers to end users in the United States.

24       38.     Music Download Providers have obtained licenses from EMI that authorize them to

25  sell or otherwise distribute, via digital download, either all or some of EMI's catalog of master

26  recordings, including Plaintiff's recordings as described herein. In this regard, in its annual review

27  for 2009/10, it was noted that "DIGITAL MILESTONES[:] EMI Music is working at the forefront

28  of digital music innovation, and we have developed an award-winning digital marketing capability

to drive our expansion in this area.  The consumer insight that this capability delivers enables us to identify potential release schedule opportunities and drive ongoing marketing efficiency and effectiveness. During the past year, the company [EMI MUSIC] signed new digital agreements with iTunes, Microsoft, Sky, Rhapsody, Napster, Deezer, MOG, RDIO, Grooveshark, Stingray Digital (Canada), Australian telco AAPT, and Hungama Digital Media (South East Asia), among others." Maltby Capital Limited Annual Review 2009/10 ("Annual Review") at 13/106.

39.    As set out by EMI itself, digital sales for its artists have been significant, for example "Katy Perry continued to have a successful 12 months with her global hit album 'One of The Boys' which was released in June 2008 selling a further 3.8 million digital track downloads and nearly half a million full albums during the 2010 financial year. Coldplay, whose 2008 album 'Viva La Vida' was the biggest selling album worldwide that year, passed another milestone in July 2009 when they became the first artist to sell more than one million full digital albums in the US and two million globally."  Annual Review at 11/106.

40.    On information and belief, under its licensing agreements with Music Download Providers, EMI does not manufacture or warehouse any physical product or packaging, nor does it ship or sell any product to stores or other distribution points, and consequently faces no risk of breakage or the return of unsold product.  Rather, as the Ninth Circuit held with respect to UMG and Aftermath Records in *F.B.T. Prods.*, EMI is licensing its catalog of recordings to Music Download Providers for sale or distribution by them via digital download by consumers.  EMI, recognizing the "continuing rapid decline of the physical market" (Annual Review at 47/106) has sought to "offset" such decline by a corresponding "growth in digital sales" (Annual Review at 24/106).

41.    The prevalence of digital download sales by Music Download Providers means that EMI's continued improper accounting of royalties owed to Plaintiff and Class members has deprived Plaintiff and the Class of millions of dollars in royalties.

**B.    Music Streaming Services**

42.    "Music Streaming Services" allow consumers to listen to (or "stream") digital versions of master recordings directly through their computers or other electronic storage devices

1  without actually purchasing an electronic copy of the recording.  Music Streaming Services often

2  have various restrictions in place to prevent the consumer from copying and/or sharing the Music

3  Stream with others.  Music Streaming Services are offered by Music Streaming Providers.

4        43.     On information and belief, in order to allow users to stream digital copies of the

5  master recordings owned by record labels, Music Streaming Providers have signed *licensing*

6  agreements with EMI and other record labels.  Depending on the licensing agreement with the

7  record label, Music Streaming Providers generally either: (a) charge a flat, per-stream fee to end

8  users; or (b) operate as a subscription service, allowing consumers to access digital copies of the

9  master recordings for a set monthly fee for as long as they continue paying the monthly

10  subscription charge.  Some providers offer both options.

11        44.     Some Music Streaming Providers have paid significant upfront fees to labels, such

12  as EMI, to acquire rights to large catalogs of music.  Due to non-disclosure agreements signed

13  between Music Streaming Providers and Labels, artists (such as Plaintiff and the Class herein) are

14  not provided with any details about these payments and there is little transparency about how –

15  and if – that money makes its way to artists.  On information and belief, EMI does not provide

16  appropriate royalty payments to its artists (such as Plaintiff and the Class herein) from the

17  licensing income it receives from Music Streaming Providers.

18  **C.    Master Ringtones**

19        45.     Ringtones that are a portion/clip of an artist's actual sound recording (rather than an

20  electronic reproduction, e.g., MIDI) and are played on a mobile phone when someone is calling,

21  texting, or otherwise trying to contact the mobile phone operator are known as "mastertones."

22        46.     Mastertones are sold to consumers by Ringtone Providers and range in price

23  between $1.00 and $3.00 per ringtone.  Ringtone Providers include, but are not limited to, wireless

24  carriers (e.g., AT&T Wireless, Verizon Wireless, Sprint, and T-Mobile), content owners (e.g.,

25  MTV and VH1), and third-party aggregators (e.g., Zed, Hudson Soft, Jamster and iTunes).  In

26  general, consumers purchase and download mastertones directly from their mobile phones.

27        47.     On information and belief, in order to sell Mastertones to consumers, Ringtone

28  Providers have entered into license agreements with EMI and other record labels that authorize

1   Ringtone Providers to use the label's master recordings to produce ringtones for sale to

2   consumers.  In return, the Ringtone Providers pay the record labels approximately fifty percent

3   (50%) of the retail sales price of the mastertone.

4          48.     Record labels have made hundreds of millions, if not billions, of dollars from their

5   licensing agreements with Ringtone Providers.  Global mastertone sales reached roughly $4 billion

6   in 2004.  In the United States, mastertone sales reached $714 million in 2007 and $541 million in

7   2008.

8          49.     Ringtone Providers continue to sell mastertones and to enter into license

9   agreements with record labels.  In fact, Apple did not enter into a license agreement with record

10  labels that enabled them to sell mastertones until in or around September 2009.  Currently,

11  mastertones are available on the iTunes Store for between 0.99¢ and $1.29 per download.

