Bruce L. Simon (Bar No. 96241)
Robert G. Retana (Bar No. 148677)
**PEARSON, SIMON, WARSHAW & PENNY, LLP**
44 Montgomery Street, Suite 2450
San Francisco, California 94104
Telephone: (415) 433-9000
Facsimile:  (415) 433-9008
Email: bsimon@pswplaw.com
Email: rretana@pswplaw.com

Neville L. Johnson (Bar No. 66329)
**JOHNSON & JOHNSON LLP**
439 N. Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile:  (310) 975-1095
Email: njohnson@jjllplaw.com

Michael D. Hausfeld                         Raymond P. Boucher (Bar No. 115364)
James J. Pizzirusso                          Jeffrey A. Koncius (Bar No. 189803)
**HAUSFELD LLP**                            **KIESEL BOUCHER LARSON LLP**
1700 K Street, NW Suite 650                 8648 Wilshire Boulevard
Washington, D.C. 20006                      Beverly Hills, California 90211
Telephone: (202) 540-7200                   Telephone: (310) 854-4444
Facsimile:  (202) 540-7201                  Facsimile:  (310) 854-0812
Email: mhausfeld@hausfledllp.com            Email: boucher@kbla.com
Email: jpizzirusso@hausfeldllp.com          Email: koncius@kbla.com

Attorneys for Plaintiff and the Class

[Additional Counsel Appear on Signature Pages]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARTHA DAVIS, as an individual on behalf of herself and all others similarly situated, | CASE NO.:  3:12-cv-01602-YGR |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| vs. | **CLASS ACTION** |
| EMI GROUP LIMITED; EMI GROUP, INC.; and CAPITOL RECORDS, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

1    Plaintiff Martha Davis, as an individual on behalf of herself and all others similarly

2 situated, alleges upon personal knowledge as to herself and her own acts, and upon information

3 and belief as to all other matters, based upon, *inter alia*, the investigation made by and through her

4 attorneys, as follows:

5    ## I. NATURE OF THE ACTION

6    1.    Plaintiff brings this nationwide class action for breach of contract and statutory

7 violations of California law against Defendants EMI Group Limited; EMI Group, Inc.; and Capitol

8 Records, LLC (collectively referred to herein as "EMI"), for EMI's failure to properly account to

9 Plaintiff and Class members for royalties stemming from the licensing of Plaintiff's and Class

10 members' musical performances or recordings produced by them that were utilized by "Music

11 Download Providers," "Music Streaming Providers" and "Ringtone Providers" (collectively

12 "Digital Content Providers") for digital download, streaming and distribution.

13    2.    Plaintiff seeks monetary damages, injunctive relief, and declaratory relief against

14 EMI for its willful violation of contracts between itself and recording artists and/or music

15 producers through which EMI obtained recording artists' and producers' master recordings in

16 exchange for the payment of certain royalties to these artists and producers (hereinafter "Standard

17 Recording Agreements"). EMI has unilaterally breached these contracts by paying its recording

18 artists and producers a fraction of the actual amount owed to them for the licensing of master

19 recordings to Digital Content Providers and failing to properly pay royalties to its artists for

20 electronic transmission of their works.

21    3.    On information and belief, EMI has entered into licensing agreements with Digital

22 Content Providers whereby EMI permits these Digital Content Providers to sell and/or stream

23 EMI's catalogue of master recordings (including those made and/or produced by Plaintiff and

24 Class members under EMI's Standard Recording Agreements) to end users via digital

25 transmission.

26    4.    On information and belief, under its licensing agreements with Music Download

27 Providers, EMI receives approximately seventy percent (70%) of the proceeds from Music

28 Download Providers for every licensed song and/or album that is downloaded by an end-user

1   through the Music Download Providers.

2       5.      On information and belief, under its licensing agreements with Ringtone Providers,

3   EMI receives approximately fifty percent (50%) of the retail sale price from the Ringtone

4   Providers for every licensed song and/or mastertone downloaded by an end-user through the

5   Ringtone Providers.

6       6.      On information and belief, under its licensing agreements with "Music Streaming

7   Providers," EMI has received significant advance and other payments related to the digital

8   streaming of music by end-users through the Music Streaming Providers.

9       7.      Under the Standard Recording Agreements at issue in this case, when EMI licenses

10  master recordings produced under these agreements to third parties, EMI is required to pay its

11  recording artists and producers a certain royalty equal to a percentage of all net receipts received

12  by EMI from these third-party licensees (hereinafter the "Masters Licensed Provisions").  The

13  Masters Licensed Provisions apply to EMI's licensing of master recordings to Digital Content

14  Providers for their transmission through digital distribution.

15      8.      Rather than pay its recording artists and producers a percentage of the net receipts it

16  received - and continues to receive - from Digital Content Providers for "licenses," EMI has failed

17  to pay the appropriate royalties to Plaintiff and the other Class members by, for example,

18  wrongfully treating each digital transmission as a "sale" of a physical phonorecord (i.e., an LP,

19  EP, CD, or cassette tape) through "Normal Retail Channels."  Sales of physical phonorecords

20  through Normal Retails Channels are governed by much lower royalty provisions than "licenses"

21  in EMI's Standard Recording Agreements.  In doing so, EMI:

22          a.      has failed to properly account to and pay Plaintiff and other Class members

23  money owed to them from the licensing of master recordings to Digital Content Providers;

24          b.      has underreported the actual number of digital downloads and digital

25  streams by treating these transmissions as they would sales of physical product that might be

26  returned;

27          c.      has deducted, without authorization or legal authority, container/packaging

28  deductions when no such deductions are applicable to digital transmissions; and/or

1        d.      has reduced its royalty payments by improperly taking "audiophile

2   deductions."[1]

3        9.      In addition, on information and belief, EMI illegally withheld, and continues to

4   withhold, a certain percentage of royalties owed to Plaintiff and Class members as "reserves."

5   These reserves are meant to offset losses related to the return of unsold records; however, digital

6   transmissions are incapable of being returned, as there is no physical product to return.

7        10.     During the applicable Class Period, EMI has, in a wide-spread and calculated

8   manner, violated the royalty provisions of its Standard Recording Agreements with Plaintiff and

9   Class members by (a) failing to make proper royalty payments to Plaintiff and Class members

10  and/or (b) failing to properly credit Plaintiff's and Class members' royalty accounts.  As a result of

11  EMI's ongoing breach of the Masters Licensed Provisions, Plaintiff and Class members have

12  suffered hundreds of millions of dollars in damages.

13       11.     The conclusion that EMI acted improperly in this case follows from a decision by

14  the Ninth Circuit in an analogous action that Universal Music Group, Inc. ("UMG") and one of its

15  owned and distributed record labels, Aftermath Records, failed as a matter of law to properly

16  account for and pay royalty payments on digital content to artists and producers.  In *F.B.T. Prods.,*

17  *LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010), the Ninth Circuit held that royalties for

18  digital downloads and mastertones (ringtones) should be paid pursuant to the amounts agreed to

19  for a "license" and not at the lower rate of a "sale."  621 F.3d at 964-67.  The Ninth Circuit's

20  ruling became final when the U.S. Supreme Court declined review.  *See id.*, *cert. denied*, 131 S.

21  Ct. 1677 (March 21, 2011).

22       12.     In holding that UMG's agreements with "iTunes [the market leader in the digital

23  downloads of recorded music], cellular phone carriers [primarily Sprint, Verizon, and AT&T] and

24  other third parties to use [UMG's] sound recordings to produce and sell permanent downloads and

25  _____

26  [1] Audiophile records are those marketed in specially priced catalog series by reason of their

27  superior sound quality or other distinctive technical characteristics.

28

1  [ring]tones . . . *qualify as licenses*," *id.* at 964 (emphasis added), the Ninth Circuit found that the

2  agreements at issue unambiguously provided for a much higher royalty payment than UMG had

3  previously paid.

4      13.    EMI's Standard Recording Agreements are, in every material way, the same as the

5  UMG  contracts at issue in *F.B.T. Prods.*  Accordingly, Plaintiff here alleges that the digital

6  download income received by EMI from Digital Content Providers is based on "licenses" and not

7  "sales," as those terms are defined in EMI's Standard Recording Agreements.  Just as UMG in

8  *F.B.T. Prods.*, EMI has not properly accounted for the appropriate amount of royalties owed to

9  Plaintiff and Class members.  Through this lawsuit, Plaintiff seeks to compel EMI to account for

10  and pay all of its recording artists and music producers their rightful share of the licensing income

11  paid to EMI for digital transmissions.

