Neville L. Johnson (Bar No. 66329)
**JOHNSON & JOHNSON LLP**
439 N. Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile:  (310) 975-1095
Email: njohnson@jjllplaw.com

Michael D. Hausfeld                        Paul R. Kiesel (Bar No. 119854)
James J. Pizzirusso                        Jeffrey A. Koncius (Bar No. 189803)
**HAUSFELD LLP**                           **KIESEL + LARSON LLP**
1700 K Street, NW Suite 650                8648 Wilshire Boulevard
Washington, D.C. 20006                     Beverly Hills, California 90211
Telephone: (202) 540-7200                  Telephone: (310) 854-4444
Facsimile:  (202) 540-7201                 Facsimile:  (310) 854-0812
Email: mhausfeld@hausfedllp.com            Email: kiesel@kbla.com
Email: jpizzirusso@hausfeldllp.com         Email: koncius@kbla.com

Attorneys for Plaintiff and the Class

[Additional Counsel Appear on Signature Pages]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTHA DAVIS, as an individual on behalf of herself and all others similarly situated, | CASE NO.:  3:12-cv-01602-YGR |
| Plaintiff, | **THIRD AMENDED COMPLAINT** |
| vs. | **CLASS ACTION** |
| CAPITOL RECORDS, LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

1   Plaintiff Martha Davis, as an individual on behalf of herself and all others similarly

2   situated, alleges upon personal knowledge as to herself and her own acts, and upon information

3   and belief as to all other matters, based upon, *inter alia*, the investigation made by and through her

4   attorneys, as follows.

5                           **I. <u>NATURE OF THE ACTION</u>**

6   1.   Plaintiff brings this nationwide class action for breach of contract and statutory

7   violations of California law against Defendant Capitol Records LLC ("Capitol" or "Defendant"),

8   for Capitol's failure to properly account to Plaintiff and Class members for royalties stemming

9   from the licensing of Plaintiff's and Class members' musical performances or recordings produced

10   by them that were utilized by "Music Download Providers" and "Ringtone Providers"

11   (collectively "Digital Content Providers") for digital download, streaming and distribution.

12   2.   Plaintiff seeks monetary damages, injunctive relief, and declaratory relief against

13   Capitol for its willful violation of contracts between itself and recording artists and/or music

14   producers through which Capitol obtained recording artists' and producers' master recordings in

15   exchange for the payment of certain royalties to these artists and producers (hereinafter "Capitol

16   Agreements").  Capitol has unilaterally breached these contracts by paying its recording artists and

17   producers a fraction of the actual amount owed to them for the licensing of master recordings to

18   Digital Content Providers and failing to properly pay royalties to its artists for electronic

19   transmission of their works.

20   3.   On information and belief, Capitol has entered into licensing agreements with

21   Digital Content Providers whereby Capitol permits these Digital Content Providers to sell and/or

22   stream Capitol's catalogue of master recordings (including those made and/or produced by

23   Plaintiff and Class members under the Capitol Agreements) to end users via digital transmission.

24   4.   On information and belief, under its licensing agreements with Music Download

25   Providers, Capitol receives approximately seventy percent (70%) of the proceeds from Music

26   Download Providers for every licensed song and/or album that is downloaded by an end-user

27   through the Music Download Providers.

28

5.      On information and belief, under its licensing agreements with Ringtone Providers, Capitol receives approximately fifty percent (50%) of the retail sale price from the Ringtone Providers for every licensed song and/or mastertone downloaded by an end-user through the Ringtone Providers.

6.      On information and belief, under its licensing agreements with "Music Streaming Providers," Capitol has received significant advance and other payments related to the digital streaming of music by end-users through the Music Streaming Providers.

7.      Under the Capitol Agreements at issue in this case, when Capitol licenses master recordings produced under these agreements to third parties, Capitol is required to pay its recording artists and producers certain royalties for "licensing" income received by Capitol from these third-party licensees (hereinafter the "License Royalty Provisions").  The License Royalty Provisions apply to Capitol's licensing of master recordings to Digital Content Providers for their transmission through digital distribution.

8.      Rather than pay its recording artists and producers the royalties set forth in the License Royalty Provisions for income received from Digital Content Providers,  Capitol wrongfully treats each digital transmission as a "sale" by the company of a physical phonorecord (*i.e.*, an LP, EP, CD, or cassette tape).   Sales by the company of physical phonorecords are governed by much lower royalty provisions than royalties for licensing income in Capitol Agreements.  In doing so, Capitol:

    a.      has failed to properly account to and pay Plaintiff and other Class members money owed to them from the licensing of master recordings to Digital Content Providers;

    b.      has underreported the actual number of digital downloads and digital streams by treating these transmissions as they would sales of physical product that might be returned;

    c.      has deducted, without authorization or legal authority, container/packaging deductions when no such deductions are applicable to digital transmissions; and/or

    d.      has reduced its royalty payments by improperly taking "audiophile

THIRD AMENDED COMPLAINT

1   deductions."[1]

2   9.      In addition, on information and belief, Capitol illegally withheld, and continues to

3   withhold, a certain percentage of royalties owed to Plaintiff and Class members as "reserves."

4   These reserves are meant to offset losses related to the return of unsold records; however, digital

5   transmissions are incapable of being returned, as there is no physical product to return.

6   10.     During the applicable Class Period, Capitol has, in a wide-spread and calculated

7   manner, violated the royalty provisions of its Capitol Agreements with Plaintiff and Class

8   members by (a) failing to make proper royalty payments to Plaintiff and Class members and/or (b)

9   failing to properly credit Plaintiff's and Class members' royalty accounts.  As a result of Capitol's

10  ongoing breach of the License  Royalty Provisions, Plaintiff and Class members have suffered

11  hundreds of millions of dollars in damages.

12  11.     The conclusion that Capitol acted improperly in this case follows from a decision

13  by the Ninth Circuit in an analogous action that Universal Music Group, Inc. ("UMG") and one of

14  its owned and distributed record labels, Aftermath Records, failed as a matter of law to properly

15  account for and pay royalty payments on digital content to artists and producers.  In *F.B.T. Prods.,*

16  *LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 1677 (2011), the

17  Ninth Circuit held that royalties for digital downloads and mastertones (ringtones) should be paid

18  pursuant to the amounts agreed to for a "license" and not at the lower rate of a "sale."  621 F.3d at

19  964-67.  The Ninth Circuit's ruling became final when the U.S. Supreme Court declined review.

20  12.     In holding that UMG's agreements with "iTunes [the market leader in the digital

21  downloads of recorded music], cellular phone carriers [primarily Sprint, Verizon, and AT&T] and

22  other third parties to use [UMG's] sound recordings to produce and sell permanent downloads and

23  [ring]tones . . . ***qualify as licenses***," *id.* at 964 (emphasis added), the Ninth Circuit found that the

24  agreements at issue unambiguously provided for a much higher royalty payment than UMG had

25  _____

26

27  [1] Audiophile records are those marketed in specially priced catalog series by reason of their

28

1 previously paid.

2     13.    The Capitol Agreements are, in every material way, the same as the UMG contracts

3 at issue in *F.B.T.*  Accordingly, Plaintiff here alleges that the digital download income received by

4 Capitol from Digital Content Providers is based on "licenses" and not "sales," as those terms are

5 defined in Capitol's Capitol Agreements.  Just as UMG in *F.B.T.*, Capitol has not properly

6 accounted for the appropriate amount of royalties owed to Plaintiff and Class members.  Through

7 this lawsuit, Plaintiff seeks to compel Capitol to account for and pay all of its recording artists and

8 music producers their rightful share of the licensing income paid to Capitol for digital

9 transmissions.