12         50.     Mastertones continue to play an important role in record labels' revenue streams as

13  well.  The RIAA has added its Gold and Platinum recognition program to mastertone sales.  In

14  2006, the RIAA awarded Gold Status (500,000 downloads) to 84 mastertones, Platinum Status

15  (1,000,000 downloads) to 40 mastertones, and Multi-Platinum Status (increments of 1,000,000

16  downloads over 1,000,000 downloads) to 4 mastertones.  In 2009, the RIAA certified Lil Wayne's

17  "Lollipop" mastertone as 5x Platinum (5 million downloads).  In 2010, the RIAA awarded

18  Platinum Status to five additional mastertones: AC/DC's "Thunderstruck"; Akon's "Right Now

19  (Na Na Na)"; Jason Aldean's "Big Green Tractor"; Drake's "Best I Ever Had"; and Young

20  Money's "Bedrock."

21         51.     On information and belief, under its licensing agreements with Ringtone Providers,

22  EMI does not manufacture or warehouse any physical product or packaging, nor does it ship or

23  sell any product to stores or other distribution points, and consequently faces no risk of breakage

24  or the return of unsold product.  Rather, EMI is licensing its catalog of master recordings to

25  Ringtone Providers for sale or distribution by them via digital download to consumers.

26         52.     The lucrative sales of mastertones by Ringtone Providers means that EMI's

27  continued improper accounting of royalties owed to Plaintiff and Class members has deprived

28  Plaintiff and the Class of millions of dollars in royalties.

53.     The agreements between Digital Content Providers and EMI that allow these providers to distribute EMI's master recordings for sale through digital downloads are "licenses" and subject to the royalty provisions for such clauses.

**D.     EMI's Standard Recording Agreements**

54.     EMI and its predecessors in interest and affiliates have entered into Standard Recording Agreements with musical artists and producers whose musical performances EMI intended to commercially exploit.  Under these Standard Recording Agreements, the artists and producers promised to make certain master recordings for EMI and to transfer title to these master recordings so that EMI could engage in commercial exploitation of these recordings.  In return, EMI promised to pay the recording artists and producers certain royalties.

55.     Specifically, under EMI's Standard Recording Agreements, the artists and producers are entitled to the payment of royalties as either (a) actual payments, or (b) credits against advances paid by EMI to the artist and/or producer until such advances are recouped, after which time, EMI is required to pay royalties to the artist and/or producer.

56.     EMI's Standard Recording Agreements set forth and govern the calculation, distribution, and payment of royalties by EMI to each Class member.  On information and belief, these royalties are computed electronically through various software programs that EMI controls and maintains.  Thus, the ability to calculate the amount owed to Plaintiff and Class members is a matter of simple calculations through adjustment of these software programs.

57.     In accordance with industry practice, EMI's Standard Recording Agreements set forth the same, or substantially the same, two equations for all Class members.  The royalties owed to these artists and performers equal the sum of two equations:

          a.     Royalties for phonorecords *sold* by EMI and its affiliates in the United States and abroad ("sold equation"); and

          b.     Royalties for master recordings *licensed* by EMI to third parties ("licensed equation").

58.     These equations were invariably drafted by EMI, its predecessors in interest and affiliates and were non-negotiable terms of its Standard Recording Agreements.  While EMI's

1  recording agreements may have varied slightly in non-material ways, every recording agreement

2  that is part of the Class has these standard equations.

3      59.     EMI's Standard Recording Agreements provide a significantly higher percentage of

4  royalties under the licensed equation than under the sold.  In general, the sold equation provides

5  for royalties of between five and thirty percent (5% - 30%) (depending on the popularity of the

6  artist; i.e., the more popular, the higher the royalty rate) while the licensed equation generally

7  provides for royalties of twenty-five to fifty percent (25% - 50%) of net receipts.  Under both

8  equations, EMI takes certain deductions before computing the royalties owed.  Again, these

9  deductions are all calculated electronically and are a matter of simple inputs into EMI's

10  standardized software programs.

11      60.     The sold equation in EMI's Standard Recording Agreements provides for

12  substantially more deductions than those found in the licensed equation.  For example, such

13  deductions typically include:

14          a.     A "Net Sales Deduction";

15          b.     A "Container Charge" deduction, depending on the type of phonorecord

16  sold; and/or

17          c.     An "Audiophile Deduction."

18      61.     As a result, a recording artist or producer is paid a significantly lower percentage of

19  the total money received by EMI for its commercial exploitation of the artist's or producer's

20  master recordings under the sold equation than under the licensed equation.

21  **E.     The Recording Agreements at Issue**

22      **1.     The Motels 1979 Contract**

23      62.     On or about May 12, 1979, "The Motels" entered into an agreement with Capitol

24  Records, Inc. ("Capitol") that is typical of the form recording agreement signed by members of the

25  Class (the "1979 Agreement").  As of the filing of this Complaint, EMI owns the Capitol label

26  and, therefore, now owns the rights to the master recordings referred to in the 1979 Agreement.

27      63.     The 1979 Agreement provides that The Motels would record masters for Capitol

28  and Capitol would exploit those masters through the sale and licensing of them.

64.     As set forth below, the royalties to be paid to The Motels differ and are dependent on whether a "sale" or "license" of their works occurs.