12      14.    Not all recording artists are paid vast sums in royalties; in fact, some recording

13  artists have been reported to be destitute after the high points of their careers have passed.  *See*

14  Chuck Phillips, "Artists Put Pressure on for Benefits," L.A. TIMES, June 3, 2002.  In response to

15  such stories, the California Senate Judiciary Committee co-chaired hearings during which Senator

16  Martha Escutia, Chair of the Committee, noted that "if public tax dollars are being spent to

17  support artists who were cheated out of their royalty earnings, we need to shift the burden back to

18  where it belongs: to the record labels that failed to pay the artists their rightful earnings."  Record

19  Label Accounting Practices: J. Hearings of the Cal. State Senate Comm. on the Judiciary and State

20  Senate Select Comm. on the Entm't Indus., 2001-2002 Leg. 3, (Cal. 2002), at 1 (as quoted in 20

21  Berkeley Tech. L.J., 933, 944 n.66).

22      15.    This action seeks the payment to artists of their "rightful earnings."

23      16.    Plaintiff seeks damages on behalf of herself and all others similarly situated, as

24  well as an accounting and judgment declaring the proper method of calculating payments of

25  royalties or crediting royalty accounts with respect to the licensing of master recordings to Digital

26  Content Providers.  Further, Plaintiff requests that this Court order EMI to adhere to the proper

27  methodology for calculating such royalties in the future.

28

## II.  THE PARTIES

17.     Plaintiff Martha Davis is a musician, recording artist, and performing artist who resides in St. Helens, Oregon, and is a citizen of Oregon.  Plaintiff was the lead singer of a band known as "The Motels."  The Motels is a New Wave band from the Los Angeles area best known for the songs "Only the Lonely" and "Suddenly Last Summer," each of which peaked at #9 on the Billboard Hot 100 in 1982 and 1983, respectively.   The Motels had five singles on the Billboard Hot 100[2], and two of its albums have gone gold in the United States.  Plaintiff was also the sole shareholder, beneficiary, and successor-in-interest of the now-dissolved Martha Davis Productions, Inc./The Motels Music Corporation, Inc./Martha Davis Productions entity that entered into various contracts with Defendants on behalf of Plaintiff, and expressly contemplated Plaintiff as a third party beneficiary to those contracts.  Martha Davis is the sole owner of all assets formerly belonging to this entity.

18.     Defendant EMI Group Limited is a business entity headquartered in the United Kingdom that undertakes significant business activity in this State and District through its divisions, related and affiliated entities, owned and distributed record labels, and predecessors in interest including, but not limited to, the entity previously headquartered in Hollywood known as "Capitol Records, Inc."

19.     Defendant EMI Group, Inc. is a Delaware Corporation that operates as a United States holding company for the EMI Group.

20.     Defendant Capitol Records, LLC is a Delaware corporation with its principal places of business in New York, New York and Los Angeles, California.  Capitol Records is a global music company that specializes in the signing, development, and promotion of recording artists and their musical compositions.

21.     At all relevant times, EMI was and continues to be in the business of exploiting the

---

[2] http://www.allmusic.com/artist/the-motels-p4960/charts-awards/billboard-singles

1   sound recordings of musical performances and the audio-visual recordings of such performances.

2   EMI's exploitation includes, but is not limited to, producing, manufacturing, distributing,

3   licensing, and selling these recordings.  According to EMI it "is one of the world's leading music

4   companies, home to some of the most successful and best known recording artists."

5   http://www.emimusic.com/about/.  EMI's record labels include Angel, Astralwerks, Blue Note,

6   Capitol, Capitol Latin, Capitol Records Nashville, EMI Classics, EMI CMG, EMI Records, EMI

7   Records Nashville, Manhattan, Parlophone, Virgin Classics and Virgin Records.  EMI's roster of

8   artists includes Lily Allen, Bat For Lashes, The Beatles, Beastie Boys, Luke Bryan, Coldplay,

9   Depeche Mode, Gorillaz, David Guetta, Iron Maiden, Norah Jones, Lady Antebellum, Massive

10  Attack, Kylie Minogue, Katy Perry, Pink Floyd, Corinne Bailey Rae, Sir Simon Rattle, Snoop

11  Dogg, Tinie Tempah, Thirty Seconds To Mars, KT Tunstall and Keith Urban as well as

12  international artists such as Amaral (Spain), Air and Camille (France), Empire of the Sun

13  (Australia), Tiziano Ferro and Vasco Rossi (Italy), Flex (Mexico), LaFee (Germany) and Hikaru

14  Utada (Japan).

15          22.     In November 2011, UMG announced it had signed a deal with EMI owner

16  Citigroup to purchase the label's recorded music division, while a consortium led by Sony agreed

17  to purchase EMI's publishing division.  EMI's recorded music unit was sold to UMG for $1.9

18  billion.[3]  However, that deal is not yet final and is undergoing regulatory approval at the time of

19  this filing.

20          23.     The European Union's antitrust regulator gave approval to the $2.2 billion

21  acquisition of the music publishing arm of EMI Group Ltd. by Sony Corp. of America and

22  investment fund Mubadala Development Co. PJSC, after the companies agreed to a series of

23  divestitures.

24          24.     SAG-AFTRA and the American Federation of Musicians sent letters to the Federal

25  Trade Commission expressing support for UMG's proposed purchase of EMI's recorded music

26  _____

27  [3] http://online.wsj.com/article/SB10001424052970204224604577031694160429400.html.

28

1 | division.

2 | ### III. __STANDING__

3 | 25.    In 1977, Plaintiff founded Martha Davis Productions, Inc.  Plaintiff was a

4 | shareholder in that company at all relevant times.

5 | 26.    In 1979, Plaintiff and The Motels entered into a recording agreement (the "1979

6 | Agreement") with Capitol Records, Inc., a predecessor-in-interest to the Defendants.

7 | 27.    The 1979 Agreement was amended in 1981 to substitute Martha Davis Productions,

8 | Inc. in place of The Motels.

9 | 28.    In 1983, Martha Davis Production, Inc. changed its name to The Motels Music

10 | Corporation, Inc.  Plaintiff was a shareholder in that company at all relevant times.

11 | 29.    In 1985, The Motels Music Corporation, Inc. entered into another recording

12 | agreement (the "1985 Agreement") with Capitol Records, Inc.

13 | 30.    In 1989, The Motels Music Corporation, Inc. changed its name to Martha Davis

14 | Productions.  Plaintiff was a shareholder in that company at all relevant times.

15 | 31.    In 1991, Martha Davis Productions dissolved, and of its all assets were transferred

16 | to its sole shareholder and successor-in-interest, Plaintiff Martha Davis.

17 | 32.    The 1979 Agreement and the 1985 Agreement were written in such a way that they

18 | expressly contemplated Plaintiff as an intended third-party beneficiary of each contract.  The

19 | contract terms expressly required that Capitol Records, Inc. confer benefits upon Plaintiff either

20 | directly or by and through an entity owned by Plaintiff.

21 | 33.    After Martha Davis Productions dissolved, Defendants directed all royalty

22 | payments under the 1979 Agreement and the 1985 Agreement to Plaintiff.  Defendants also

23 | directed all communications and account statements under those contracts to Plaintiff.

24 | ### IV. __JURISDICTION AND VENUE__

25 | 34.    This Court has jurisdiction over this matter pursuant to the Class Action Fairness

26 | Act, 28 U.S.C. §§ 1332(d), because the aggregate claims of the Class exceed the sum or value of

27 | $5,000,000, and there is diversity of citizenship between proposed Class members and EMI.  This

28 | Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

35.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (c).

## V.  SUBSTANTIVE ALLEGATIONS

### A.     Music Download Services

36.     "Music Download Services" allow consumers to purchase and download digital versions of master recordings directly to their computers or other electronic storage devices ("Music Downloads").  There is no physical packaging and returns are not permitted.  However, Music Downloads often have various restrictions in place to prevent the consumer from copying and/or sharing the Music Download with others.  Oftentimes, these restrictions are enforced through a Digital Rights Management system ("DRM") that encrypts the content.  Music Download Services are offered by Music Download Providers.

37.     On information and belief, in order to allow users to purchase digital copies of the master recordings owned by record labels, Music Download Providers have signed *licensing* agreements with EMI and other record labels.  Depending on the licensing agreement with the record label, Music Download Providers generally either: (a) charge a flat, per-download fee to end users; or (b) operate as a subscription service, allowing consumers to access digital copies of the master recordings for a set monthly fee for as long as they continue paying the monthly subscription charge.  Some providers offer both options.

38.     The first commercially successful Music Download Provider, Ritmoteca.com, was founded in or around 1999.  Ritmoteca signed licensing agreements with UMG, Warner Brothers, Sony Music Entertainment, and Bertelsmann Music Group, between 1999 and 2000.  These licensing agreements allowed Ritmoteca to offer its customers 300,000 tracks for download at prices between 99¢ and $1.99 per track, or $9.99 per album.  Ritmoteca folded during the dot-com bust in April 2000.