10     14.    Not all recording artists are paid vast sums in royalties; in fact, some recording

11 artists have been reported to be destitute after the high points of their careers have passed.  *See*

12 Chuck Phillips, "Artists Put Pressure on for Benefits," L.A. Times, June 3, 2002.  In response to

13 such stories, the California Senate Judiciary Committee co-chaired hearings during which Senator

14 Martha Escutia, Chair of the Committee, noted that "if public tax dollars are being spent to

15 support artists who were cheated out of their royalty earnings, we need to shift the burden back to

16 where it belongs: to the record labels that failed to pay the artists their rightful earnings."  Record

17 Label Accounting Practices: J. Hearings of the Cal. State Senate Comm. on the Judiciary and State

18 Senate Select Comm. on the Entm't Indus., 2001-2002 Leg. 3, (Cal. 2002), at 1 (as quoted in 20

19 *Berkeley Tech. L.J.*, 933, 944 n.66).

20     15.    This action seeks the payment to artists of their "rightful earnings."

21     16.    Plaintiff seeks damages on behalf of herself and all others similarly situated, as

22 well as an accounting and judgment declaring the proper method of calculating payments of

23 royalties or crediting royalty accounts with respect to the licensing of master recordings to Digital

24 Content Providers.  Further, Plaintiff requests that this Court order Capitol to adhere to the proper

25 methodology for calculating such royalties in the future.

26

27                   **II.  THE PARTIES**

28

17.     Plaintiff Martha Davis is a musician, recording artist, and performing artist who resides in St. Helens, Oregon, and is a citizen of Oregon.  Plaintiff was the lead singer of a band known as "The Motels."  The Motels is a New Wave band from the Los Angeles area best known for the songs "Only the Lonely" and "Suddenly Last Summer," each of which peaked at #9 on the Billboard Hot 100 in 1982 and 1983, respectively.   The Motels had five singles on the Billboard Hot 100[2], and two of its albums have gone gold in the United States.  Plaintiff was also the sole shareholder, beneficiary, and successor-in-interest of the now-dissolved Martha Davis Productions, Inc./The Motels Music Corporation, Inc./Martha Davis Productions entity that entered into various contracts with Defendant on behalf of Plaintiff, and expressly contemplated Plaintiff as a third party beneficiary to those contracts.  Martha Davis is the sole owner of all assets formerly belonging to this entity.

18.     Defendant Capitol is a Delaware corporation with its principal places of business in New York, New York and Los Angeles, California.  Capitol is a global music company that specializes in the signing, development, and promotion of recording artists and their musical compositions. Capitol's artists have included, *inter alia*, the Lettermen, Frank Sinatra, the Beatles, the Beach Boys, the Kingston Trio, the Red Hot Chili Peppers, Les Baxter, Peggy Lee, Nat King Cole, Tennessee Ernie Ford, Stan Kenton, Judy Garland, Jackie Gleason, Andy Griffith, Shirley Bassey, Merle Travis, Dean Martin, the Four Freshmen, Al Martino, Dinah Shore, Nancy Wilson, Helen Reddy, Anne Murray, Buzzcocks, David Bowie, Kim Carnes, Rosanne Cash, Natalie Cole, Sammy Hagar, The Knack, Diana Ross, Bob Seger, The Stranglers, George Thorogood, Wings, Richard Marx, The Motels, Tina Turner, George Clinton, Duran Duran, Heart, Katrina & The Waves, Grace Jones, Pet Shop Boys, Queen, Roxette, Spandau Ballet, Concrete Blonde, Billy Idol, Megadeth, Poison, Iron Maiden, Queensrÿche, the Beastie Boys, Robbie Robertson, Freddie Jackson, Selena, Blind Melon, Garth Brooks, Coldplay, The Dandy Warhols, Dilated Peoples,

---

[2] http://www.allmusic.com/artist/the-motels-p4960/charts-awards/billboard-singles

Doves, Everclear, Foo Fighters, Geri Halliwell, Ice Cube, Jane's Addiction, Mazzy Star, MC Hammer, MC Ren, Liz Phair, Lisa Marie Presley, Radiohead, Bonnie Raitt, Snoop Dogg, and Richard Thompson.  From the 1960s on, Capitol was controlled by EMI Music Group ("EMI") or its predecessors and was, until recently, a subsidiary of EMI.

19.     In November 2011, UMG announced it had signed a deal with EMI's owner Citigroup to purchase the label's recorded music division, while a consortium led by Sony agreed to purchase EMI's publishing division.  EMI's recorded music unit was sold to UMG for $1.9 billion.[3]  That deal was finalized in February of 2013. Capitol is now a wholly-owned subsidiary of  UMG.

### III.  STANDING

20.     In 1977, Plaintiff founded Martha Davis Productions, Inc.  Plaintiff was a shareholder in that company at all relevant times.

21.     In 1979, Plaintiff and The Motels entered into a recording agreement (the "1979 Agreement") with Capitol Records, Inc. ("CRI"), a predecessor-in-interest to the Defendant.

22.     The 1979 Agreement was amended in 1981 to substitute Martha Davis Productions, Inc. in place of The Motels.

23.     In 1983, Martha Davis Production, Inc. changed its name to The Motels Music Corporation, Inc.  Plaintiff was a shareholder in that company at all relevant times.

24.     In 1985, The Motels Music Corporation, Inc. entered into another recording agreement (the "1985 Agreement") with CRI.

25.     In 1989, The Motels Music Corporation, Inc. changed its name to Martha Davis Productions.  Plaintiff was a shareholder in that company at all relevant times.

26.     In 1991, Martha Davis Productions dissolved, and of its all assets were transferred to its sole shareholder and successor-in-interest, Plaintiff Martha Davis.

_____

[3] http://online.wsj.com/article/SB10001424052970204224604577031694160429400.html.

27.     The 1979 Agreement and the 1985 Agreement were written in such a way that they expressly contemplated Plaintiff as an intended third-party beneficiary of each contract.  The contract terms expressly required that CRI confer benefits upon Plaintiff either directly or by and through an entity owned by Plaintiff.

28.     After Martha Davis Productions dissolved, Defendant directed all royalty payments under the 1979 Agreement and the 1985 Agreement to Plaintiff.  Defendant also directed all communications and account statements under those contracts to Plaintiff.

## IV.  JURISDICTION AND VENUE

29.     This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, and there is diversity of citizenship between proposed Class members and Capitol. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (c).

## V.  SUBSTANTIVE ALLEGATIONS

### A.     Music Download Services

31.     "Music Download Services" allow consumers to purchase and download digital versions of master recordings directly to their computers or other electronic storage devices ("Music Downloads").  There is no physical packaging and returns are not permitted.  However, Music Downloads often have various restrictions in place to prevent the consumer from copying and/or sharing the Music Download with others.  Oftentimes, these restrictions are enforced through a Digital Rights Management system ("DRM") that encrypts the content.  Music Download Services are offered by Music Download Providers.

32.     On information and belief, in order to allow users to purchase digital copies of the master recordings owned by record labels, Music Download Providers have signed *licensing* agreements with Capitol and other record labels.  Depending on the licensing agreement with the record label, Music Download Providers generally either: (a) charge a flat, per-download fee to

end users; or (b) operate as a subscription service, allowing consumers to access digital copies of the master recordings for a set monthly fee for as long as they continue paying the monthly subscription charge.  Some providers offer both options.

33.      The first commercially successful Music Download Provider, Ritmoteca.com, was founded in or around 1999.  Ritmoteca signed licensing agreements with UMG, Warner Brothers, Sony Music Entertainment, and Bertelsmann Music Group, between 1999 and 2000.  These licensing agreements allowed Ritmoteca to offer its customers 300,000 tracks for download at prices between 99¢ and $1.99 per track, or $9.99 per album.  Ritmoteca folded during the dot-com bust in April 2000.