65.     Paragraph 2 of the 1979 Agreement generally governs the payment of royalties to The Motels for the "sale" of their master recordings to be paid as follows:

- 14% for sales of singles
- 16% for sales of "other records"

66.     With regard to royalties on "lp-disc" sales, pursuant to Paragraph 20(a), they are paid on a sliding scale as follows during the initial and first option periods:

- 16% for net sales of 1 – 500,000 units
- 18% for net sales of 500,001 – 1,000,000 units
- 20% for net sales of 1,000,001 – 1,500,000 units
- 22% for net sales over 1,500,000 units

Pursuant to Paragraph 20(c), during the second and third option periods, the above percentages are each increased 2%, e.g., 18% for net sales of 1 – 500,000 units, etc.

67.     With regard to royalties on singles, pursuant to Paragraph 20(e), they are paid on a sliding scale as follows:

- 14% for net sales of 1 – 500,000 units
- 16% for net sales over 500,000 units

68.     With regard to royalties for "sales" in the United States such royalties, pursuant to Paragraph 3(a)(i) are to be "computed and paid upon net sales of records" against which "Capitol shall be entitled to withhold from payments otherwise due from time to time reasonable reserves against anticipated returns, rebates and credits".

69.     In contrast to the payment of royalties on sales contained in the 1979 Agreement, Paragraph 3(a)(vii) stated that the royalty on licenses of the artistic works would be 50% of the net sales:

> (vii) As to records sold embodying masters hereunder or masters*
> [*hereunder] otherwise used by licensees of Capitol or licensees of
> Capitol's licensees, and if fees payable to Capitol are for record club
> sales or are based on a flat fee, or cent rate per unit sold (herein
> referred to as "Flat Fee"), then in lieu of any other royalty specified
> in this agreement, my royalty shall be 50% of Capitol's net royalties
> from such licensee with respect to such sale of records or other use
> of the applicable masters, as the case may be, computed on the same
> quantity, basis and in the same manner as Capitol is paid.  For the
> purpose hereof, the term "net royalties" shall mean the gross Flat

Fee received by Capitol from the applicable licensee with respect to either:

(a)     net sales of records, . . . .

70.     Accordingly, a licensed master should result in the payment of 50% of EMI's net sales, which is significantly higher than the royalty payable on sales as set out above.

71.     Paragraph 17 of the 1979 Agreement contains a California choice of law provision and expressly provides that the contract be interpreted under California law.  As set forth above, both Plaintiff and EMI have substantial contacts with the State of California.

**2.      The Motels 1985 Contract**

72.     On or about April 1, 1985, "The Motels" entered into a subsequent agreement with Capitol that is typical of the form recording agreement signed by members of the Class (the "1985 Agreement").

73.     The 1985 Agreement provides that The Motels would record masters for Capitol and Capitol would exploit those masters through the sale and licensing of them.

74.     As set forth below, the royalties to be paid to The Motels differ and are dependent on whether a "sale" or "license" of their works occurs.

75.     Paragraph 7 of the 1985 Agreement governs the payment of royalties to The Motels for the "sale" and "licensing" of their master recordings.

76.     With regard to royalties for "sales" in the United States such royalties, pursuant to Paragraph (7)(a)(i) are to be "computed and paid upon net sales of records" against which "Capitol shall be entitled to withhold from payments otherwise due from time to time reasonable reserves against anticipated returns and credits".  Further, the royalty to be paid is as follows:

- 20% for sales of 7 inch singles
- 14% for sales of 12 inch singles and Mini-LP's
- $1.15 for "All Other Records"

Paragraph 7(b)(i) then "proportionally" increases, or decreases, the royalty on album sales using $8.98 as a benchmark (where x, in the following formula "equals the royalty applicable to the album with the Different Retail List Price"):

$$\frac{\$1.15}{\$8.98} \quad = \quad \frac{x}{\text{Different Retail List Price}}$$

Therefore, the benchmark royalty on an album sale, is 12.81% ($1.15 ÷ $8.98).

77.     In contrast to the payment of royalties on sales contained in the 1985 Agreement, Paragraph 7(a)(vi) stated that the royalty on licenses of the artistic works would be 50% of the net sales:

> (vi) As to records sold by a licensee of Capitol through a special markets plan or record club distribution plan; or as to soundtrack albums (other than soundtrack albums distributed by Capitol or licensed by Capitol to be distributed by Primary Licensees) embodying masters; or with respect to masters otherwise used by licensees of Capitol (other than Primary Licensees) in lieu of any other royalty specified in this Agreement, Company's royalty shall be fifty percent (50%) of the net royalties received by Capitol from such licensee with respect to such sales of records or such other use of the applicable masters, as the case may be, computed on the same quantity, basis and in the same manner as Capitol is paid.  For purposes hereof the term "net royalties" shall mean the gross amount received by Capitol from the applicable licensee with respect to either:
>
> (A) net sales of records, . . . .

78.     Accordingly, a licensed master should result in the payment of 50% of EMI's net sales, which is significantly higher than the royalty payable on sales as set out above.  Therefore, in both the 1979 and 1985 Agreements the royalty to be paid on licenses is 50% of net receipts.

79.     Paragraph 9 of the 1985 Agreement contains a California choice of law provision and expressly provides that the contract be interpreted under California law.  As set forth above, both Plaintiff and EMI have substantial contacts with the State of California.