39.     Shortly thereafter, in or around 2001, other Music Download Services were developed by both the major record labels and by independent companies.  These services faced stiff competition from illegal downloading sites such as Napster.com and were largely unsuccessful.

40.     When Apple launched its iTunes Store in April 2003 and offered "legal" Music

1 Downloads for, on average, 99¢ per track or $9.99 per album, the popularity of digital downloads

2 began to grow exponentially.  On February 24, 2010, total Music Downloads from the iTunes

3 Store reached 10 billion tracks.  Today, the iTunes Store accounts for roughly two-thirds of all

4 Music Downloads.  The iTunes store generated roughly $1.4 billion in revenue for Apple in the

5 second quarter of 2011, up from about $1.1 billion in the second quarter of 2010.

6   41. Besides the iTunes Store, many Music Download Providers have signed licensing

7 deals with EMI and other record labels to offer Music Downloads to consumers.  These providers

8 include, but are not limited to, Amazon.com, Buy.com, Liquid Digital Media (walmart.com),

9 Napster, Rhapsody, Microsoft's Zune Marketplace, and eMusic.  In fact, the International

10 Federation of the Phonographic Industry ("IFPI"), a worldwide representative of the record

11 industry, estimates that record labels had licensed roughly 13 million tracks of music to over 400

12 Music Download Providers by 2010.

13   42. The licensing of master recordings to Music Download Providers has become

14 highly lucrative for record labels such as EMI.  It is estimated that the licensing of master

15 recordings generated $4.6 billion in worldwide revenue for record labels in 2010, or roughly 29%

16 of their total revenue.  In the United States, Music Downloads account for roughly half of record

17 labels' revenues; revenue from Music Downloads is expected to surpass revenue from album sales

18 by 2012.

19   43. EMI itself has long recognized the important role that digital distribution plays and

20 how it has continued to seek to make its presence felt in the digital marketplace:

> Given our heritage of innovation, when digital music began to take
> off in the 1990s, EMI was well placed to respond to the new trends.
> EMI Music's first websites went live in 1993 and 1994 and in 1998
> EMI streamed the first complete album over the internet,
> 'Mezzanine' by Massive Attack.  The following year EMI was the
> first company to release a digital album download, David Bowie's
> '…Hours'.   EMI also launched the first internet video single in
> 2001.  In 2007 EMI was the first major music company to make its
> music available without digital rights management (DRM) software.
>
> In 2009 Coldplay became the first recording artists to sell more than
> one million digital albums in the US and two million worldwide and
> this year we launched OpenEMI to engage directly with the tech

developer community around the world with initiatives such as creating a platform with The Echo Nest for developers to access EMI Music tracks and content to create innovative and exciting new apps and digital music concepts for EMI's artists.

Today EMI Music has agreements with hundreds of digital partners to distribute our music across the globe, covering a huge variety of digital music business models and ideas.[4]

44.     EMI is, as of this filing, one of the "Big 4" group of record labels (UMG, EMI, Warner Music Group Corp., and Sony BMG Music Entertainment), which is soon to be known as the "Big 3" once EMI is acquired by UMG.  Together, these labels license 80% of the Music Downloads offered to end users  by Music Download Providers in the United States.

45.     Music Download Providers have obtained licenses from EMI that authorize them to sell or otherwise distribute, via digital download, either all or some of EMI's catalog of master recordings, including Plaintiff's recordings as described herein. In this regard, in its annual review for 2009/10, EMI noted, "DIGITAL MILESTONES[:] EMI Music is working at the forefront of digital music innovation, and we have developed an award-winning digital marketing capability to drive our expansion in this area.  The consumer insight that this capability delivers enables us to identify potential release schedule opportunities and drive ongoing marketing efficiency and effectiveness. During the past year, the company [EMI MUSIC] signed new digital agreements with iTunes, Microsoft, Sky, Rhapsody, Napster, Deezer, MOG, RDIO, Grooveshark, Stingray Digital (Canada), Australian telco AAPT, and Hungama Digital Media (South East Asia), among others." Maltby Capital Limited Annual Review 2009/10 ("Annual Review") at 13/106.

46.     As admitted by EMI, digital sales for its artists have been significant.  For example "Katy Perry continued to have a successful 12 months with her global hit album 'One of The Boys' which was released in June 2008 selling a further 3.8 million digital track downloads and nearly half a million full albums during the 2010 financial year. Coldplay, whose 2008 album

---

[4] http://www.emimusic.com/about/.

1  'Viva La Vida' was the biggest selling album worldwide that year, passed another milestone in

2  July 2009 when they became the first artist to sell more than one million full digital albums in the

3  US and two million globally."  Annual Review at 11/106.

4        47.      Under its licensing agreements with Music Download Providers, EMI does not

5  manufacture or warehouse any physical product or packaging, nor does it ship or sell any product

6  to stores or other distribution points, and consequently faces no risk of breakage or the return of

7  unsold product.  Rather, as the Ninth Circuit held with respect to UMG and Aftermath Records in

8  *F.B.T. Prods.*, EMI is licensing its catalog of recordings to Music Download Providers for their

9  sale or distribution via digital download by consumers.  EMI, recognizing the "continuing rapid

10  decline of the physical market" (Annual Review at 47/106) has sought to "offset" such decline by

11  a corresponding "growth in digital sales" (Annual Review at 24/106).

12        48.      The magnitude of digital downloads by Music Download Providers means that

13  EMI's continued improper accounting of royalties owed to Plaintiff and Class members has

14  deprived Plaintiff and the Class of millions of dollars in royalties.

15  **B.**      <u>**Music Streaming Services**</u>

16        49.      "Music Streaming Services" allow consumers to listen to (or "stream") digital

17  versions of master recordings directly through their computers or other electronic devices (*e.g.*,

18  mobile phones, iPods, etc…) without actually purchasing an electronic copy of the recording.

19  Music Streaming Services often have restrictions in place to prevent the consumer from copying

20  and/or sharing the Music Stream with others.  Music Streaming Services are offered by Music

21  Streaming Providers.

22        50.      On information and belief, in order to allow users to stream digital copies of the

23  master recordings owned by record labels, Music Streaming Providers have signed ***licensing***

24  agreements with EMI and other record labels.  Depending on the licensing agreement with the

25  record label, Music Streaming Providers generally either: (a) charge a flat, per-stream fee to end

26  users; or (b) operate as a subscription service, allowing consumers to access digital copies of the

27  master recordings for a set monthly fee for as long as they continue paying the monthly

28  subscription charge.  Some providers offer both options.

51.     Some Music Streaming Providers have paid significant upfront fees to labels, such as EMI, to acquire digital distribution rights to large catalogs of music.  Due to non-disclosure agreements signed between Music Streaming Providers and labels, artists (such as Plaintiff and the Class herein) are not provided with any details about these payments, and there is little transparency about how – and if – that money makes its way to artists.  On information and belief, EMI does not provide appropriate royalty payments to its artists (such as Plaintiff and the Class herein) from the licensing income it receives from Music Streaming Providers.

C.     **Mastertones**

52.     Ringtones that are a portion/clip of an artist's actual sound recording (rather than an electronic reproduction, *e.g.*, MIDI) and are played on a mobile phone when someone is calling, texting, or otherwise trying to contact the mobile phone operator are known as "mastertones."

53.     Mastertones are sold to consumers by Ringtone Providers and cost, on average, between $1.00 and $3.00 per ringtone.  Ringtone Providers include, but are not limited to, wireless carriers (*e.g.*, AT&T Wireless, Verizon Wireless, Sprint, and T-Mobile), content owners (*e.g.*, MTV and VH1), and third-party aggregators (*e.g.*, Zed, Hudson Soft, Jamster and iTunes).  In general, consumers purchase and download mastertones directly from their mobile phones.

54.     On information and belief, in order to sell mastertones to consumers, Ringtone Providers have entered into license agreements with EMI and other record labels that authorize Ringtone Providers to use the label's master recordings to produce ringtones for distribution to consumers.  In return, the Ringtone Providers pay the record labels approximately fifty percent (50%) of the retail sales price of the mastertone.

55.     Record labels have made hundreds of millions, if not billions, of dollars from their licensing agreements with Ringtone Providers.  Global mastertone sales reached roughly $4 billion in 2004.  In the United States, mastertone sales reached $714 million in 2007 and $541 million in 2008.

56.     Ringtone Providers continue to sell mastertones and enter into license agreements with EMI and other record labels.  In fact, Apple did not enter into a license agreement with record labels that enabled them to sell mastertones until in or around September 2009.  Currently,

1    mastertones are available on the iTunes Store for between 0.99¢ and $1.29 per download.