34.      Shortly thereafter, in or around 2001, other Music Download Services were developed by both the major record labels and by independent companies.  These services faced stiff competition from illegal downloading sites such as Napster.com and were largely unsuccessful.

35.      When Apple launched its iTunes Store in April 2003 and offered "legal" Music Downloads for, on average, 99¢ per track or $9.99 per album, the popularity of digital downloads began to grow exponentially.  On February 24, 2010, total Music Downloads from the iTunes Store reached 10 billion tracks.  Today, the iTunes Store accounts for roughly two-thirds of all Music Downloads.  The iTunes store generated roughly $1.4 billion in revenue for Apple in the second quarter of 2011, up from about $1.1 billion in the second quarter of 2010.

36.      Besides the iTunes Store, many Music Download Providers have signed licensing deals with Capitol and other record labels to offer Music Downloads to consumers.  These providers include, but are not limited to, Amazon.com, Buy.com, Liquid Digital Media (walmart.com), Napster, Rhapsody, Microsoft's Zune Marketplace, and eMusic.  In fact, the International Federation of the Phonographic Industry ("IFPI"), a worldwide representative of the record industry, estimates that record labels had licensed roughly 13 million tracks of music to over 400 Music Download Providers by 2010.

37.      The licensing of master recordings to Music Download Providers has become

highly lucrative for record labels such as Capitol.  It is estimated that the licensing of master recordings generated $4.6 billion in worldwide revenue for record labels in 2010, or roughly 29% of their total revenue.  In the United States, Music Downloads account for roughly half of record labels' revenues; revenue from Music Downloads surpassed revenue from album sales in 2012.

38.     Music Download Providers have obtained licenses from Capitol that authorize them to sell or otherwise distribute, via digital download, either all or some of Capitol's catalog of master recordings, including Plaintiff's recordings as described herein. Under its licensing agreements with Music Download Providers, Capitol does not manufacture or warehouse any physical product or packaging, nor does it ship or sell any product to stores or other distribution points, and consequently faces no risk of breakage or the return of unsold product.  Rather, as the Ninth Circuit held with respect to UMG and Aftermath Records in *F.B.T.*, Capitol is licensing its catalog of recordings to Music Download Providers for their sale or distribution via digital download by consumers.  The magnitude of digital downloads by Music Download Providers means that Capitol's continued improper accounting of royalties owed to Plaintiff and Class members has deprived Plaintiff and the Class of millions of dollars in royalties.

**B.     Music Streaming Services**

39.     "Music Streaming Services" allow consumers to listen to (or "stream") digital versions of master recordings directly *through their* computers or other electronic devices (*e.g.*, mobile phones, iPods, etc…) without actually purchasing an electronic copy of the recording. Music Streaming Services often have restrictions in place to prevent the consumer from copying and/or sharing the Music Stream with others.  Music Streaming Services are offered by Music Streaming Providers.

40.     On information and belief, in order to allow users to stream digital copies of the master recordings owned by record labels, Music Streaming Providers have signed ***licensing*** agreements with Capitol and other record labels.  Depending on the licensing agreement with the record label, Music Streaming Providers generally either: (a) charge a flat, per-stream fee to end

1    users; or (b) operate as a subscription service, allowing consumers to access digital copies of the

2    master recordings for a set monthly fee for as long as they continue paying the monthly

3    subscription charge.  Some providers offer both options.

4            41.     Some Music Streaming Providers have paid significant upfront fees to labels, such

5    as Capitol, to acquire digital distribution rights to large catalogs of music.  Due to non-disclosure

6    agreements signed between Music Streaming Providers and labels, artists (such as Plaintiff and the

7    Class herein) are not provided with any details about these payments, and there is little

8    transparency about how – and if – that money makes its way to artists.  On information and belief,

9    Capitol does not provide appropriate royalty payments to its artists (such as Plaintiff and the Class

10   herein) from the licensing income it receives from Music Streaming Providers.

11

12   **C.    Mastertones**

13           42.     Ringtones that are a portion/clip of an artist's actual sound recording (rather than an

14   electronic reproduction, *e.g.*, MIDI) and are played on a mobile phone when someone is calling,

15   texting, or otherwise trying to contact the mobile phone operator are known as "mastertones."

16           43.     Mastertones are sold to consumers by Ringtone Providers and cost, on average,

17   between $1.00 and $3.00 per ringtone.  Ringtone Providers include, but are not limited to, wireless

18   carriers (*e.g.*, AT&T Wireless, Verizon Wireless, Sprint, and T-Mobile), content owners (*e.g.*,

19   MTV and VH1), and third-party aggregators (*e.g.*, Zed, Hudson Soft, Jamster and iTunes).  In

20   general, consumers purchase and download mastertones directly from their mobile phones.

21           44.     On information and belief, in order to sell mastertones to consumers, Ringtone

22   Providers have entered into license agreements with Capitol and other record labels that authorize

23   Ringtone Providers to use the label's master recordings to produce ringtones for distribution to

24   consumers.  In return, the Ringtone Providers pay the record labels approximately fifty percent

25   (50%) of the retail sales price of the mastertone.

26           45.     Record labels have made hundreds of millions, if not billions, of dollars from their

27   licensing agreements with Ringtone Providers.  Global mastertone sales reached roughly $4 billion

28

1    in 2004.  In the United States, mastertone sales reached $714 million in 2007 and $541 million in

2    2008.

3           46.    Ringtone Providers continue to sell mastertones and enter into license agreements

4    with Capitol and other record labels.  In fact, Apple did not enter into a license agreement with

5    record labels that enabled them to sell mastertones until in or around September 2009.  Currently,

6    mastertones are available on the iTunes Store for between 0.99¢ and $1.29 per download.

7           47.    Mastertones continue to play an important role in record labels' revenue streams as

8    well.  The Recording Industry Association of America ("RIAA"), of which Capitol is a member,

9    has added its Gold and Platinum recognition program to mastertone sales.  In 2006, the RIAA

10   awarded Gold Status (500,000 downloads) to 84 mastertones, Platinum Status (1,000,000

11   downloads) to 40 mastertones, and Multi-Platinum Status (increments of 1,000,000 downloads

12   over 1,000,000 downloads) to 4 mastertones.  In 2009, the RIAA certified Lil Wayne's "Lollipop"

13   mastertone as 5x Platinum (5 million downloads).  In 2010, the RIAA awarded Platinum Status to

14   five additional mastertones: AC/DC's "Thunderstruck"; Akon's "Right Now (Na Na Na)"; Jason

15   Aldean's "Big Green Tractor"; Drake's "Best I Ever Had"; and Young Money's "Bedrock."

16          48.    Under its licensing agreements with Ringtone Providers, Capitol does not

17   manufacture or warehouse any physical product or packaging, nor does it ship or sell any product

18   to stores or other distribution points, and consequently faces no risk of breakage or the return of

19   unsold product.  Rather, Capitol is licensing its catalog of master recordings to Ringtone Providers

20   for sale or distribution by them via digital download to consumers.

21          49.    The lucrative sales of mastertones by Ringtone Providers means that Capitol's

22   continued improper accounting of royalties owed to Plaintiff and Class members has deprived

23   Plaintiff and the Class of millions of dollars in royalties.

24          50.    The agreements between Digital Content Providers and Capitol that allow these

25   providers to distribute Capitol's master recordings for sale through digital downloads are

26   "licenses" and are therefore subject to the Masters Licensed Provisions in its Capitol Agreements.

27

28   D.     **The Capitol Agreements**

51.     Capitol and its predecessors in interest and affiliates have entered into the above-referenced Capitol Agreements with recording artists and producers whose musical performances Capitol intended to commercially exploit.  Under these Capitol Agreements, the artists and producers promised to make certain master recordings for Capitol and to transfer title to these master recordings so that Capitol could engage in commercial exploitation of these recordings.  In return, Capitol promised to pay the recording artists and producers certain royalties.