80.     The Motels have satisfied their obligations under the 1979 and 1985 Agreements.  However, EMI has not paid The Motels, nor the members of the Class similarly situated, the correct sums for digital transmissions of their music.  Instead of paying the agreed-upon rate of fifty percent (50%) of net receipts for a *licensed* master recording, EMI pays The Motels and members of the Class similarly situated a much lower royalty based on a *sale* of a physical recording (e.g., a CD) which includes, on information and belief, deductions for container charges and other items that are not at issue in digital transmissions since no physical product is being

1  manufactured and shipped for use by end-users.

2  **F.      EMI Has Licensed its Master Recordings to Digital Download Services and Should Pay License Royalty Rates to Artists**

3

4      81.      EMI's Standard Recording Agreements provide that where EMI licenses master

5  recordings to third parties for the third party's record or other use, EMI will pay the recording

   artist or producer whose master was licensed fifty percent (50%) of its net receipts from the third

6  party.

7      82.      On information and belief, EMI has entered into contracts with Digital Content

8  Providers that allow these providers to digitally distribute all or some of EMI's catalog of master

9  recordings to end-users.  In exchange, these providers pay EMI a flat rate or fixed percentage per

10 digital download (typically 70¢).  As is custom in the industry, and upon information and belief,

11 EMI typically receives sales reports from Digital Download Services which set out the sales of the

12 recordings as set out herein.

13     83.      These Digital Content Providers include, but are not limited to, the following

14 entities:

15          a.      Apple (iTunes Store);

16          b.      Amazon.com;

17          c.      Buy.com;

18          d.      Liquid Digital Media (walmart.com);

19          e.      Napster;

20          f.      MOG;

21          g.      Rdio;

22          h.      Rhapsody;

23          i.      Microsoft (Zune Marketplace);

24          j.      eMusic;

25          k.      Verizon Wireless;

26          l.      AT&T Wireless;

27          m.      Nokia;

28

1          n.      Sprint;

2          o.      T-Mobile;

3          p.      Virgin Mobile;

4          q.      Vodafone;

5          r.      Spotify;

6          s.      MTV;

7          t.      VH1;

8          u.      Zed;

9          v.      Orange;

10         w.      YouTube;

11         x.      MySpace Music;

12         y.      Hudson Soft; and

13         z.      Jamster.

14         84.     As discussed herein, EMI's agreements with these Digital Content Providers

15  constitute licenses and not sales.  As such, under EMI's Standard Recording Agreements, EMI is

16  required to pay Plaintiff and Class members the corresponding percentage of its net receipts from

17  these Digital Content Providers for licenses.

18         85.     However, in breach of its contractual obligations under its Standard Recording

19  Agreements, EMI has treated its transactions with Digital Content Providers as "sales" rather than

20  "licenses."  In so doing, EMI has applied the incorrect formula for calculating royalties owed to

21  Plaintiff and Class members, taken unjustifiable deductions (including, but not limited to, the Net

22  Sales Deduction, the Container Charge deduction, and the Audiophile Deduction), and applied a

23  royalty percentage that is, in general, less than half of what it should be applying in its

24  computation.

25         86.     Plaintiff is informed and believes that, before violating its obligations to its royalty

26  participants, EMI vetted the policies and practices at issue in this case at its highest corporate

27  levels; that it commissioned, either on its own initiative or with the support of the U.S. music

28  industry's principal trade organization, so-called "white papers" on the issue; that it analyzed

1   internally the financial consequences of its misconduct and cast it in terms of the additional profit

2   to be made by it avoiding its contractual obligations; and that it repeatedly made public statements

3   characterizing its agreements with Digital Music Providers in the interest of its recording artists.

4         87.    The licensing provision in EMI's Standard Recording Agreements provide a higher

5   royalty rate than retail sales because in cases where the record label "licenses" the master

6   recordings, the label is essentially acting as a conduit between the artist and a third party, and the

7   label incurs none of the normal costs of goods sold, such as physical materials, distribution,

8   advertising, and promotion.  Because the label incurs none of the traditional costs associated with

9   physical distribution of records when it gives Digital Content Providers the right to sell or stream

10  digital copies of master recordings, these agreements fall within the types of situations

11  contemplated by the parties when they agreed to the Master License Provision.

12        88.    Similarly, the royalty base price in EMI's Standard Recording Agreement is

13  generally computed, in part, by deducting a "Container Charge."  However, Container Charges are

14  meant to compensate the record label for the physical packaging of a record, and as such, are

15  inappropriate for digital transmissions that neither have, nor require, physical packaging.

16  Consequently, the royalty base price is unascertainable for digital downloads and cannot apply.

17        89.    The ordinary meaning of a license is the "permission to act," WEBSTER'S THIRD

18  NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1304 (2002), while a sale is (a) an

19  actual transfer of title in a copy of the work or (b) the passing of all exclusive, intellectual property

20  rights in a work.  *See* 17 U.S.C. § 109 (describing (a)); *Quality King Distribs. v. L'anza Research*

21  *Int'l*, 523 U.S. 135, 145 (1998) (describing (b)).

22        90.    Based on the ordinary meanings of "license" and "sale," the Ninth Circuit found in

23  *F.B.T. Prods.* that the record labels "did not 'sell' anything to the download distributors.  The

24  download distributors did not obtain title to the digital files.  The ownership of those files

25  remained with [the label, which] reserved the right to regain possession of the files at anytime, and

26  [the label] obtained recurring benefits in the form of payments based on the volume of

27  downloads."  The facts in this case are analogous and, as such, the ordinary meaning of these

28  words supports a finding that these agreements were "licenses" under the Master License

1    Provision and not "sales."

2          91.    Under the first sale doctrine, after the first sale of a legally copyrighted work, the

3    copyright holder no longer has a right to restrict or prevent subsequent sale of their work.  Thus,

4    purchasers are free to resell CDs and other physical music products that were lawfully purchased

5    without obtaining the copyright holder's approval.  The U.S. Copyright Office, however, has

6    declined to extend this doctrine to digital media further arguing against these types of transactions

7    as "sales" as opposed to "licenses."