2        57.     Mastertones continue to play an important role in record labels' revenue streams as

3    well.  The RIAA has added its Gold and Platinum recognition program to mastertone sales.  In

4    2006, the RIAA awarded Gold Status (500,000 downloads) to 84 mastertones, Platinum Status

5    (1,000,000 downloads) to 40 mastertones, and Multi-Platinum Status (increments of 1,000,000

6    downloads over 1,000,000 downloads) to 4 mastertones.  In 2009, the RIAA certified Lil Wayne's

7    "Lollipop" mastertone as 5x Platinum (5 million downloads).  In 2010, the RIAA awarded

8    Platinum Status to five additional mastertones: AC/DC's "Thunderstruck"; Akon's "Right Now

9    (Na Na Na)"; Jason Aldean's "Big Green Tractor"; Drake's "Best I Ever Had"; and Young

10   Money's "Bedrock."

11       58.     Under its licensing agreements with Ringtone Providers, EMI does not manufacture

12   or warehouse any physical product or packaging, nor does it ship or sell any product to stores or

13   other distribution points, and consequently faces no risk of breakage or the return of unsold

14   product.  Rather, EMI is licensing its catalog of master recordings to Ringtone Providers for sale

15   or distribution by them via digital download to consumers.

16       59.     The lucrative sales of mastertones by Ringtone Providers means that EMI's

17   continued improper accounting of royalties owed to Plaintiff and Class members has deprived

18   Plaintiff and the Class of millions of dollars in royalties.

19       60.     The agreements between Digital Content Providers and EMI that allow these

20   providers to distribute EMI's master recordings for sale through digital downloads are "licenses"

21   and are therefore subject to the Masters Licensed Provisions in its Standard Recording

22   Agreements.

23   **D.     EMI's Standard Recording Agreements**

24       61.     EMI and its predecessors in interest and affiliates have entered into Standard

25   Recording Agreements with recording artists and producers whose musical performances EMI

26   intended to commercially exploit.  Under these Standard Recording Agreements, the artists and

27   producers promised to make certain master recordings for EMI and to transfer title to these master

28   recordings so that EMI could engage in commercial exploitation of these recordings.  In return,

1    EMI promised to pay the recording artists and producers certain royalties.

2        62.    Specifically, under EMI's Standard Recording Agreements, the artists and

3    producers are entitled to the payment of royalties as either (a) actual payments, or (b) credits

4    against advances paid by EMI to the artist and/or producer until such advances are recouped, after

5    which time, EMI is required to pay royalties to the artist and/or producer.

6        63.    EMI's Standard Recording Agreements set forth and govern the calculation,

7    distribution, and payment of royalties by EMI to each Class member.  On information and belief,

8    these royalties are computed electronically through various software programs that EMI controls

9    and maintains.  Thus, the ability to calculate the amount owed to Plaintiff and Class members is a

10   matter of simple calculations through adjustment of these software programs.

11       64.    In accordance with industry practice, EMI's Standard Recording Agreements set

12   forth the same, or substantially the same, two equations for all Class members.  The royalties

13   owed to these artists and performers equal the sum of two equations:

14           a.    Royalties for phonorecords *sold* by EMI and its affiliates in the United

15   States and abroad ("sold equation"); and

16           b.    Royalties for master recordings *licensed* by EMI to third parties ("licensed

17   equation").

18       65.    These equations were invariably drafted by EMI, its predecessors in interest and

19   affiliates and were non-negotiable terms of its Standard Recording Agreements.  While EMI's

20   recording agreements may have varied slightly in non-material ways, every recording agreement

21   that is part of the Class has these standard equations.

22       66.    EMI's Standard Recording Agreements provide a significantly higher percentage of

23   royalties under the licensed equation than under the sold equation.  In general, the sold equation

24   provides for royalties of between five and thirty percent (5% - 30%) (depending on the popularity

25   of the artist; *i.e.,* the more popular, the higher the royalty rate) while the licensed equation

26   generally provides for royalties of twenty-five to fifty percent (25% - 50%) of net receipts.  Under

27   both equations, EMI takes certain deductions before computing the royalties owed; however, as

28   explained below, the sold equation has significantly more deductions than the licensed equation.

1   Again, these deductions are all calculated electronically and are a matter of simple inputs into

2   EMI's standardized software programs.

3       67.    The sold equation in EMI's Standard Recording Agreements provides for

4   substantially more deductions than those found in the licensed equation.  For example, such

5   deductions typically include:

6           a.    A "Net Sales Deduction";

7           b.    A "Container Charge" deduction, depending on the type of phonorecord

8   sold; and/or

9           c.    An "Audiophile Deduction."

10      68.    As a result, a recording artist or producer is paid a significantly lower percentage of

11  the total money received by EMI for its commercial exploitation of the artist's or producer's

12  master recordings under the sold equation than under the licensed equation.

13  **E.    The Recording Agreements at Issue**

14      **1.    The Motels 1979 Contract**

15      69.    On or about May 12, 1979, Plaintiff and The Motels entered into the 1979

16  Agreement with Capitol Records, Inc. ("Capitol").  The 1979 Agreement is typical of the form

17  recording agreement signed by members of the Class.  As of the filing of this Complaint, EMI

18  owns the Capitol label and now owns the rights to the master recordings referred to in the 1979

19  Agreement.

20      70.    The 1979 Agreement provides that The Motels would record masters for Capitol

21  and Capitol would exploit those masters through the sale and licensing of them.

22      71.    As set forth below, the royalties to be paid to The Motels differ and are dependent

23  on whether a "sale" or "license" of their works occurs.

24      72.    Paragraph 2 of the 1979 Agreement generally governs the payment of royalties to

25  The Motels for the "sale" of their master recordings to be paid as follows:

26      •   14% for sales of singles
        •   16% for sales of "other records"

27

28      73.    With regard to royalties on "lp-disc" sales, pursuant to Paragraph 20(a), they are

paid on a sliding scale as follows during the initial and first option periods:

- 16% for net sales of 1 – 500,000 units
- 18% for net sales of 500,001 – 1,000,000 units
- 20% for net sales of 1,000,001 – 1,500,000 units
- 22% for net sales over 1,500,000 units

Pursuant to Paragraph 20(c), during the second and third option periods, the above percentages are each increased 2%, e.g., 18% for net sales of 1 – 500,000 units, etc.

74.     With regard to royalties on singles, pursuant to Paragraph 20(e), they are paid on a sliding scale as follows:

- 14% for net sales of 1 – 500,000 units
- 16% for net sales over 500,000 units

75.     With regard to royalties for "sales" in the United States such royalties, pursuant to Paragraph 3(a)(i) are to be "computed and paid upon net sales of records" against which "Capitol shall be entitled to withhold from payments otherwise due from time to time reasonable reserves against anticipated returns, rebates and credits."

76.     In contrast to the payment of royalties on sales contained in the 1979 Agreement, Paragraph 3(a)(vii) stated that the royalty on licenses of the artistic works would be 50% of the net sales:

> (vii) As to records sold embodying masters hereunder or masters* [*hereunder] otherwise used by licensees of Capitol or licensees of Capitol's licensees, and if fees payable to Capitol are for record club sales or are based on a flat fee, or cent rate per unit sold (herein referred to as "Flat Fee"), then in lieu of any other royalty specified in this agreement, my royalty shall be 50% of Capitol's net royalties from such licensee with respect to such sale of records or other use of the applicable masters, as the case may be, computed on the same quantity, basis and in the same manner as Capitol is paid.  For the purpose hereof, the term "net royalties" shall mean the gross Flat Fee received by Capitol from the applicable licensee with respect to either:
>
> (a)     net sales of records, . . . .

77.     Accordingly, when EMI licenses a master recording, it should pay Plaintiff 50% of its net royalties, which is significantly higher than the royalty payable on sales as set out above.

78.     Paragraph 17 of the 1979 Agreement contains a California choice of law provision and expressly provides that the contract be interpreted under California law.  As set forth above,

1    both Plaintiff and EMI have substantial contacts with the State of California.

2            **2.    The Motels 1985 Contract**

3            79.     On or about April 1, 1985, The Motels Music Corporation, Inc. entered into the

4    1985 Agreement with Capitol.  The 1985 Agreement is typical of the form recording agreement

5    signed by members of the Class.

6            80.     The 1985 Agreement provides for the exclusive services of Martha Davis and her

7    bandmates (collectively, "The Motels").  Under the 1985 Agreement, The Motels were to record

8    masters for Capitol and Capitol would exploit those masters through the sale and licensing of

9    them.