52.     Specifically, under Capitol's Capitol Agreements, the artists and producers are entitled to the payment of royalties as either (a) actual payments, or (b) credits against advances paid by Capitol to the artist and/or producer until such advances are recouped, after which time, Capitol is required to pay royalties to the artist and/or producer.

53.     Capitol's Capitol Agreements set forth and govern the calculation, distribution, and payment of royalties by Capitol to each Class member.  On information and belief, these royalties are computed electronically through various software programs that Capitol controls and maintains.  Thus, the ability to calculate the amount owed to Plaintiff and Class members is a matter of simple calculations through adjustment of these software programs.

54.     In accordance with industry practice, Capitol's Capitol Agreements set forth the same, or substantially the same, two equations for all Class members.  The royalties owed to these artists and performers equal the sum of two equations:

    a.     Royalties for phonorecords **_sold_** by Capitol and its affiliates in the United States and abroad ("sold equation"); and

    b.     Royalties for master recordings **_licensed_** by Capitol to third parties ("licensed equation").

55.     These equations were invariably drafted by Capitol, its predecessors in interest and affiliates and were non-negotiable terms of its Capitol Agreements.  While Capitol's recording agreements may have varied slightly in non-material ways, every recording agreement that is part of the Class has these standard equations.

56.     Capitol's Capitol Agreements provide a significantly higher percentage of royalties

under the licensed equation than under the sold equation.  In general, the sold equation provides for royalties of between five and thirty percent (5% - 30%) (depending on the popularity of the artist; *i.e.*, the more popular, the higher the royalty rate) while the licensed equation generally provides for royalties of twenty-five to fifty percent (25% - 50%) of net receipts.  Under both equations, Capitol takes certain deductions before computing the royalties owed; however, as explained below, the sold equation has significantly more deductions than the licensed equation. Again, these deductions are all calculated electronically and are a matter of simple inputs into Capitol's standardized software programs.

57.     The sold equation in Capitol's Capitol Agreements provides for substantially more deductions than those found in the licensed equation.  For example, such deductions typically include:

      a.     A "Net Sales Deduction";

      b.     A "Container Charge" deduction, depending on the type of phonorecord sold; and/or

      c.     An "Audiophile Deduction."

58.     As a result, a recording artist or producer is paid a significantly lower percentage of the total money received by Capitol for its commercial exploitation of the artist's or producer's master recordings under the sold equation than under the licensed equation.

**E.     The Recording Agreements at Issue**

**1.     The Motels 1979 Contract**

59.     On or about May 12, 1979, Plaintiff and The Motels entered into the 1979 Agreement with CRI.  The 1979 Agreement is typical of the form recording agreement signed by members of the Class.  As of the filing of this Complaint, UMG owns the Capitol label and now owns the rights to the master recordings referred to in the 1979 Agreement.

60.     The 1979 Agreement provides that The Motels would record masters for CRI and CRI would exploit those masters through the sale and licensing of them.

61.     As set forth below, the royalties to be paid to The Motels differ and are dependent on whether a "sale" or "license" of their works occurs.

62.     Paragraph 2 of the 1979 Agreement generally governs the payment of royalties to The Motels for the "sale" of their master recordings to be paid as follows:

- 14% for sales of singles
- 16% for sales of "other records"

63.     With regard to royalties on "lp-disc" sales, pursuant to Paragraph 20(a), they are paid on a sliding scale as follows during the initial and first option periods:

- 16% for net sales of 1 – 500,000 units
- 18% for net sales of 500,001 – 1,000,000 units
- 20% for net sales of 1,000,001 – 1,500,000 units
- 22% for net sales over 1,500,000 units

Pursuant to Paragraph 20(c), during the second and third option periods, the above percentages are each increased 2%, e.g., 18% for net sales of 1 – 500,000 units, etc.

64.     With regard to royalties on singles, pursuant to Paragraph 20(e), they are paid on a sliding scale as follows:

- 14% for net sales of 1 – 500,000 units
- 16% for net sales over 500,000 units

65.     With regard to royalties for "sales" in the United States such royalties, pursuant to Paragraph 3(a)(i) are to be "computed and paid upon net sales of records" against which "Capitol shall be entitled to withhold from payments otherwise due from time to time reasonable reserves against anticipated returns, rebates and credits."

66.     In contrast to the payment of royalties on sales contained in the 1979 Agreement, Paragraph 3(a)(vii) stated that the royalty on licenses of the artistic works would be 50% of the net sales:

> (vii) As to records sold embodying masters hereunder or masters*
> [*hereunder] otherwise used by licensees of Capitol or licensees of
> Capitol's licensees, and if fees payable to Capitol are for record club
> sales or are based on a flat fee, or cent rate per unit sold (herein

referred to as "Flat Fee"), then in lieu of any other royalty specified in this agreement, my royalty shall be 50% of Capitol's net royalties from such licensee with respect to such sale of records or other use of the applicable masters, as the case may be, computed on the same quantity, basis and in the same manner as Capitol is paid.  For the purpose hereof, the term "net royalties" shall mean the gross Flat Fee received by Capitol from the applicable licensee with respect to either:

(a)     net sales of records, . . . .

67.     Accordingly, when Capitol licenses a master recording, it should pay Plaintiff 50% of its net royalties, which is significantly higher than the royalty payable on sales as set out above.

68.     Paragraph 17 of the 1979 Agreement contains a California choice of law provision and expressly provides that the contract be interpreted under California law.  As set forth above, both Plaintiff and Capitol have substantial contacts with the State of California.

**2.      The Motels 1985 Contract**

69.     On or about April 1, 1985, The Motels Music Corporation, Inc. entered into the 1985 Agreement with Capitol.  The 1985 Agreement is typical of the form recording agreement signed by members of the Class.

70.     The 1985 Agreement provides for the exclusive services of Martha Davis and her bandmates (collectively, "The Motels").  Under the 1985 Agreement, The Motels were to record masters for Capitol and Capitol would exploit those masters through the sale and licensing of them.

71.     As set forth below, the royalties to be paid to The Motels differ and are dependent on whether a "sale" or "license" of their works occurs.

72.     Paragraph 7 of the 1985 Agreement governs the payment of royalties to The Motels for the "sale" and "licensing" of their master recordings.

73.     With regard to royalties for "sales" in the United States such royalties, pursuant to Paragraph (7)(a)(i) are to be "computed and paid upon net sales of records" against which "Capitol shall be entitled to withhold from payments otherwise due from time to time reasonable reserves against anticipated returns and credits."  Further, the royalty to be paid is as follows:

- 20% for sales of 7 inch singles
- 14% for sales of 12 inch singles and Mini-LP's
- $1.15 for "All Other Records"

Paragraph 7(b)(i) then "proportionally" increases, or decreases, the royalty on album sales using $8.98 as a benchmark (where x, in the following formula "equals the royalty applicable to the album with the Different Retail List Price"):

$$\frac{\$1.15}{\$8.98} = \frac{x}{\text{Different Retail List Price}}$$

Therefore, the benchmark royalty on an album sale, is 12.81% ($1.15 ÷ $8.98).

74.    In contrast to the payment of royalties on sales contained in the 1985 Agreement, Paragraph 7(a)(vi) stated that the royalty on licenses of the artistic works would be 50% of the net sales:

> (vi) As to records sold by a licensee of Capitol through a special markets plan or record club distribution plan; or as to soundtrack albums (other than soundtrack albums distributed by Capitol or licensed by Capitol to be distributed by Primary Licensees) embodying masters; or with respect to masters otherwise used by licensees of Capitol (other than Primary Licensees) in lieu of any other royalty specified in this Agreement, Company's royalty shall be fifty percent (50%) of the net royalties received by Capitol from such licensee with respect to such sales of records or such other use of the applicable masters, as the case may be, computed on the same quantity, basis and in the same manner as Capitol is paid.  For purposes hereof the term "net royalties" shall mean the gross amount received by Capitol from the applicable licensee with respect to either:
>
> (A) net sales of records, . . . .