8          92.    Indeed, in the case of *Capitol Records, LLC v. ReDigi, Inc.*, Case No. 1:12-cv-

9    00095-RJS (S.D.N.Y.), Defendant Capitol Records, LLC has filed suit against a company known

10   as Redigi, Inc. (), an online marketplace for "used" MP3 files, arguing that consumers have no

11   right to re-sell these works.  Notably, in Paragraph 14 of Capitol Records, LLC's Complaint, it

12   asserts: "Plaintiff also redistributes and ***licenses*** its sound recordings in the form of digital audio

13   files, which are marketed and distributed online and delivered to the consumer via the Internet

14   through, inter alia, iTunes and Amazon."  (emphasis added).  Thus, it is inconceivable how EMI

15   can argue here that what is sold is a "phonorecord" under its Standard Artist Contracts (subject to

16   much lower royalty rates), but what is purchased by the consumer is not.

17         93.    As one commentator has noted, this position is inconsistent with the position taken

18   by the defendants in *F.B.T. Prods.*:

19              Two recent court cases hinge on how the sale of an MP3 download
                compares to the sale of a conventional physical recording, known as
20              a "phonorecord" in Copyright-speak. In one case, the singer
                Eminem demanded that Universal Music Group calculate his
21              royalties for downloads based on the higher rate for licensed
                material instead of the lower rate for phonorecord sales. UMG
22              refused, arguing that the sale of an MP3 download was the same as a
                phonorecord sale. In the second case, EMI filed suit against ReDigi,
23              a company that allows purchasers of MP3 downloads to resell those
                files under Copyright law's "first sale" doctrine. EMI argued that the
24              MP3 files were not phonorecords and thus not subject to first sale.

25              Putting these two arguments together, we see the music industry
                imagining transactions where what's sold is a phonorecord but
26              what's purchased isn't.

27   http://slworona.wordpress.com/2012/02/09/cognitive-dissonance-in-the-music-business/

28         94.    In another legal complaint against Grooveshark, an online, on-demand music

streaming service ("Complaint" (Jan. 4, 2012) in *EMI Entertainment World, Inc. v. Escape Media Group, Inc.*, No. 650013/2012 (Sup. Ct. N.Y. Cty.), EMI Entertainment World, Inc. averred that it had entered into a "Licensing Agreement" with Grooveshark whereby it granted Grooveshark the "'non-exclusive, non-transferable, royalty-bearing limited right and license' to reproduce Plaintiff's musical compositions in digital files and to distribute such files as so-called 'On-Demand Audio Streams' via the Grooveshark Service. *Id.*, Exhibit A ¶ 2. 'On-Demand Audio Streams' are defined in the License Agreement, essentially, as encrypted digital transmissions of music files from Defendant's server made at the request of and at a time chosen by the end user. Id.¶ 1(h).'"

95.     On information and belief, a recent deal between Apple and EMI that brought The Beatles' catalog to iTunes for the first time purportedly required EMI to treat The Beatles' digital downloads as subject to a license, as The Beatles and their publisher are being paid directly by Apple.

96.     Former Apple CEO, Steve Jobs, published a piece entitled "Thoughts on Music" on February 6, 2007 in which he stated, "[s]ince Apple does not own or control any music itself, it must *license* the rights to distribute music from others, primarily the 'big four' music companies: Universal, Sony BMG, Warner, and EMI."  (Emphasis added.)  Thus, the CEO of the largest Digital Download Provider in the world has characterized its agreement with EMI as a "license" and not a "sale."

97.     In its terms of service of the iTunes Store, Apple states that "Apple and its *licensors* reserve the right to change, suspend, remove, or disable access to any iTunes products, content, or other materials."  (Emphasis added.)  Thus, Apple has explicitly acknowledged that it licenses content from third parties, which includes EMI.

98.     Upon information and belief, the Master License Provisions found in the recording agreements at issue here, as relevant to the claims herein, are the same or substantially similar to those found in other production and recording agreements across all or substantially all of EMI's owned and distributed record labels entered into by EMI and/or its predecessors in interest and/or affiliates.  Those agreements call for accountings and payments to recording artists and producers

1   for licensing of masters as a percentage (usually fifty percent (50%)) of the net receipts of the

2   label, rather than a lesser percentage as a royalty paid to the artist or producer based on the

3   suggested retail list price of each unit sold.

4   **G.      EMI's Failure to Provide a Proper Calculation of its Royalty Obligations Has**
        **Caused Substantial Damages to Plaintiff and the Class**

5

6   99.      EMI's accounting practices, as alleged herein, have allowed EMI to illegally

7   withhold a substantial amount of money it receives from Digital Content Providers at the expense

    of Plaintiff and the Class.

8

9   100.     As a result, EMI is paying Plaintiff and Class Members much lower royalties than

10  it should be paying them for moneys received from Digital Content Providers.

11  101.     As a result of EMI's systematic violation of its contractual obligations to Plaintiff

12  and other Class members to make proper royalty payments and to properly credit royalty accounts

    pursuant to its Standard Recording Agreement, EMI has caused substantial damages to Plaintiff

13  and Class members, the exact amount to be determined at trial.