10           81.     As set forth below, the royalties to be paid to The Motels differ and are dependent

11   on whether a "sale" or "license" of their works occurs.

12           82.     Paragraph 7 of the 1985 Agreement governs the payment of royalties to The Motels

13   for the "sale" and "licensing" of their master recordings.

14           83.     With regard to royalties for "sales" in the United States such royalties, pursuant to

15   Paragraph (7)(a)(i) are to be "computed and paid upon net sales of records" against which "Capitol

16   shall be entitled to withhold from payments otherwise due from time to time reasonable reserves

17   against anticipated returns and credits."  Further, the royalty to be paid is as follows:

18           • 20% for sales of 7 inch singles
             • 14% for sales of 12 inch singles and Mini-LP's
19           • $1.15 for "All Other Records"

20   Paragraph 7(b)(i) then "proportionally" increases, or decreases, the royalty on album sales using

21   $8.98 as a benchmark (where x, in the following formula "equals the royalty applicable to the

22   album with the Different Retail List Price"):

23               $$\frac{\$1.15}{\$8.98} = \frac{x}{\text{Different Retail List Price}}$$

24

25   Therefore, the benchmark royalty on an album sale, is 12.81% ($1.15 ÷ $8.98).

26           84.     In contrast to the payment of royalties on sales contained in the 1985 Agreement,

27   Paragraph 7(a)(vi) stated that the royalty on licenses of the artistic works would be 50% of the net

28   sales:

(vi) As to records sold by a licensee of Capitol through a special markets plan or record club distribution plan; or as to soundtrack albums (other than soundtrack albums distributed by Capitol or licensed by Capitol to be distributed by Primary Licensees) embodying masters; or with respect to masters otherwise used by licensees of Capitol (other than Primary Licensees) in lieu of any other royalty specified in this Agreement, Company's royalty shall be fifty percent (50%) of the net royalties received by Capitol from such licensee with respect to such sales of records or such other use of the applicable masters, as the case may be, computed on the same quantity, basis and in the same manner as Capitol is paid.   For purposes hereof the term "net royalties" shall mean the gross amount received by Capitol from the applicable licensee with respect to either:

(A) net sales of records, . . . .

85.      Accordingly, a licensed master should result in the payment of 50% of EMI's net royalties derived from that license, which is significantly higher than the royalty payable on sales as set out above.  Therefore, in both the 1979 and 1985 Agreements the royalty to be paid on licenses is 50% of net receipts.

86.      Paragraph 9 of the 1985 Agreement contains a California choice of law provision and expressly provides that the contract be interpreted under California law.  As set forth above, both Plaintiff and EMI have substantial contacts with the State of California.

87.      Plaintiff has satisfied her obligations under the 1979 and 1985 Agreements. However, EMI has not paid her, nor the members of the Class similarly situated, the correct sums for digital transmissions of their music.  Instead of paying the agreed-upon rate of fifty percent (50%) of net receipts for a *licensed* master recording, EMI paid and continues to pay Plaintiff and The Motels and members of the Class similarly situated a much lower royalty based on a *sale* of a physical recording (*e.g.*, a CD) which includes, on information and belief, deductions for container charges and other items that are not at issue in digital transmissions since no physical product is being manufactured and shipped for use by end-users.

**F.      EMI Has Licensed its Master Recordings to Digital Download Services and Should Pay License Royalty Rates to Artists**

88.      EMI's Standard Recording Agreements provide that where EMI licenses master

1   recordings to third parties for the third party's record or other use, EMI will pay the recording

2   artist or producer whose master was licensed between twenty-five and fifty percent (25% - 50%)

3   of its net receipts from the third party.

4        89.     On information and belief, EMI has entered into contracts with Digital Content

5   Providers that allow these providers to digitally distribute all or some of EMI's catalog of master

6   recordings to end-users.  In exchange, these providers pay EMI a flat rate or fixed percentage per

7   digital download (typically 70¢).  As is custom in the industry, and upon information and belief,

8   EMI typically receives reports from Digital Download Providers that set out the total number of

9   downloads of each recording as set out herein.

10        90.     These Digital Content Providers include, but are not limited to, the following

11   entities:

12              a.     Apple (iTunes Store);

13              b.     Amazon.com;

14              c.     Buy.com;

15              d.     Liquid Digital Media (walmart.com);

16              e.     Napster;

17              f.     MOG;

18              g.     Rdio;

19              h.     Rhapsody;

20              i.     Microsoft (Zune Marketplace);

21              j.     eMusic;

22              k.     Verizon Wireless;

23              l.     AT&T Wireless;

24              m.     Nokia;

25              n.     Sprint;

26              o.     T-Mobile;

27              p.     Virgin Mobile;

28              q.     Vodafone;

1        r.     Spotify;

2        s.     MTV;

3        t.     VH1;

4        u.     Zed;

5        v.     Orange;

6        w.     YouTube;

7        x.     MySpace Music;

8        y.     Hudson Soft; and

9        z.     Jamster.

10      91.     As discussed herein, EMI's agreements with these Digital Content Providers

11 constitute licenses and not sales.  As such, under EMI's Standard Recording Agreements, EMI is

12 required to pay Plaintiff and Class members the corresponding percentage of its net receipts from

13 these Digital Content Providers for licenses.

14      92.     However, in breach of its contractual obligations under its Standard Recording

15 Agreements, EMI has treated its transactions with Digital Content Providers as "sales" rather than

16 "licenses."  In so doing, EMI has applied the incorrect formula for calculating royalties owed to

17 Plaintiff and Class members, taken unjustifiable deductions (including, but not limited to, the Net

18 Sales Deduction, the Container Charge deduction, and the Audiophile Deduction), and applied a

19 royalty percentage that is, in general, less than half of what it should be applying in its

20 computation.

21      93.     Plaintiff is informed and believes that, before violating its obligations to its royalty

22 participants, EMI vetted the policies and practices at issue in this case at its highest corporate

23 levels; that it commissioned, either on its own initiative or with the support of the U.S. music

24 industry's principal trade organization, so-called "white papers" on the issue; that it analyzed

25 internally the financial consequences of its misconduct and cast it in terms of the additional profit

26 to be made by it avoiding its contractual obligations; and that it repeatedly made public statements

27 characterizing its agreements with Digital Music Providers in the interest of its recording artists.

28      94.     The licensing provision in EMI's Standard Recording Agreements provide a higher

1  royalty rate than retail sales because in cases where the record label "licenses" the master

2  recordings, the label is essentially acting as a conduit between the artist and a third party, and the

3  label incurs none of the normal costs of selling phonorecords, such as physical materials,

4  distribution, advertising, and promotion.  Because EMI incurs none of the traditional costs

5  associated with physical distribution of records when it gives Digital Content Providers the right

6  to distribute or stream digital copies of master recordings, these agreements fall within the types of

7  situations contemplated by the parties when they agreed to the Master License Provision.

8      95.    Similarly, the royalty base price in EMI's Standard Recording Agreement is

9  generally computed, in part, by deducting a "Container Charge."  However, Container Charges are

10  meant to compensate the record label for the physical packaging of a record, and as such, are

11  inappropriate for digital transmissions that neither have, nor require, physical packaging.

12  Consequently, the royalty base price is unascertainable for digital downloads and cannot apply.

13      96.    The ordinary meaning of a license is the "permission to act," WEBSTER'S THIRD

14  NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1304 (2002), while a sale is (a) an

15  actual transfer of title in a copy of the work or (b) the passing of all exclusive, intellectual property

16  rights in a work.  *See* 17 U.S.C. § 109 (describing (a)); *Quality King Distribs. v. L'anza Research*

17  *Int'l*, 523 U.S. 135, 145 (1998) (describing (b)).

18      97.    Based on the ordinary meanings of "license" and "sale," the Ninth Circuit found in

19  *F.B.T. Prods.* that the record labels "did not 'sell' anything to the download distributors.  The

20  download distributors did not obtain title to the digital files.  The ownership of those files

21  remained with [the label, which] reserved the right to regain possession of the files at anytime, and

22  [the label] obtained recurring benefits in the form of payments based on the volume of

23  downloads."  The facts in this case are analogous and, as such, the ordinary meaning of these

24  words supports a finding that these agreements were "licenses" under the Master License

25  Provision and not "sales."

26      98.    Under the first sale doctrine, after the first sale of a legally copyrighted work, the

27  copyright holder no longer has a right to restrict or prevent subsequent sale of their work.  Thus,

28  purchasers are free to resell CDs and other physical music products that were lawfully purchased

1   without obtaining the copyright holder's approval.  The U.S. Copyright Office, however, has

2   declined to extend this doctrine to digital media further arguing against these types of transactions

3   as "sales" as opposed to "licenses."