75.    Accordingly, a licensed master should result in the payment of 50% of Capitol's net royalties derived from that license, which is significantly higher than the royalty payable on sales as set out above.  Therefore, in both the 1979 and 1985 Agreements the royalty to be paid on licenses is 50% of net receipts.

76.    Paragraph 9 of the 1985 Agreement contains a California choice of law provision and expressly provides that the contract be interpreted under California law.  As set forth above,

1  both Plaintiff and Capitol have substantial contacts with the State of California.

2      77.    Plaintiff has satisfied her obligations under the 1979 and 1985 Agreements.

3  However, Capitol has not paid her, nor the members of the Class similarly situated, the correct

4  sums for digital transmissions of their music.  Instead of paying the agreed-upon rate of fifty

5  percent (50%) of net receipts for a *licensed* master recording, Capitol paid and continues to pay

6  Plaintiff and The Motels and members of the Class similarly situated a much lower royalty based

7  on a *sale* of a physical recording (*e.g.*, a CD) which includes, on information and belief,

8  deductions for container charges and other items that are not at issue in digital transmissions since

9  no physical product is being manufactured and shipped for use by end-users.

10

11  **F.     Capitol Has Licensed its Master Recordings to Digital Download Services and Should Pay License Royalty Rates to Artists**

12

13      78.    The Capitol Agreements typically provide that where Capitol licenses master

14  recordings to third parties for the third party's record or other use, Capitol will pay the recording

15  artist or producer whose master was licensed between twenty-five and fifty percent (25% - 50%)

16  of its net receipts from the third party.

17      79.    On information and belief, Capitol has entered into contracts with Digital Content

18  Providers that allow these providers to digitally distribute all or some of Capitol's catalog of

19  master recordings to end-users.  In exchange, these providers pay Capitol a flat rate or fixed

20  percentage per digital download (typically 70¢).  As is custom in the industry, and upon

21  information and belief, Capitol typically receives reports from Digital Download Providers that set

22  out the total number of downloads of each recording as set out herein.

23      80.    These Digital Content Providers include, but are not limited to, the following

24  entities:

25          a.      Apple (iTunes Store);

26          b.      Amazon.com;

27          c.      Buy.com;

28          d.      Liquid Digital Media (walmart.com);

1    e.  Napster;

2    f.  MOG;

3    g.  Rdio;

4    h.  Rhapsody;

5    i.  Microsoft (Zune Marketplace);

6    j.  eMusic;

7    k.  Verizon Wireless;

8    l.  AT&T Wireless;

9    m.  Nokia;

10    n.  Sprint;

11    o.  T-Mobile;

12    p.  Virgin Mobile;

13    q.  Vodafone;

14    r.  Spotify;

15    s.  MTV;

16    t.  VH1;

17    u.  Zed;

18    v.  Orange;

19    w.  YouTube;

20    x.  MySpace Music;

21    y.  Hudson Soft; and

22    z.  Jamster.

23   81.  As discussed herein, Capitol's agreements with Digital Content Providers

24 constitute licenses and not sales.  As such, under Capitol's Capitol Agreements, Capitol is required

25 to pay Plaintiff and Class members the corresponding royalties for licenses.

26   82.  However, in breach of its contractual obligations under its Capitol Agreements and

27 as an unfair, unlawful, and fraudulent business practice, Capitol has treated its transactions with

28

1   Digital Content Providers as "sales" rather than "licenses."  In so doing, Capitol has applied the

2   incorrect formula for calculating royalties owed to Plaintiff and Class members, taken

3   unjustifiable deductions (including, but not limited to, the Net Sales Deduction, the Container

4   Charge deduction, and the Audiophile Deduction), and applied a royalty percentage that is, in

5   general, less than half of what it should be applying in its computation.

6       83.     Plaintiff is informed and believes that, before violating its obligations to its royalty

7   participants, Capitol vetted the policies and practices at issue in this case at its highest corporate

8   levels; that it commissioned, either on its own initiative or with the support of the U.S. music

9   industry's principal trade organization, so-called "white papers" on the issue; that it analyzed

10  internally the financial consequences of its misconduct and cast it in terms of the additional profit

11  to be made by it avoiding its contractual obligations; and that it repeatedly made public statements

12  characterizing its agreements with Digital Music Providers in the interest of its recording artists.

13      84.     The licensing provision in Capitol's Capitol Agreements provide a higher royalty

14  rate than retail sales because in cases where the record label "licenses" the master recordings, the

15  label is essentially acting as a conduit between the artist and a third party, and the label incurs

16  none of the normal costs of selling phonorecords, such as physical materials, distribution,

17  advertising, and promotion.  Because Capitol incurs none of the traditional costs associated with

18  physical distribution of records when it gives Digital Content Providers the right to distribute or

19  stream digital copies of master recordings, these agreements fall within the types of situations

20  contemplated by the parties when they agreed to the License Royalty Provision.

21      85.     Similarly, the royalty base price in Capitol's Capitol Agreement is generally

22  computed, in part, by deducting a "Container Charge."  However, Container Charges are meant to

23  compensate the record label for the physical packaging of a record, and as such, are inappropriate

24  for digital transmissions that neither have, nor require, physical packaging. Consequently, the

25  royalty base price is unascertainable for digital downloads and cannot apply.

26      86.     The ordinary meaning of a license is the "permission to act," WEBSTER'S THIRD

27  NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1304 (2002), while a sale is (a) an

28

1    actual transfer of title in a copy of the work or (b) the passing of all exclusive, intellectual property

2    rights in a work. *See* 17 U.S.C. § 109 (describing (a)); *Quality King Distribs. v. L'anza Research*

3    *Int'l*, 523 U.S. 135, 145 (1998) (describing (b)).

4          87.    Based on the ordinary meanings of "license" and "sale," the Ninth Circuit found in

5    *F.B.T.* that the record labels "did not 'sell' anything to the download distributors.  The download

6    distributors did not obtain title to the digital files.  The ownership of those files remained with [the

7    label, which] reserved the right to regain possession of the files at anytime, and [the label]

8    obtained recurring benefits in the form of payments based on the volume of downloads."  The

9    facts in this case are analogous and, as such, the ordinary meaning of these words supports a

10   finding that these agreements were "licenses" under the License Royalty Provision and not

11   "sales."

12         88.    Under the first sale doctrine, after the first sale of a legally copyrighted work, the

13   copyright holder no longer has a right to restrict or prevent subsequent sale of their work.  Thus,

14   purchasers are free to resell CDs and other physical music products that were lawfully purchased

15   without obtaining the copyright holder's approval.  The U.S. Copyright Office, however, has

16   declined to extend this doctrine to digital media further arguing against these types of transactions

17   as "sales" as opposed to "licenses."

18         89.    Former Apple CEO, Steve Jobs, published a piece entitled "Thoughts on Music" on

19   February 6, 2007 in which he stated, "Since Apple does not own or control any music itself, it

20   must **license** the rights to distribute music from others, primarily the 'big four' music companies:

21   Universal, Sony BMG, Warner, and EMI."  (Emphasis added.)  Thus, the CEO of the largest

22   Digital Download Provider in the world has characterized its agreement with Capitol as a

23   "license" and not a "sale."

24         90.    In its terms of service of the iTunes Store, Apple states that "Apple and its

25   **licensors** reserve the right to change, suspend, remove, or disable access to any iTunes products,

26   content, or other materials."  (Emphasis added.)  Thus, Apple has explicitly acknowledged that it

27   licenses content from third parties, which includes Capitol.