14  102.     At all relevant times, EMI has had a duty and obligation under its recording

15  agreements with Plaintiff and other Class Members to properly and accurately account for moneys

16  received by EMI from Digital Content Providers, to which EMI has licensed the master recordings

17  of Plaintiff and other Class Members.  However, rather than fulfilling its contractual obligations,

18  EMI has systematically, knowingly, and intentionally miscalculated the royalties due to Plaintiff

19  and other Class members.  As a result, EMI has under credited and/or underpaid each and every

20  Class member, while also deriving substantial financial benefits from its licensing of these master

21  recordings.

22          **V.  CLASS ACTION ALLEGATIONS**

23  103.     Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a)

24  and 23(b) on behalf of herself and the following Class:

25          All persons and entities, their agents, successors in interest, assigns,
            heirs, executors, and administrators who are or were parties to EMI
26          recording agreements containing "Master License Provisions" or
            their equivalent, through which such persons and entities, either
27          directly or indirectly, received royalties on, or financial credits or
            adjustments for, income received by EMI for the commercial

28

**FIRST AMENDED COMPLAINT**

1  exploitation of master recordings through EMI's licensing of said
2  master recordings to Digital Content Providers, at a rate less than the
   rate provided for in their contract with EMI.

3  104.   The following persons and entities shall be excluded from the Class: (1) EMI and

4  its subsidiaries, affiliates, officers, and employees; (2) all persons who make a timely election to

5  be excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom this

6  case is assigned and any immediate family members thereof.

7  105.   Plaintiff reserves the right to redefine the Class prior to certification.

8  106.   This action is properly maintainable as a class action.

9  107.   The Class for whose benefit this action is brought is so numerous that joinder of all

10  Class members is impracticable.  While Plaintiff does not presently know the exact number of

11  Class members, Plaintiff is informed and believes that there are tens of thousands of Class

12  members, and that those Class members can only be determined and identified through EMI's files

13  and, if necessary, other appropriate discovery.

14  108.   There are questions of law and fact which are common to Class members and

15  which predominate over any questions affecting only individual members of the Class.  A class

16  action will generate common answers to the below questions, which are apt to drive the resolution

17  of the litigation:

18  a.   Whether EMI violated its recording agreements by, *inter alia*,

19  mischaracterizing the money it received from Digital Content Providers as "sales" income rather

20  than "license" income in violation of the recording agreements;

21  b.   Whether EMI benefited financially from its wrongful acts;

22  c.   Whether EMI acted in a manner calculated to conceal the illegality of its

23  actions from recording artists and music producers;

24  d.   Whether EMI will continue collecting licensing income from Digital

25  Content Providers and misrepresent the royalties due for such licensing income to its recording

26  artists and music producers despite knowing that such misrepresentation constitutes a breach of its

27  artists' recording contract;

28  e.   Whether EMI, by way of the conduct alleged herein, must comply with

1  California Code of Civil Procedure §§ 337, 337a and provide a proper accounting of the amounts

2  owed to Plaintiff and other Class members;

3          f.      Whether EMI, by way of the conduct alleged herein, engaged in deceptive

4  or unfair acts or practices in violation of California unfair trade practices laws, including but not

5  limited to California Business & Professions Code §§ 17200, *et seq.,* for which Plaintiff and other

6  Class members are entitled to recover;

7          g.      Whether, assuming EMI intends to continue breaching its contractual

8  obligations to Plaintiff and other Class members, and/or to violate California state statutory law,

9  declaratory and injunctive relief is appropriate to curtail its conduct as alleged herein;

10         h.      Whether Plaintiff and other Class members have been damaged by EMI's

11 actions or conduct; and

12         i.      The proper measure of damages.

13 109.    Plaintiff is committed to prosecuting this action and has retained competent counsel

14 experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of other Class

15 members and Plaintiff has the same interests as other Class members.  Plaintiff has no interests

16 that are antagonistic to, or in conflict with, the interests of the other members of the Class.

17 Plaintiff is an adequate representative of the Class and will fairly and adequately protect the

18 interests of the Class.

19 110.    The prosecution of separate actions by individual Class members could create a

20 risk of inconsistent or varying adjudications with respect to individual members of the Class,

21 which could establish incompatible standards of conduct for EMI or adjudications with respect to

22 individual members of the Class which would, as a practical matter, be dispositive of the interests

23 of the members of the Class not parties to the adjudications.

24 111.    Furthermore, as the damages suffered by some of the individual Class members

25 may be relatively small, the expense and burden of individual litigation make it impracticable for

26 the individual members of the Class to redress the wrongs done to them individually.  If a Class or

27 general public action is not permitted, Class members will continue to suffer losses and EMI's

28 misconduct will continue without proper remedy.

112.     EMI has acted and refused to act on grounds generally applicable to the entire Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

113.     Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action.  Class members may be identified from EMI's records and such Class members may be notified of the pendency of this action by mail or by electronic means (like email), using techniques and a form of notice customarily used in class actions.

114.     For the above reasons, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## VI.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Breach of Contract)**

**(On Behalf of Plaintiff and All Class Members)**

115.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

116.     Plaintiff and Class members entered into a Standard Recording Agreement with EMI or one of its affiliates.

117.     These Standard Recording Agreements contained the same or substantially similar terms relating to the treatment of licensing income for royalty accounting.  By definition, such licensing income includes income derived from the licensing of recordings to Digital Content Providers.