4          99.      Indeed, Defendant Capital Records LLC recently sued Redigi, Inc., an online

5   marketplace for "used" digital downloads, alleging that consumers have no right to re-sell digital

6   downloads.  *See Capitol Records, LLC v. ReDigi, Inc*., Case No. 1:12-cv-00095-RJS (S.D.N.Y.).

7   Notably, in Paragraph 14 of Capitol Records, LLC's Complaint, it asserts: "Plaintiff also

8   redistributes and ***licenses*** its sound recordings in the form of digital audio files, which are

9   marketed and distributed online and delivered to the consumer via the Internet through, inter alia,

10  iTunes and Amazon."  (Emphasis added.)  Thus, it is inconceivable how EMI can argue here that

11  mastertones licensed to Digital Content Providers are phonorecords under its Standard  Recording

12  Agreements (subject to much lower royalty rates), but that what is actually sold to consumers is

13  something less than a phonorecord; if consumers purchased a phonorecord, then there would be no

14  legal bar to the consumer reselling the digital download.

15         100.     As one commentator has noted, this position is inconsistent with the position taken

16  by the defendants in *F.B.T. Prods*.:

17              Two recent court cases hinge on how the sale of an MP3 download
                compares to the sale of a conventional physical recording, known as
18              a  "phonorecord"  in  Copyright-speak.  In  one  case,  the  singer
                Eminem  demanded  that  Universal  Music  Group  calculate  his
19              royalties  for  downloads  based  on  the  higher  rate  for  licensed
                material  instead  of  the  lower  rate  for  phonorecord  sales.  UMG
20              refused, arguing that the sale of an MP3 download was the same as a
                phonorecord sale. In the second case, EMI filed suit against ReDigi,
21              a company that allows purchasers of MP3 downloads to resell those
                files under Copyright law's "first sale" doctrine. EMI argued that the
22              MP3 files were not phonorecords and thus not subject to first sale.
                Putting these two arguments together, we see the music industry
23              imagining transactions where what's sold is a phonorecord but
                what's purchased isn't.[5]
24

25

26  _____

27  [5] http://slworona.wordpress.com/2012/02/09/cognitive-dissonance-in-the-music-business/.

28

101.    In another legal complaint against Grooveshark, an online, on-demand music streaming service ("Complaint") (Jan. 4, 2012), EMI Entertainment World, Inc. averred that it had entered into a "Licensing Agreement" with Grooveshark whereby it granted Grooveshark the "'non-exclusive, non-transferable, royalty-bearing limited right and license' to reproduce Plaintiff's musical compositions in digital files and to distribute such files as so-called 'On-Demand Audio Streams' via the Grooveshark Service. *EMI Entertainment World, Inc. v. Escape Media Group, Inc*., No. 650013/2012 (Sup. Ct. N.Y. Cty.),  Exhibit A ¶ 2. 'On-Demand Audio Streams' are defined in the License Agreement, essentially, as encrypted digital transmissions of music files from Defendant's server made at the request of and at a time chosen by the end user. *Id*.¶ 1(h).'"

102.    On information and belief, a recent deal between Apple and EMI that brought The Beatles' catalog to iTunes for the first time purportedly required EMI to treat The Beatles' digital downloads as subject to a license, as The Beatles, their publisher, and/or their respective predecessors-in-interest, are being paid directly by Apple.

103.    Former Apple CEO, Steve Jobs, published a piece entitled "Thoughts on Music" on February 6, 2007 in which he stated, "Since Apple does not own or control any music itself, it must *license* the rights to distribute music from others, primarily the 'big four' music companies: Universal, Sony BMG, Warner, and EMI."  (Emphasis added.)  Thus, the CEO of the largest Digital Download Provider in the world has characterized its agreement with EMI as a "license" and not a "sale."

104.    In its terms of service of the iTunes Store, Apple states that "Apple and its *licensors* reserve the right to change, suspend, remove, or disable access to any iTunes products, content, or other materials."  (Emphasis added.)  Thus, Apple has explicitly acknowledged that it licenses content from third parties, which includes EMI.

105.    Upon information and belief, the Master License Provisions found in Standard Recording Agreements at issue here and as relevant to the claims herein, are the same or substantially similar to those found in other production and recording agreements across all or substantially all of EMI's owned and distributed record labels entered into by EMI and/or its

predecessors in interest and/or affiliates.  Those agreements call for accountings and payments to recording artists and producers for licensing of masters as a percentage (usually fifty percent (50%)) of the net receipts of the label, rather than a lesser percentage as a royalty paid to the artist or producer based on the suggested retail list price of each unit sold.

**G.      EMI's Failure to Provide a Proper Calculation of its Royalty Obligations Has Caused Substantial Damages to Plaintiff and the Class**

106.    EMI's accounting practices, as alleged herein, have caused EMI to illegally withhold a substantial amount of money it receives from Digital Content Providers at the expense of Plaintiff and the Class.

107.    As a result, EMI has paid and continues to pay Plaintiff and Class Members much lower royalties than it should be paying them for moneys received from Digital Content Providers.

108.    As a result of EMI's systematic violation of its contractual obligations to Plaintiff and other Class members to make proper royalty payments and to properly credit royalty accounts pursuant to its Standard Recording Agreement, EMI has caused substantial damages to Plaintiff and Class members, the exact amount to be determined at trial.

109.    At all relevant times, EMI has had a duty and obligation under its recording agreements with Plaintiff and other Class Members to properly and accurately account for royalties received by EMI from Digital Content Providers, to which EMI has licensed the master recordings of Plaintiff and other Class members.  However, rather than fulfilling its contractual obligations, EMI has systematically, knowingly, and intentionally miscalculated the royalties due to Plaintiff and other Class members.  As a result, EMI has under-credited and/or underpaid each and every Class member, while also deriving substantial financial benefits from its licensing of these master recordings.

**H.      Plaintiff Has Provided Defendants With Notice And An Opportunity To Cure Its Failure to Provide Proper Payment**

110.    On March 30, 2012, Plaintiff filed a Complaint against EMI, (ECF No. 1), on behalf of herself and all others similarly situated, thereby providing notice to Defendants of their deficient royalty payments and various breaches of the 1979 Agreement and the 1985 Agreement.

111.    On June 19, 2012, Plaintiff, by and through her counsel, provided additional notice

1    to Defendants via certified mail, return receipt requested, of Defendants' deficient payment of

2    royalties and various other breaches of the 1979 Agreement and the 1985 Agreement.

3        112.    As of the filing of this Complaint, Defendants have refused to cure or correct their

4    deficient payments.

5    **I.    Limitations of Remedies Clauses in the Agreements Should Not Be Enforced**

6        113.    The 1979 Agreement contains a provision that purports to render all account or

7    royalty statements "final, conclusive and binding on [Plaintiff] and shall constitute an account

8    stated," unless Plaintiff specifically requests to inspect EMI's records with regard to that statement

9    within three years, and hires a CPA at her own expense to review EMI's records.  1979

10   Agreement, Section 3.f.  The clause further provides that Plaintiff "shall be foreclosed from

11   maintaining any action, claim or proceeding against [EMI] in any forum or tribunal with respect to

12   any statement or accounting due hereunder unless such action . . . is commenced . . . within four

13   years after the receipt of such statement or accounting."  *Id.*

14       114.    The 1985 Agreement has a similar clause at Section 7.h(ii), that purports to bar

15   any action commenced more than four years after the receipt of a royalty statement or accounting.

16       115.    These clauses are so one sided in their burdens and benefits and present such a

17   complete lack of meaningful choice for Plaintiff that they should not be enforced.

18       116.    Where, as here, Defendants knowingly underpaid Plaintiff by reporting digital

19   download licenses as sales of physical record sales, and concealed the fact that the sales were

20   improperly accounted for, that clause would purport to immunize Defendants from their own

21   knowing or intentional wrongful acts.  By contrast, California state law provides a similar four

22   year statute of limitations for breach of contract cases, but allows the tolling of that statute of

23   limitations in the case of fraudulent concealment.

24       117.    Here, in particular, EMI's breaches of the two contracts were difficult, if not

25   impossible, for Plaintiff to detect, as all she was given was a royalty statement.  Plaintiff could not

26   discover any breach of contract without hiring an expensive CPA at her own cost to do a costly

27   spot-check.  Nor would breaches be apparent from her royalty statements unless the sales numbers

28   did not match public reports.  Simply taking licenses from one category and reporting them as

1  another category could constitute a serious breach, but would not be readily perceivable to

2  Plaintiff.

3       118.    Defendants, by contrast, knowingly breached the contract and were in a far

4  superior position to determine whether they were breaching the contract.