28

91.     The misleading and deceptive nature of Capitol's policy was also reflected in Congressional testimony given in 2008 by Jeffrey Harleston, now the Senior-Vice President for Business & Legal Affairs for UMG, who gave testimony on behalf of the RIAA on July 29, 2008 before the Judiciary Committee of the United States Senate in which he stated: "[f]or example, at Geffen records we *license* the use of our recordings to hundreds of companies, from Amazon.com, MTV, MySpace and Verizon, to television programs like 'Grey's Anatomy,' to retail outlets like Wal-Mart, to video games, toys, toothbrushes and greeting cards. What is important is that the negotiation of the *license* in each instance takes into account the market considerations. For example, *a license of a recording for a toothbrush will have a different fee than the license of the same recording when it is selected on demand and downloaded to an iPod. Thus, the actual price each licensor pays can be very different*." (Emphasis added.)

92.     Upon information and belief, the License Royalty Provisions found in Capitol Agreements at issue here and as relevant to the claims herein, are the same or substantially similar to those found in other production and recording agreements across all or substantially all of Capitol's owned and distributed record labels entered into by Capitol and/or its predecessors in interest and/or affiliates.  Those agreements call for higher royalty accountings and payments to recording artists and producers for licensing of masters rather than a lesser percentage as a royalty paid to the artist or producer based on units sold.

**G.     Capitol's Failure to Provide a Proper Calculation of its Royalty Obligations Has Caused Substantial Damages to Plaintiff and the Class**

93.     Capitol's accounting practices, as alleged herein, have caused Capitol to illegally withhold a substantial amount of money it receives from Digital Content Providers at the expense of Plaintiff and the Class.

94.     As a result, Capitol has paid and continues to pay Plaintiff and Class Members much lower royalties than it should be paying them for moneys received from Digital Content Providers.

95.     As a result of Capitol's deceit regarding the nature of its license agreements with

Digital Content Providers and its systematic violation of its contractual obligations to Plaintiff and other Class members to make proper royalty payments and to properly credit royalty accounts pursuant to its agreement, Capitol has caused substantial damages to Plaintiff and Class members, the exact amount to be determined at trial.

96.     At all relevant times, Capitol has had a duty and obligation under its recording agreements with Plaintiff and other Class Members to properly and accurately account for royalties received by Capitol from Digital Content Providers, to which Capitol has licensed the master recordings of Plaintiff and other Class members.  However, rather than fulfilling its contractual obligations, Capitol has systematically, knowingly, and intentionally miscalculated the royalties due to Plaintiff and other Class members.  As a result, Capitol has under-credited and/or underpaid each and every Class member, while also deriving substantial financial benefits from its licensing of these master recordings.

**H.     Plaintiff Has Provided Defendant With Notice And An Opportunity To Cure Its Failure to Provide Proper Payment**

97.     On March 30, 2012, Plaintiff filed a Complaint against, inter alia,  Capitol, (ECF No. 1), on behalf of herself and all others similarly situated, thereby providing notice to Defendant of its deficient royalty payments and various breaches of the 1979 Agreement and the 1985 Agreement.

98.     On June 19, 2012, Plaintiff, by and through her counsel, provided additional notice to Defendant via certified mail, return receipt requested, of Defendant's deficient payment of royalties and various other breaches of the 1979 Agreement and the 1985 Agreement.

99.     As of the filing of this Complaint, Defendant has refused to cure or correct their deficient payments.

**I.     Limitations of Remedies Clauses in the Agreements Should Not Be Enforced**

100.     The 1979 Agreement contains a provision that purports to render all account or royalty statements "final, conclusive and binding on [Plaintiff] and shall constitute an account stated," unless Plaintiff specifically requests to inspect Capitol's records with regard to that statement within three years, and hires a CPA at her own expense to review Capitol's records. 1979 Agreement, Section 3.f.  The clause further provides that Plaintiff "shall be foreclosed from maintaining any action, claim or proceeding against [Capitol] in any forum or tribunal with respect to any statement or accounting due hereunder unless such action . . . is commenced . . . within four years after the receipt of such statement or accounting." *Id.*

101.     The 1985 Agreement has a similar clause at Section 7.h(ii), that purports to bar any action commenced more than four years after the receipt of a royalty statement or accounting.

102.     These clauses are so one sided in their burdens and benefits and present such a complete lack of meaningful choice for Plaintiff that they should not be enforced.

103.     Where, as here, Defendant knowingly underpaid Plaintiff by reporting digital download licenses as sales of physical record sales, and concealed the fact that the sales were improperly accounted for, that clause would purport to immunize Defendant from its own knowing or intentional wrongful acts.  By contrast, California state law provides a similar four year statute of limitations for breach of contract cases, but allows the tolling of that statute of limitations in the case of fraudulent concealment.

104.     Here, in particular, Capitol's breaches of the two contracts were difficult, if not impossible, for Plaintiff to detect, as all she was given was a royalty statement.  Plaintiff could not discover any breach of contract without hiring an expensive CPA at her own cost to do a costly spot-check.  Nor would breaches be apparent from her royalty statements unless the sales numbers did not match public reports.  Simply taking licenses from one category and reporting them as another category could constitute a serious breach, but would not be readily perceivable to Plaintiff.

105.     Defendant, by contrast, knowingly breached the contract and was in a far superior position to determine whether it was breaching the contract.

106.     Further, because of the nature of the breach and Defendant's fraudulent concealment thereof, it was a natural consequence that Plaintiff and others would remain unaware of the breach, a fact of which Defendant must have been aware.

107.     Furthermore, the limitation of remedies clauses in these agreements violate public policy, and should not be enforced.  Public policy, embodied in California law, applies a statute of limitations, but prevents wrongdoers from profiting from their own fraudulent concealment by tolling that statute of limitations in the case of fraud.  The contract clauses here contravene that public policy.

## VI.  CLASS ACTION ALLEGATIONS

108.     Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of herself and the following Class:

> All persons and entities who entered into Capitol or its prede-cessors-in-interest (including its label and affiliates) production or recording agreements from January 1, 1965 to April 30, 2004 and who, along with their agents, successors in interest, assigns, heirs, executors and administrators, received royalties on, or financial credits or adjustments for, income received by Capitol from Digital Content Providers at a rate less than the rate provided for licensing income in their contract with Capitol (hereinafter, the "Class").

109.     The following persons and entities are excluded from the Class: (1) Capitol, UMG and EMI and their respective subsidiaries, affiliates, officers, and employees; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

110.     Plaintiff reserves the right to redefine the Class prior to certification.

111.     This action is properly maintainable as a class action.

112.     The Class for whose benefit this action is brought is so numerous that joinder of all Class members is impracticable.  While Plaintiff does not presently know the exact number of Class members, Plaintiff is informed and believes that there are tens of thousands of Class members, and that those Class members can only be determined and identified through Capitol's

1  files and, if necessary, other appropriate discovery.