118.     Plaintiff and other Class members have performed their obligations under their respective recording agreements by providing master recordings to EMI to exploit.  At no point did EMI advise Plaintiff and Class members that such master recordings were non-conforming or otherwise objectionable.  As a result, all conditions required for EMI's performance under the written contracts—namely, the payment of the appropriate royalties to Plaintiff and Class members—have occurred

119.     By reason of the foregoing, and other acts not presently known to Plaintiff and

1  Class members, EMI has materially breached its contractual obligations under its pertinent

2  Standard Recording Agreements between itself and Class members by failing to properly account

3  and provide adequately royalty compensation to Plaintiff and Class members with regard to

4  licensing of master recordings to Digital Content Providers.  Further, EMI has disregarded the

5  rights of Plaintiff and other Class members by breaching its contractual obligations.

6      120.    EMI has failed and refused to cure these breaches and continues to incorrectly

7  calculate these royalties in violation of Plaintiff's and Class members' recording agreements.

8  Further, EMI has continued to disregard the rights of Plaintiff and other Class members.

9      121.    By reason of the foregoing, Plaintiff and other Class members have been damaged

10  in an amount to be determined at trial.

11                          **SECOND CAUSE OF ACTION**

12                          **(Declaratory Judgment)**

13                    **(On Behalf of Plaintiff and All Class Members)**

14      122.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs

15  above as though fully set forth herein.

16      123.    Pursuant to its Standard Recording Agreements, EMI is obligated to pay and/or

17  credit Plaintiff and other Class members a certain percentage of the income EMI derives from its

18  licensing of master recordings, produced for EMI by Plaintiff and other Class members, to Digital

19  Content Providers, but that EMI has failed to provide sufficient payment/credit to Plaintiff and

20  other Class members by illegally mischaracterizing these licenses as sales.

21      124.    Plaintiff and other Class members have no adequate remedy at law.

22      125.    By reason of the foregoing, there is a present controversy between Plaintiff and

23  other Class members, on the one hand, and EMI, on the other hand, with respect to which this

24  Court should enter a declaratory judgment determining that the pertinent recording agreements

25  obligate EMI to pay and/or credit Plaintiff and other Class members the percentage specified for

26  licensing, rather than for sales, when EMI licenses the master recordings of Plaintiff and other

27  Class members to Digital Content Providers.

28

**THIRD CAUSE OF ACTION**

**(Common Counts – Open Book Account:**

**California Code of Civil Procedure § 337a)**

**(On Behalf of Plaintiff and All Class Members)**

126.   Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

127.   Pursuant to EMI's agreements with Plaintiff and other Class members, EMI keeps, and at all relevant times has kept, open book accounts reflecting the debits and credits made to each Class member's account with EMI from inception.  Plaintiff is informed and believes that said open book accounts include entries reflecting income EMI has received, and continues to receive, from its license agreements with Digital Content Providers.

128.   These book accounts constitute the principal records of the transactions between EMI and all Class members, including Plaintiff.

129.   Plaintiff is informed and believes that said book accounts are, and at all relevant times were, created in the regular course of EMI's business and kept in a reasonably permanent form and manner.

130.   EMI has become indebted to Plaintiff and other Class members on said open book accounts in an amount equal to EMI's underpayment on the income EMI has received, and continues to receive, from its licenses for digital downloads.

131.   As such, the outstanding balance owed by EMI to Plaintiff and other Class members on said open book accounts, including a calculation of the amount of underpayment with respect to digital downloads, can be determined by examining all of the debits and credits recorded for each account.

**FOURTH CAUSE OF ACTION**

**(Violations of California's Unfair Competition Law:**

**California Business & Professions Code §§ 17200, *et seq.*)**

**(On Behalf of Plaintiff and All Class Members)**

132.   Plaintiff repeats and realleges each and every allegation contained in the paragraphs

above as though fully set forth herein.

133.   California Business and Professions Code §§ 17200, *et seq.* prohibits any unlawful, unfair, or fraudulent business acts or practices.

134.   As detailed in this Complaint, EMI has violated the foregoing law, by engaging in unlawful, unfair, and fraudulent business practices.  EMI knowingly breached its Standard Recording Agreements with Plaintiff and other Class members.  EMI either knew, should have known, or recklessly disregarded that the income it collected from Digital Content Providers was in connection with a license agreement, and as such, that the royalties payable to Plaintiff and other Class members should have been accounted and paid for on this basis.  Furthermore, failing to disclose the unlawful nature of its conduct, and employing such devices as are alleged above, as well as affirmatively representing its authority to collect and account for this income on such basis, had a tendency to mislead Plaintiff and other Class members.

135.   EMI engaged in "unfair" business acts or practices by converting monies properly due Plaintiff and the Class under the express terms of the Standard Recording Agreements.  EMI's misconduct offends public policy and is immoral, unscrupulous, unethical, and offensive, and causes substantial injury to consumers.

136.   The harm to Plaintiff and other Class members resulting from EMI's deceptive and unlawful practices outweighs the utility, if any, of those practices.  There is no possible economic justification for such conduct, and consequently, the gravity of the misconduct outweighs any possible economic justification offered by EMI.