5       119.    Further, because of the nature of the breach and Defendants' fraudulent

6  concealment thereof, it was a natural consequence that Plaintiff and others would remain unaware

7  of the breach, a fact of which Defendants must have been aware.

8       120.    Furthermore, the limitation of remedies clauses in these agreements violate

9  public policy, and should not be enforced.  Public policy, embodied in California law, applies a

10  statute of limitations, but prevents wrongdoers from profiting from their own fraudulent

11  concealment by tolling that statute of limitations in the case of fraud.  The contract clauses here

12  contravene that public policy.

13  **VI.  <u>CLASS ACTION ALLEGATIONS</u>**

14       121.    Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a)

15  and 23(b) on behalf of herself and the following Class:

16          All persons and entities, their agents, successors in interest, assigns,

17          heirs, executors, and administrators who are or were parties to EMI
        recording agreements containing "Master License Provisions" or

18          their equivalent, through which such persons and entities, either
        directly or indirectly, received royalties on, or financial credits or

19          adjustments for, income received by EMI for the commercial
        exploitation of master recordings through EMI's licensing of said

20          master recordings to Digital Content Providers, at a rate less than the
        rate provided for in their contract with EMI.

21

22       122.    The following persons and entities are excluded from the Class: (1) EMI and its

23  subsidiaries, affiliates, officers, and employees; (2) all persons who make a timely election to be

24  excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom this

25  case is assigned and any immediate family members thereof.

26       123.    Plaintiff reserves the right to redefine the Class prior to certification.

27       124.    This action is properly maintainable as a class action.

28       125.    The Class for whose benefit this action is brought is so numerous that joinder of all

1   Class members is impracticable.  While Plaintiff does not presently know the exact number of

2   Class members, Plaintiff is informed and believes that there are tens of thousands of Class

3   members, and that those Class members can only be determined and identified through EMI's files

4   and, if necessary, other appropriate discovery.

5          126.    There are questions of law and fact which are common to Class members and

6   which predominate over any questions affecting only individual members of the Class.  A class

7   action will generate common answers to the below questions, which are apt to drive the resolution

8   of the litigation:

9                  a.      Whether EMI violated its recording agreements by, *inter alia*,

10  mischaracterizing the money it received from Digital Content Providers as "sales" income rather

11  than "license" income in violation of the recording agreements;

12                 b.      Whether EMI benefited financially from its wrongful acts;

13                 c.      Whether EMI acted in a manner calculated to conceal the illegality of its

14  actions from recording artists and music producers;

15                 d.      Whether EMI will continue collecting licensing income from Digital

16  Content Providers and misrepresent the royalties due for such licensing income to its recording

17  artists and music producers despite knowing that such misrepresentation constitutes a breach of its

18  artists' recording contract;

19                 e.      Whether EMI, by way of the conduct alleged herein, must comply with

20  California Code of Civil Procedure §§ 337 and 337a and provide a proper accounting of the

21  amounts owed to Plaintiff and other Class members;

22                 f.      Whether EMI, by way of the conduct alleged herein, engaged in deceptive

23  or unfair acts or practices in violation of California unfair trade practices laws, including but not

24  limited to California Business & Professions Code §§ 17200, *et seq.,* for which Plaintiff and other

25  Class members are entitled to recover;

26                 g.      Whether, assuming EMI intends to continue breaching its contractual

27  obligations to Plaintiff and other Class members, and/or to violate California state law, declaratory

28  and injunctive relief is appropriate to curtail its conduct as alleged herein;

h.      Whether Plaintiff and other Class members have been damaged by EMI's actions or conduct; and

i.      The proper measure of damages.

127.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of other Class members and Plaintiff has the same interests as other Class members.  Plaintiff has no interests that are antagonistic to, or in conflict with, the interests of the other members of the Class. Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

128.    The prosecution of separate actions by individual Class members could create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for EMI or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class not parties to the adjudications.

129.    Furthermore, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for the individual members of the Class to redress the wrongs done to them individually.  If a Class or general public action is not permitted, Class members will continue to suffer losses and EMI's misconduct will continue without proper remedy.

130.    EMI has acted and refused to act on grounds generally applicable to the entire Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

131.    Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action.  Class members may be identified from EMI's records and such Class members may be notified of the pendency of this action by mail or by electronic means (like email), using techniques and a form of notice customarily used in class actions.

132.    For the above reasons, a class action is superior to other available methods for the fair and efficient adjudication of this action.

# VII. CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (Breach of Contract)
### (On Behalf of Plaintiff and All Class Members)

133.   Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

134.   Plaintiff and Class members entered into a Standard Recording Agreement with EMI or one of its affiliates.

135.   These Standard Recording Agreements contained the same or substantially similar terms relating to the treatment of licensing income for royalty accounting. By definition, such licensing income includes income derived from the licensing of recordings to Digital Content Providers.

136.   Plaintiff and other Class members have performed their obligations under their respective recording agreements by providing master recordings to EMI to exploit. At no point did EMI advise Plaintiff and Class members that such master recordings were non-conforming or otherwise objectionable. As a result, all conditions required for EMI's performance under the written contracts—namely, the payment of the appropriate royalties to Plaintiff and Class members—have occurred.

137.   By reason of the foregoing, and other acts not presently known to Plaintiff and Class members, EMI has materially breached its contractual obligations under its pertinent Standard Recording Agreements between itself and Class members by failing to properly account and provide adequately royalty compensation to Plaintiff and Class members with regard to licensing of master recordings to Digital Content Providers. Further, EMI has disregarded the rights of Plaintiff and other Class members by breaching its contractual obligations.

138.   EMI has failed and refused to cure these breaches and continues to incorrectly calculate these royalties in violation of Plaintiff's and Class members' recording agreements. Further, EMI has continued to disregard the rights of Plaintiff and other Class members.

139.   By reason of the foregoing, Plaintiff and other Class members have been damaged

in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment)
### (On Behalf of Plaintiff and All Class Members)

140.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

141.    Pursuant to its Standard Recording Agreements, EMI is obligated to pay and/or credit Plaintiff and other Class members a certain percentage of the income EMI derives from its licensing of master recordings, produced for EMI by Plaintiff and other Class members, to Digital Content Providers, but that EMI has failed to provide sufficient payment/credit to Plaintiff and other Class members by illegally mischaracterizing these licenses as sales.

142.    Plaintiff and other Class members have no adequate remedy at law.

143.    By reason of the foregoing, there is a present controversy between Plaintiff and other Class members, on the one hand, and EMI, on the other hand, with respect to which this Court should enter declaratory judgment determining that the pertinent recording agreements obligate EMI to pay and/or credit Plaintiff and other Class members the percentage specified for licensing, rather than for sales, when EMI licenses the master recordings of Plaintiff and other Class members to Digital Content Providers.

## THIRD CAUSE OF ACTION
### (Common Counts – Open Book Account:
### California Code of Civil Procedure § 337a)
### (On Behalf of Plaintiff and All Class Members)

144.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

145.    Pursuant to EMI's agreements with Plaintiff and other Class members, EMI keeps, and at all relevant times has kept, open book accounts reflecting the debits and credits made to each Class member's account with EMI from inception.  Plaintiff is informed and believes that said open book accounts include entries reflecting income EMI has received, and continues to receive, from its license agreements with Digital Content Providers.

146.    These book accounts constitute the principal records of the transactions between

1   EMI and all Class members, including Plaintiff.

2       147.    Plaintiff is informed and believes that said book accounts are, and at all relevant

3   times were, created in the regular course of EMI's business and kept in a reasonably permanent

4   form and manner.

5       148.    EMI has become indebted to Plaintiff and other Class members on said open book

6   accounts in an amount equal to EMI's underpayment on the income EMI has received, and

7   continues to receive, from its licenses for digital downloads.

8       149.    As such, the outstanding balance owed by EMI to Plaintiff and other Class

9   members on said open book accounts, including a calculation of the amount of underpayment with

10  respect to digital downloads, can be determined by examining all of the debits and credits recorded

11  for each account.

12              **FOURTH CAUSE OF ACTION**
                **(Breach of the Covenant of Good Faith and Fair Dealing)**
13              **(On Behalf of Plaintiff and All Class Members)**

14      150.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs

15  above as though fully set forth herein.

16      151.    The Standard Recording Agreements between EMI and the Plaintiff and the Class

17  are bound by the Covenant of Good Faith and Fair Dealing, which requires the contracting parties

18  to perform their duties under the contract in good faith, and not to do anything that will deprive the

19  other parties of the benefits of the contract.

20      152.    Here, the Covenant of Good Faith and Fair Dealing required EMI to properly

21  account for and pay the Plaintiff and the Class royalties stemming from the license of their

22  musical performances and recordings.