2        113.    There are questions of law and fact which are common to Class members and

3  which predominate over any questions affecting only individual members of the Class.  A class

4  action will generate common answers to the below questions, which are apt to drive the resolution

5  of the litigation:

6           a.    Whether Capitol violated its recording agreements by, *inter alia*,

7  mischaracterizing the money it received from Digital Content Providers as "sales" income rather

8  than "license" income in violation of the recording agreements;

9           b.    Whether Capitol benefited financially from its wrongful acts;

10           c.    Whether Capitol acted in a manner calculated to conceal the illegality of its

11  actions from recording artists and music producers;

12           d.    Whether Capitol will continue collecting licensing income from Digital

13  Content Providers and misrepresent the royalties due for such licensing income to its recording

14  artists and music producers despite knowing that such misrepresentation constitutes a breach of its

15  artists' recording contract;

16           e.    Whether Capitol, by way of the conduct alleged herein, must comply with

17  California Code of Civil Procedure §§ 337 and 337a and provide a proper accounting of the

18  amounts owed to Plaintiff and other Class members;

19           f.    Whether Capitol, by way of the conduct alleged herein, engaged in

20  deceptive or unfair acts or practices in violation of California unfair trade practices laws, including

21  but not limited to California Business & Professions Code §§ 17200, *et seq.,* for which Plaintiff

22  and other Class members are entitled to recover;

23           g.    Whether, assuming Capitol intends to continue breaching its contractual

24  obligations to Plaintiff and other Class members, and/or to violate California state law, declaratory

25  and injunctive relief is appropriate to curtail its conduct as alleged herein;

26           h.    Whether Plaintiff and other Class members have been damaged by

27  Capitol's actions or conduct; and

28

1          i.      The proper measure of damages.

2      114.    Plaintiff is committed to prosecuting this action and has retained competent counsel

3   experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of other Class

4   members and Plaintiff has the same interests as other Class members.  Plaintiff has no interests

5   that are antagonistic to, or in conflict with, the interests of the other members of the Class.

6   Plaintiff is an adequate representative of the Class and will fairly and adequately protect the

7   interests of the Class.

8      115.    The prosecution of separate actions by individual Class members could create a

9   risk of inconsistent or varying adjudications with respect to individual members of the Class,

10  which could establish incompatible standards of conduct for Capitol or adjudications with respect

11  to individual members of the Class which would, as a practical matter, be dispositive of the

12  interests of the members of the Class not parties to the adjudications.

13     116.    Furthermore, as the damages suffered by some of the individual Class members

14  may be relatively small, the expense and burden of individual litigation make it impracticable for

15  the individual members of the Class to redress the wrongs done to them individually.  If a Class or

16  general public action is not permitted, Class members will continue to suffer losses and Capitol's

17  misconduct will continue without proper remedy.

18     117.    Capitol has acted and refused to act on grounds generally applicable to the entire

19  Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with

20  respect to the Class as a whole.

21     118.    Plaintiff anticipates no unusual difficulties in the management of this litigation as a

22  class action.  Class members may be identified from Capitol's records and such Class members

23  may be notified of the pendency of this action by mail or by electronic means (like email), using

24  techniques and a form of notice customarily used in class actions.

25     119.    For the above reasons, a class action is superior to other available methods for the

26  fair and efficient adjudication of this action.

27                          **VII.  <u>CAUSES OF ACTION</u>**

28

### FIRST CAUSE OF ACTION
### (Breach of Contract)
### (On Behalf of Plaintiff and All Class Members)

120.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

121.    Plaintiff and Class members entered into a Capitol Agreement with Capitol or one of its affiliates.

122.    These Capitol Agreements contained the same or substantially similar terms relating to the treatment of licensing income for royalty accounting.  By definition, such licensing income includes income derived from the licensing of recordings to Digital Content Providers.

123.    Plaintiff and other Class members have performed their obligations under their respective recording agreements by providing master recordings to Capitol to exploit.  At no point did Capitol advise Plaintiff and Class members that such master recordings were non-conforming or otherwise objectionable.  As a result, all conditions required for Capitol's performance under the written contracts—namely, the payment of the appropriate royalties to Plaintiff and Class members—have occurred.

124.    By reason of the foregoing, and other acts not presently known to Plaintiff and Class members, Capitol has materially breached its contractual obligations under its pertinent Capitol Agreements between itself and Class members by failing to properly account and provide adequately royalty compensation to Plaintiff and Class members with regard to licensing of master recordings to Digital Content Providers.  Furthermore, Capitol has disregarded the rights of Plaintiff and other Class members by breaching its contractual obligations.

125.    Capitol has failed and refused to cure these breaches and continues to incorrectly calculate these royalties in violation of Plaintiff's and Class members' recording agreements.  Furthermore, Capitol has continued to disregard the rights of Plaintiff and other Class members.

126.    By reason of the foregoing, Plaintiff and other Class members have been damaged in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Declaratory Judgment)**
**(On Behalf of Plaintiff and All Class Members)**

127.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

128.    Pursuant to its Capitol Agreements, Capitol is obligated to pay and/or credit Plaintiff and other Class members a certain percentage of the income Capitol derives from its licensing of master recordings, produced for Capitol by Plaintiff and other Class members, to Digital Content Providers, but that Capitol has failed to provide sufficient payment/credit to Plaintiff and other Class members by illegally mischaracterizing these licenses as sales.

129.    Plaintiff and other Class members have no adequate remedy at law.

130.    By reason of the foregoing, there is a present controversy between Plaintiff and other Class members, on the one hand, and Capitol, on the other hand, with respect to which this Court should enter declaratory judgment determining that the pertinent recording agreements obligate Capitol to pay and/or credit Plaintiff and other Class members the percentage specified for licensing, rather than for sales, when Capitol licenses the master recordings of Plaintiff and other Class members to Digital Content Providers.

**THIRD CAUSE OF ACTION**
**(Common Counts – Open Book Account:**
**California Code of Civil Procedure § 337a)**
**(On Behalf of Plaintiff and All Class Members)**

131.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

132.    Pursuant to Capitol's agreements with Plaintiff and other Class members, Capitol keeps, and at all relevant times has kept, open book accounts reflecting the debits and credits made to each Class member's account with Capitol from inception.  Plaintiff is informed and believes that said open book accounts include entries reflecting income Capitol has received, and continues

1    to receive, from its license agreements with Digital Content Providers.

2        133.    These book accounts constitute the principal records of the transactions between

3    Capitol and all Class members, including Plaintiff.

4        134.    Plaintiff is informed and believes that said book accounts are, and at all relevant

5    times were, created in the regular course of Capitol's business and kept in a reasonably permanent

6    form and manner.

7        135.    Capitol has become indebted to Plaintiff and other Class members on said open

8    book accounts in an amount equal to Capitol's underpayment on the income Capitol has received,

9    and continues to receive, from its licenses for digital downloads.

10       136.    As such, the outstanding balance owed by Capitol to Plaintiff and other Class

11   members on said open book accounts, including a calculation of the amount of underpayment with

12   respect to digital downloads, can be determined by examining all of the debits and credits recorded

13   for each account.

14

15                        **FOURTH CAUSE OF ACTION**
                  **(Breach of the Covenant of Good Faith and Fair Dealing)**
16                   **(On Behalf of Plaintiff and All Class Members)**

17       137.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs

18   above as though fully set forth herein.

19       138.    The Capitol Agreements between Capitol and the Plaintiff and the Class are bound

20   by the Covenant of Good Faith and Fair Dealing, which requires the contracting parties to perform

21   their duties under the contract in good faith, and not to do anything that will deprive the other

22   parties of the benefits of the contract.

23       139.    Here, the Covenant of Good Faith and Fair Dealing required Capitol to properly

24   account for and pay the Plaintiff and the Class royalties stemming from the license of their

25   musical performances and recordings.

26       140.    In engaging in the acts alleged above, Capitol breached the covenant of good faith

27   and fair dealing by, *inter alia*, improperly accounting for the monies owed to Plaintiff and the

28

Class.

141.     Through its conduct, Capitol has deprived Plaintiff and the Class of the benefits of the contract and has caused financial and economic injuries to Plaintiff and the Class.

142.     Such unfair and bad faith conduct by Capitol proximately caused injury to Plaintiff and the Class.

**FIFTH CAUSE OF ACTION**
**(Violations of California's Unfair Competition Law:**
**California Business & Professions Code §§ 17200, *et seq.*)**
**(On Behalf of Plaintiff and All Class Members)**

143.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

144.     California Business and Professions Code §§ 17200, *et seq.* prohibits any unlawful, unfair, or fraudulent business acts or practices.