137.   EMI's illegal conduct, as described herein, is ongoing, continues to this date, and constitutes unfair and fraudulent business acts and practices within the meaning of Business & Professions Code §§ 17200, *et seq.*, as interpreted by the California State Courts.  Further, EMI's unlawful and unfair business acts and practices present a continuing threat to Plaintiff, Class members, and the general public in that EMI has refused to publicly acknowledge and correct its wrongdoing, and provide compensation for the damages it has caused.

138.   Pursuant to California Business & Professions Code § 17203, Plaintiff and other Class members are therefore entitled to:

1          a.      An Order requiring EMI to cease the acts of unfair competition alleged

2   herein;

3          b.      An Order enjoining EMI from continuing to account for royalties payable to

4   Plaintiff and Class members in the manner it does for income derived from such licenses;

5          c.      Full restitution of all monies paid to and retained by EMI otherwise payable

6   to Plaintiff and Class members including, but not limited to, disgorgement pursuant to California

7   Code of Civil Procedure § 384;

8          d.      Interest at the highest rate allowable by law; and

9          e.      The payment of Plaintiff's attorneys' fees and costs under, among other

10  provisions of law, Cal. Code Civ. Proc. § 1021.5, or otherwise to the extent permitted by law.

11                          **PRAYER FOR RELIEF**

12      **WHEREFORE,** Plaintiff, on behalf of herself and the other putative Class members,

13  prays for judgment against EMI as follows:

14      1.      An order certifying the proposed Class, designating Plaintiff as the named

15  representative of the Class, and designating the undersigned as Class Counsel;

16      2.      A declaration that EMI is financially responsible for notifying all Class members

17  that the pertinent recording agreements obligate EMI to pay and/or credit Plaintiff and other Class

18  members the percentage specified in their contracts for licensing, rather than for sales, and that

19  EMI has been improperly accounting for such transactions;

20      3.      An injunction requiring EMI to abide by the express terms of its Standard

21  Recording Agreements with regard to licensing of master recordings to Digital Content Providers;

22      4.      An award to Plaintiff and the Class of compensatory, exemplary, and/or statutory

23  damages in an amount to be proven at trial;

24      5.      An award of attorneys' fees and costs, as allowed by law;

25      6.      An award of pre-judgment and post-judgment interest, as provided by law;

26      7.      For leave to amend the Complaint to conform to the evidence produced at trial; and

27      8.      Such other and further relief as the Court may deem just and proper.

28

1

## JURY TRIAL DEMANDED

2

Plaintiff, on behalf of herself and the Class, hereby demands a trial by jury.

3  DATED: May 4, 2012        **PEARSON, SIMON, WARSHAW & PENNY, LLP**

4

5            By:       /s/ *Robert G. Retana*

Bruce L. Simon (Bar No. 96241)

6                       Robert G. Retana (Bar No. 148677)

Aaron M. Sheanin (Bar No. 214472)

7                       William J. Newsom (Bar No. 267643)

**PEARSON, SIMON, WARSHAW &**

8                       **PENNY, LLP**

44 Montgomery Street, Suite 2450

9                       San Francisco, CA  94104

Telephone: (415) 433-9000

10                       Facsimile:  (415) 433-9008

bsimon@pswplaw.com

11                       rretana@pswplaw.com

asheanin@pswplaw.com

12                       wnewsom@pswplaw.com

13                       Clifford H. Pearson (Bar No. 108523)

Daniel L. Warshaw (Bar No. 185365)

14                       **PEARSON, SIMON, WARSHAW & PENNY, LLP**

15                       15165 Ventura Boulevard, Suite 400

Sherman Oaks, CA  91403

16                       Telephone: (818) 788-8300

Facsimile:  (818) 788-8104

17                       cpearson@pswplaw.com

dwarshaw@pswplaw.com

18

19                       Neville L. Johnson (Bar No. 66329)

Douglas L. Johnson (Bar No. 209216)

20                       James T. Ryan (Bar No. 210515)

**JOHNSON & JOHNSON LLP**

21                       439 N. Canon Drive, Suite 200

Beverly Hills, CA  90210

22                       Telephone: (310) 975-1080

Facsimile:  (310) 975-1095

23                       njohnson@jjllplaw.com

djohnson@jjllplaw.com

24                       jryan@jjllplaw.com

25                       Michael D. Hausfeld (*pro hac vice* pending)

James J. Pizzirusso (*pro hac vice* pending)

26                       **HAUSFELD LLP**

1700 K Street, NW Suite 650

27                       Washington, D.C. 20006

Telephone: (202) 540-7200

28                       Facsimile:  (202) 540-7201

mhausfeld@hausfledllp.com

jpizzirusso@hausfeldllp.com

Michael P. Lehmann (Bar No. 77152)
Bruce J. Wecker (Bar No. 78530)
Arthur N. Bailey, Jr. (Bar No. 248460)
**HAUSFELD LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile:  (415) 358-4980
mlehmann@hausfeldllp.com
bwecker@hausfeldllp.com
abailey@hausfeldllp.com

David M. Given (Cal. Bar No. 142375)
**PHILLIPS, ERLEWINE & GIVEN LLP**
50 California Street, 35th Floor
San Francisco, CA 94111
Telephone: (415) 398-0900
Facsimile: (415) 398-0911
dmg@phillaw.com

Michael W. Sobol (Cal. Bar No. 194857)
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
msobol@lchb.com

Leonard B. Simon
**LAW OFFICES LEONARD B. SIMON P.C.**
655 West Broadway, Suite 1900
San Diego, California 92101
Telephone:  (619) 338-4549
Facsimile:  (619) 231-7423
lens@rgrdlaw.com