23      153.    In engaging in the acts alleged above, EMI breached the covenant of good faith and

24  fair dealing by, *inter alia*, improperly accounting for the monies owed to Plaintiff and the Class.

25      154.    Through its conduct, EMI has deprived Plaintiff and the Class of the benefits of the

26  contract and has caused financial and economic injuries to Plaintiff and the Class.

27      155.    Such unfair and bad faith conduct by EMI proximately caused injury to Plaintiff

28

1    and the Class.

2                        **FIVE CAUSE OF ACTION**
                  **(Violations of California's Unfair Competition Law:**
3            **California Business & Professions Code §§ 17200,** *et seq.***)**
                **(On Behalf of Plaintiff and All Class Members)**
4

5        156.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs

6    above as though fully set forth herein.

7        157.    California Business and Professions Code §§ 17200, *et seq.* prohibits any unlawful,

8    unfair, or fraudulent business acts or practices.

9        158.    As detailed in this Complaint, EMI has violated the foregoing law, by engaging in

10   unlawful, unfair, and fraudulent business practices.  EMI knowingly breached its Standard

11   Recording Agreements with Plaintiff and other Class members.  EMI either knew, should have

12   known, or recklessly disregarded that the income it collected from Digital Content Providers was

13   in connection with a license agreement, and as such, that the royalties payable to Plaintiff and

14   other Class members should have been accounted and paid for on this basis.  Furthermore, failing

15   to disclose the unlawful nature of its conduct, and employing such devices as are alleged above, as

16   well as affirmatively representing its authority to collect and account for this income on such

17   basis, had a tendency to mislead Plaintiff and other Class members.

18       159.    EMI engaged in "unfair" business acts or practices by converting monies properly

19   due Plaintiff and the Class under the express terms of the Standard Recording Agreements.  EMI's

20   misconduct offends public policy and is immoral, unscrupulous, unethical, and offensive, and

21   causes substantial injury to consumers.

22       160.    The harm to Plaintiff and other Class members resulting from EMI's deceptive and

23   unlawful practices outweighs the utility, if any, of those practices.  There is no possible economic

24   justification for such conduct, and consequently, the gravity of the misconduct outweighs any

25   possible economic justification offered by EMI.

26       161.    EMI's illegal conduct, as described herein, is ongoing, continues to this date, and

27   constitutes unfair and fraudulent business acts and practices within the meaning of Business &

28   Professions Code §§ 17200, *et seq.*, as interpreted by the California State Courts.  Further, EMI's

1 unlawful and unfair business acts and practices present a continuing threat to Plaintiff, Class

2 members, and the general public in that EMI has refused to publicly acknowledge and correct its

3 wrongdoing, and provide compensation for the damages it has caused.

4    162.   EMI's illegal conduct, as described herein, constitutes a conscious and systematic

5 breach of Standard Recording Agreements, and that breach was done in a like manner as to the

6 Standard Recording Agreements of all Class Members.

7    163.   Pursuant to California Business & Professions Code § 17203, Plaintiff and other

8 Class members are therefore entitled to:

9        a.    An Order requiring EMI to cease the acts of unfair competition alleged

10 herein;

11       b.    An Order enjoining EMI from continuing to account for royalties payable to

12 Plaintiff and Class members in the manner it does for income derived from such licenses;

13       c.    Full restitution of all monies paid to and retained by EMI otherwise payable

14 to Plaintiff and Class members including, but not limited to, disgorgement pursuant to California

15 Code of Civil Procedure § 384;

16       d.    Interest at the highest rate allowable by law; and

17       e.    The payment of Plaintiff's attorneys' fees and costs under, among other

18 provisions of law, Cal. Code Civ. Proc. § 1021.5, or otherwise to the extent permitted by law.

19                    **PRAYER FOR RELIEF**

20    **WHEREFORE,** Plaintiff, on behalf of herself and the other putative Class members,

21 prays for judgment against EMI as follows:

22    164.   An order certifying the proposed Class, designating Plaintiff as the named

23 representative of the Class, and designating the undersigned as Class Counsel;

24    165.   A declaration that EMI is financially responsible for notifying all Class members

25 that the pertinent recording agreements obligate EMI to pay and/or credit Plaintiff and other Class

26 members the percentage specified in their contracts for licensing, rather than for sales, and that

27 EMI has been improperly accounting for such transactions;

28    166.   An injunction requiring EMI to abide by the express terms of its Standard

1    Recording Agreements with regard to licensing of master recordings to Digital Content Providers;

2         167.    An award to Plaintiff and the Class of compensatory, exemplary, and/or statutory

3    damages in an amount to be proven at trial;

4         168.    An award of attorneys' fees and costs, as allowed by law;

5         169.    An award of pre-judgment and post-judgment interest, as provided by law;

6         170.    For leave to amend the Complaint to conform to the evidence produced at trial; and

7         171.    Such other and further relief as the Court may deem just and proper.

8                              **JURY TRIAL DEMANDED**

9         Plaintiff, on behalf of herself and the Class, hereby demands a trial by jury.

10   DATED: August 1, 2012                    **PEARSON, SIMON, WARSHAW & PENNY, LLP**

11

12                                      By:      /s/  *Robert G. Retana*
                                                _____
13                                              Bruce L. Simon (Bar No. 96241)
                                                Robert G. Retana (Bar No. 148677)
14                                              Aaron M. Sheanin (Bar No. 214472)
                                                William J. Newsom (Bar No. 267643)
15                                              **PEARSON, SIMON, WARSHAW &
                                                PENNY, LLP**
16                                              44 Montgomery Street, Suite 2450
                                                San Francisco, CA  94104
17                                              Telephone: (415) 433-9000
                                                Facsimile:  (415) 433-9008
18                                              bsimon@pswplaw.com
                                                rretana@pswplaw.com
19                                              asheanin@pswplaw.com
                                                wnewsom@pswplaw.com
20
                                                Clifford H. Pearson (Bar No. 108523)
21                                              Daniel L. Warshaw (Bar No. 185365)
                                                **PEARSON, SIMON, WARSHAW &
22                                              PENNY, LLP**
                                                15165 Ventura Boulevard, Suite 400
23                                              Sherman Oaks, CA  91403
                                                Telephone: (818) 788-8300
24                                              Facsimile:  (818) 788-8104
                                                cpearson@pswplaw.com
25                                              dwarshaw@pswplaw.com

26                                              Neville L. Johnson (Bar No. 66329)
                                                Douglas L. Johnson (Bar No. 209216)
27                                              James T. Ryan (Bar No. 210515)
                                                **JOHNSON & JOHNSON LLP**
28                                              439 N. Canon Drive, Suite 200
                                                Beverly Hills, CA  90210

1    Telephone: (310) 975-1080
     Facsimile:  (310) 975-1095
2    njohnson@jjllplaw.com
     djohnson@jjllplaw.com
3    jryan@jjllplaw.com

4    Michael D. Hausfeld (*pro hac vice* pending)
     James J. Pizzirusso (*pro hac vice* pending)
5    **HAUSFELD LLP**
     1700 K Street, NW Suite 650
6    Washington, D.C. 20006
     Telephone: (202) 540-7200
7    Facsimile:  (202) 540-7201
     mhausfeld@hausfledllp.com
8    jpizzirusso@hausfeldllp.com

9    Michael P. Lehmann (Bar No. 77152)
     Bruce J. Wecker (Bar No. 78530)
10   Arthur N. Bailey, Jr. (Bar No. 248460)
     **HAUSFELD LLP**
11   44 Montgomery Street, Suite 3400
     San Francisco, CA 94104
12   Telephone: (415) 633-1908
     Facsimile:  (415) 358-4980
13   mlehmann@hausfeldllp.com
     bwecker@hausfeldllp.com
14   abailey@hausfeldllp.com

15   David M. Given (Cal. Bar No. 142375)
16   **PHILLIPS, ERLEWINE & GIVEN LLP**
     50 California Street, 35th Floor
17   San Francisco, CA 94111
     Telephone: (415) 398-0900
18   Facsimile: (415) 398-0911
     dmg@phillaw.com
19

20   Michael W. Sobol (Cal. Bar No. 194857)
     **LIEFF CABRASER HEIMANN &**
21   **BERNSTEIN, LLP**
     275 Battery Street, 29th Floor
22   San Francisco, California 94111
     Telephone:  (415) 956-1000
23   Facsimile:  (415) 956-1008
     msobol@lchb.com
24

25   Leonard B. Simon
     **LAW OFFICES LEONARD B. SIMON P.C.**
26   655 West Broadway, Suite 1900
     San Diego, California 92101
27   Telephone:  (619) 338-4549
     Facsimile:  (619) 231-7423
28

lens@rgrdlaw.com