145.     As detailed in this Complaint, Capitol has violated the foregoing law, by engaging in unlawful, unfair, and fraudulent business practices.

146.     Capitol engaged in "unlawful" business practices by knowingly and systematically breaching its Capitol Agreements with Plaintiff and other Class members.

147.     Capitol engaged in "unfair" business practices by converting monies properly due Plaintiff and the Class under the express terms of the Capitol Agreements.  Capitol either knew, should have known, or recklessly disregarded that the income it collected from Digital Content Providers was in connection with a license agreement, and as such, that the royalties payable to Plaintiff and other Class members should have been accounted and paid for on this basis.  Capitol's misconduct is contrary to legislatively declared public policy and is immoral, unscrupulous, unethical, and offensive, and causes substantial injury to consumers.

148.     Capital engaged in "fraudulent" business practices by failing to disclose, actively concealing, and affirmatively misrepresenting the unlawful nature of its conduct, the nature of its agreements with Digital Content Providers, and its authority to collect and account for Digital Content income as "sales" rather than "licensing" income. This conduct was likely to mislead

1  objectively reasonable artists, producers, and members of the public, including Plaintiff and other

2  Class members.

3       149.    The harm to Plaintiff and other Class members resulting from Capitol's deceptive

4  and unlawful practices outweighs the utility, if any, of those practices.  There is no possible

5  economic justification for such conduct, and consequently, the gravity of the misconduct

6  outweighs any possible economic justification offered by Capitol.

7       150.    Capitol's illegal conduct, as described herein, is ongoing, continues to this date,

8  and constitutes unfair and fraudulent business acts and practices within the meaning of Business &

9  Professions Code §§ 17200, *et seq.*, as interpreted by the California State Courts.  Furthermore,

10  Capitol's unlawful and unfair business acts and practices present a continuing threat to Plaintiff,

11  Class members, and the general public in that Capitol has refused to publicly acknowledge and

12  correct its wrongdoing, and provide compensation for the damages it has caused.

13       151.    Capitol 's illegal conduct, as described herein, constitutes a conscious and

14  systematic breach of Capitol Agreements, and that breach was done in a like manner as to the

15  Capitol Agreements of all Class Members.

16       152.    Pursuant to California Business & Professions Code § 17203, Plaintiff and other

17  Class members are therefore entitled to:

18          a.    An Order requiring Capitol to cease the acts of unfair competition alleged

19  herein;

20          b.    An Order enjoining Capitol from continuing to account for royalties

21  payable to Plaintiff and Class members in the manner it does for income derived from such

22  licenses;

23          c.    Full restitution of all monies paid to and retained by Capitol otherwise

24  payable to Plaintiff and Class members including, but not limited to, disgorgement pursuant to

25  California Code of Civil Procedure § 384;

26          d.    Interest at the highest rate allowable by law; and

27          e.    The payment of Plaintiff's attorneys' fees and costs under, among other

28

1 | provisions of law, Cal. Code Civ. Proc. § 1021.5, or otherwise to the extent permitted by law.

2

### PRAYER FOR RELIEF

3 | **WHEREFORE,** Plaintiff, on behalf of herself and the other putative Class members,

4 | prays for judgment against Capitol as follows:

5 | 153.   An order certifying the proposed Class, designating Plaintiff as the named

6 | representative of the Class, and designating the undersigned as Class Counsel;

7 | 154.   A declaration that Capitol is financially responsible for notifying all Class members

8 | that the pertinent recording agreements obligate Capitol to pay and/or credit Plaintiff and other

9 | Class members the percentage specified in their contracts for licensing, rather than for sales, and

10 | that Capitol has been improperly accounting for such transactions;

11 | 155.   An injunction requiring Capitol to abide by the express terms of its Capitol

12 | Agreements with regard to licensing of master recordings to Digital Content Providers;

13 | 156.   An award to Plaintiff and the Class of compensatory, exemplary, and/or statutory

14 | damages in an amount to be proven at trial;

15 | 157.   An award of attorneys' fees and costs, as allowed by law;

16 | 158.   An award of pre-judgment and post-judgment interest, as provided by law;

17 | 159.   For leave to amend the Complaint to conform to the evidence produced at trial; and

18 | 160.   Such other and further relief as the Court may deem just and proper.

19

### JURY TRIAL DEMANDED

20 | Plaintiff, on behalf of herself and the Class, hereby demands a trial by jury.

21

22 | DATED: July 22, 2013                    **PEARSON, SIMON & WARSHAW, LLP**

23

24 | By:        /s/  *Robert G. Retana*
Bruce L. Simon (Bar No. 96241)
25 | Robert G. Retana (Bar No. 148677)
Aaron M. Sheanin (Bar No. 214472)
26 | William J. Newsom (Bar No. 267643)
**PEARSON, SIMON & WARSHAW, LLP**
27 | 44 Montgomery Street, Suite 2450
San Francisco, CA  94104
28 | Telephone: (415) 433-9000

Facsimile:  (415) 433-9008
bsimon@pswlaw.com
rretana@pswlaw.com
asheanin@pswlaw.com
wnewsom@pswlaw.com

Clifford H. Pearson (Bar No. 108523)
Daniel L. Warshaw (Bar No. 185365)
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA  91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104
cpearson@pswlaw.com
dwarshaw@pswlaw.com

Neville L. Johnson (Bar No. 66329)
Douglas L. Johnson (Bar No. 209216)
James T. Ryan (Bar No. 210515)
**JOHNSON & JOHNSON LLP**
439 N. Canon Drive, Suite 200
Beverly Hills, CA  90210
Telephone: (310) 975-1080
Facsimile:  (310) 975-1095
njohnson@jjllplaw.com
djohnson@jjllplaw.com
jryan@jjllplaw.com

Michael D. Hausfeld (*pro hac vice* pending)
James J. Pizzirusso (*pro hac vice* pending)
**HAUSFELD LLP**
1700 K Street, NW Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile:  (202) 540-7201
mhausfeld@hausfeldllp.com
jpizzirusso@hausfeldllp.com

Michael P. Lehmann (Bar No. 77152)
Bruce J. Wecker (Bar No. 78530)
Arthur N. Bailey, Jr. (Bar No. 248460)
**HAUSFELD LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile:  (415) 358-4980
mlehmann@hausfeldllp.com
bwecker@hausfeldllp.com
abailey@hausfeldllp.com

Paul R. Kiesel (Bar No. 119854)
Jeffrey A. Koncius (Bar No. 189803)
**KIESEL + LARSON LLP**
8648 Wilshire Boulevard

THIRD AMENDED COMPLAINT

1  Beverly Hills, CA 90211
   Telephone: (310) 854-4444
2  Facsimile: (310) 854-0812
   kiesel@kbla.com
3  koncius@kbla.com

4  David M. Given (Cal. Bar No. 142375)
5  **PHILLIPS, ERLEWINE & GIVEN LLP**
   50 California Street, 35th Floor
6  San Francisco, CA 94111
   Telephone: (415) 398-0900
7  Facsimile: (415) 398-0911
   dmg@phillaw.com
8

9  Michael W. Sobol (Cal. Bar No. 194857)
   **LIEFF CABRASER HEIMANN &**
10 **BERNSTEIN, LLP**
   275 Battery Street, 29th Floor
11 San Francisco, California 94111
   Telephone:  (415) 956-1000
12 Facsimile:  (415) 956-1008
   msobol@lchb.com
13

14 Leonard B. Simon
   **LAW OFFICES LEONARD B. SIMON P.C.**
15 655 West Broadway, Suite 1900
   San Diego, California 92101
16 Telephone:  (619) 338-4549
   Facsimile:  (619) 231-7423
17 lens@rgrdlaw.com

18

19

20

21

22

23

24

25

26

27

28